# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

United States District Court
Southern District of Texas
FILED

MAR 27 2000

Michael N. Milby, Clerk

| | | |
|---|---|---|
| ANA AGUIRRE, et al., | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. C-00-61 |
| | § | |
| CITGO PETROLEUM CORPORATION, | § | |
| et al., | § | |
| | § | |
| **Defendants** | § | |

## DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' MOTION TO REMAND

Defendants CITGO Petroleum Corporation, CITGO Refining and Chemicals Company, L.P., (collectively, "CITGO") and co-defendant Al Prebula hereby file this opposition to Plaintiffs' Motion to Remand. CITGO removed this case to federal court because it involves diverse parties and an amount in controversy in excess of $75,000. In support of their opposition, defendants incorporate herein the representations as stated in their Notice of Removal filed on February 11, 2000.

## I. INTRODUCTION AND STATEMENT OF FACTS

Plaintiffs, residents of Corpus Christi, Texas, filed this action against the defendants seeking damages for personal injuries allegedly suffered as a result of exposure to the chemicals associated with the May 12, 1997 fire at CITGO's Corpus Christi refinery.[1] *See* Plaintiffs' Original Petition

---

[1] This action is similar to other actions pending before this Court. *Aguilar, et al. v. CITGO Refinery Company, L.P., et al.,* C.A. No. C-97-279 ("*Aguilar I*") (consolidated with *Balderas, et al. v. CITGO Petroleum Corporation,* C.A. No. C-97-668 (jointly referred to as "*Consolidated Aguilar*")); *Branton, et al. v. CITGO Petroleum Corp., et al.,* C.A. No.

43256:915754.1:032700

attached as Exhibit A of Defendants' Notice of Removal.

In a transparent attempt to defeat CITGO's right to remove this case to federal court, plaintiffs fraudulently joined Defendants Prebula and H.B. Zachry Company ("Zachry") .[2] *See Id.* Defendant Prebula is CITGO's former Corpus Christi plant manager, who was not present at the time of the explosion and outbreak of fire, and who acted at all material times solely by virtue of authority granted by his employer to facilitate the purposes of his employment at CITGO. Prebula was not the plant manager during the 1995 turnaround in the alkylation unit that is involved in the May 12th fire at the Corpus Christi refinery, and did not take any affirmative act with respect to the inspection or replacement of pipes during the 1995 maintenance turnaround. Zachry is a corporation that worked on the 1995 turnaround as a contractor at all times under the direction and control of CITGO. Zachry had no contractual duty that could give rise to liability to the plaintiffs in this

---

C-98-585; *Cavada, et al. v. CITGO Petroleum Corp., et al.,* C.A. No. C-99-227; *Barrera, et al. v. CITGO Petroleum Corp., et al.,* C.A. No. C-99-279; *Vela, et al. v. CITGO Petroleum Corp.,* C.A. No. C-99-254; *Aguilar, et al. v. CITGO Refining Co., et al.,* C.A. No. C-99-257; *Acevedo, et al. v. CITGO Refining Co., et al.,* C.A. No. C-99-258; *Avila, et al. v. CITGO Petroleum Corp., et al.,* C.A. No. C-99-370; *Acosta, et al. v. CITGO Petroleum Corp., et al.,* C.A. No. C-99-379; *Pena, et al. v. CITGO Petroleum Corp., et al.,* C.A. No. C-99-402; *Hinojosa v. CITGO,* C.A. No. C-99-404; *Aguilar, et al. v. CITGO Refining and Chemicals Co., et al.,* C.A. No. C-99-405; *Gonzalez, et al. v. CITGO Petroleum Corp., et al.,* C.A. No. C-99-406; *Abrego, et al. v. CITGO Petroleum Corp., et al.,* C.A. No. C-99-407; *Shurtloff, et al. v. CITGO Petroleum Corp., et al.,* C.A. No. C-99-410.

[2] The consent of Defendant H.B. Zachry Company to remove this case was not required because Zachry has been fraudulently joined in an effort to avoid this Court's jurisdiction. *See Martineau v. Arco Chemical Co.,* 25 F. Supp.2d 762, 767 (S.D. Tex. 1998) (holding that a "[n]otice of removal . . . does not require the consent of co-defendants that were fraudulently joined to defeat diversity jurisdiction").

action. Zachry completed the work it contracted to perform, and the work it performed did not cause the May 12th fire.

As shown below and detailed in Defendants' Notice of Removal, the amount in controversy exceeds $75,000, and diverse citizenship exists between the plaintiffs and the proper defendants in this action. Thus, CITGO properly removed this case to federal court. CITGO now urges this Court to deny Plaintiffs' Motion to Remand.

## II. ARGUMENT

In order for a federal court to exercise diversity jurisdiction over this matter, the court must find that: (1) the suit is between citizens of different states and (2) that the amount in controversy is $75,000 or more, exclusive of interest and costs. 28 U.S.C. § 1332. The allegations in Plaintiffs' Original Petition, the governing case law and the circumstances of this case, demonstrate that diversity jurisdiction exists and the amount in controversy exceeds $75,000. Thus, Plaintiffs' Motion to Remand should be denied.

### A.    Plaintiffs Have Fraudulently Pled Their Damages

In their Petition, the plaintiffs seek to recover unspecified damages. The mere fact that plaintiffs have alleged, as prohibited by the Tex. R. Civ. P. 47(b), damages not to exceed $75,000 is not dispositive here. *See De Aguilar v. Boeing Company*, 47 F.3d 1404, 1410 (5th Cir. 1995) (*"De Aguilar II"*) ("The face of the plaintiff's pleading will not control if made in bad faith."). Yet, this allegation is most telling in that it reveals the lengths to which the plaintiffs will go to avoid federal jurisdiction. Conclusory allegations of damages by the plaintiff are not dispositive, but may be

demonstrated by a removing party to be understated upon a showing, by a preponderance of the evidence, that the actual amount *likely* to be awarded, or otherwise in controversy, is sufficient to invoke federal jurisdiction. *De Aguilar II,* 47 F.3d at 1412; *see also Allen v. R&H Oil & Gas Co.,* 63 F.3d 1326, 1335 n.14 (5th Cir. 1995) ("where plaintiffs claims can be proved to be of the type that are worth more than [$75,000], they can be removed unless the plaintiff can show he is legally bound to accept less"). CITGO has made just such a demonstration with regard to plaintiffs alleged damages.

Defendants CITGO and Prebula removed this case because it became clear that it was more likely than not that the amount in controversy exceeds $75,000.[3] Plaintiffs attempt to create a smoke screen around the real issue here, which is that plaintiffs intend to seek punitive damages. *See* Exhibit C of Defendants' Notice of Removal. Plaintiffs refuse to disavow punitive damages. *See id.*

CITGO has requested, *as is permitted under the law,* that the punitive damages be considered with the likely compensatory damages to determine the amount in controversy. *See St. Paul Reinsurance Co. v. Greenberg,* 134 F.3d 1250, 1253 (5th Cir. 1998) (punitive damages to be

---

[3] On February 22, 2000, the Court ordered the parties to confer on amount-in-controversy jurisdictional issues and file a discovery plan to ascertain damages claimed by plaintiffs on March 3, 2000. Exhibit A (February 22, 2000 Memorandum and Order). On March 3, 2000, CITGO filed a proposed discovery plan to ascertain plaintiffs' damages. Exhibit B (Defendants' Report of the Meeting and Discovery Plan to Ascertain Damages Pursuant to the Court's February 22, 2000 Order). Plaintiffs also filed a proposal for providing damages information on March 3. Exhibit C (Plaintiffs' Advisory to the Court). Plaintiffs' proposal shows a continuation of their attempt to conceal from CITGO and the Court the amount of damages they will seek in this case.

considered in ascertaining amount in controversy); *see also Watson v. Shell Oil Co.,* 979 F.2d 1014, 1021 (5th Cir. 1992) ("When a claim includes compensatory and punitive damages, both must be considered in determining the amount in controversy."); *Goldstein v. Dickinson,* 1998 U.S. Dist. LEXIS 15544, * 3 (N.D. Tex. September 25, 1998) (court must consider punitive damages and attorneys fees in determining the amount in controversy), attached hereto as Exhibit D; 14A Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 3702 (2d Ed. 1985) ("exemplary or punitive damages, if permitted under the governing law, can be included in determining whether the amount in controversy has been met") (footnote omitted).

As stated in Defendants' Notice of Removal, the jurisdictional amount is satisfied in this case, because statutory provisions governing the award of exemplary damages in Texas provide for amounts of up to two times economic damages plus an amount equal to non-economic damages not to exceed $750,000.00 against a defendant. TEX. CIV. PRAC. & REM. CODE § 41.008(b)(1). Accordingly, should the plaintiffs prevail on issues of liability resulting in an award of compensatory damages sought and establish gross negligence on the part of the defendants, exemplary damages in excess of $75,000.00 could be awarded.[4]   In fact, Texas law allows $200,000.00 in exemplary damages on only nominal recoveries. *Id.* at § 41.008(b)(2). Significantly, this Court has already found that the jurisdictional amount was met in the other cases claiming punitive damages as a result

---

[4] CITGO will, in fact, vigorously contest the legitimacy and scope of the plaintiffs' damage claims at time of trial. CITGO's arguments here relate to the assumption, for purposes of establishing its legitimate entitlement to diversity jurisdiction, that the plaintiffs' claims when taken as true and provable at trial, would comport with awards in other cases and circumstances which are credible, demonstrating a probable award in excess of the minimal jurisdiction amount of this Court.

43256:915754.1:032700                    5

of this incident. *See* Exhibit C of Defendants' Notice of Removal (Order, dated June 23, 1998, finding "that the amount in controversy exceeds $75,000 between each plaintiff and each defendant," *Saenz, et al. v. CITGO Petroleum Corp., et al.,* C.A. No. 97-411 and *Robles, et al. v. CITGO Petroleum Corp., et al.,* C.A. No. 412).

Moreover, plaintiffs have not established to a legal certainty that the amount in controversy does not exceed $75,000 or that they *would not* be able to recover more in state court than what is alleged in their complaint. *See St. Paul Mercury Indemnity Co.*, 303 U.S. at 289 ("it must appear to a legal certainty that the claim is really for less than the jurisdictional amount"). Plaintiffs have not satisfied the requirement that they show that, as a matter of law, it is *certain* that they will not be able to recover more than $75,000. *See De Aguilar II*, 47 F.3d at 1411. In *De Aguilar II*, the court succinctly held that "if a defendant can show that the amount in controversy actually exceeds the jurisdictional amount, the plaintiff must be able to show that, *as a matter of law*, it is certain that he will not be able to recover more than the damages for which he has prayed in the state court complaint. Such a rule is necessary to avoid the sort of manipulation that has occurred in the instant case." *Id.* (emphasis added). Plaintiffs cannot and have not satisfied this requirement. The Texas statute regarding punitive damages clearly allows damages in excess of $75,000, and similar chemical exposure cases demonstrate that damages can exceed well over $75,000. *See* Exhibit E (Survey of Environmental/Toxic Exposure Damages) attached hereto. Moreover, plaintiffs' counsel has, in essence, admitted that plaintiffs will pursue punitive damages.

**B.     As a Matter of Texas Law a Cause of Action Cannot Exist Against Defendants Prebula and Zachry**

**1.     Plaintiffs Cannot Establish that Defendant Prebula Owed Them a Legal Duty**

Plaintiffs have ignored the case law and established facts of this case. As explained in the Notice of Removal, plaintiffs have fraudulently joined Prebula because they have no chance of recovery against him. *See Burden v. General Dynamics Corp.*, 60 F.3d 213 (5th Cir. 1995) (defendant has been fraudulently joined and removal is appropriate when plaintiff has engaged in fraudulent pleading or has no chance of recovery against the non-diverse defendant). In identical cases, involving the same event, this Court has already reached this conclusion. *See* Order Denying Motion to Remand and Dismissing Defendant Al Prebula attached as Exhibit D of Defendants' Notice of Removal.

The law is clear that in order to be found negligent a party must first owe a legal duty. *See C.J. Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). Defendant Al Prebula's sole involvement in the underlying transaction is the exclusive result of his employment as the plant manager of CITGO's Corpus Christi refinery at the time of the fire in 1997. Plaintiffs miss this point in their motion to remand. Plaintiffs intimate that it is enough that Prebula was the plant manager in 1997. Yet, Prebula has no personal duty that could give rise to liability because he did not knowingly participate in any tortious conduct, which caused the May 12th fire.

**a.  Prebula only acted within the scope of his employment with CITGO**

The general rule is that a corporate officer cannot be held personally liable for activities performed in the scope of his duties for the corporation. *See Leitch v. Hornsby*, 935 S.W.2d 114, 117 (Tex. 1996); *Portlock v. Perry*, 852 S.W.2d 578, 582 (Tex. App. – Dallas 1993) (citing *Delaney*

*v. Fidelity Lease Ltd.*, 526 S.W.2d 543 (Tex. 1975)); *see also Palmer v. Wal-Mart Stores, Inc.*, No. CIV. A. G-99-523, 1999 WL 759804, at *1 (S.D. Tex. Sept. 22, 1999) (negligence action brought by customer against corporations that operated store and store manager), attached hereto as Exhibit F; *Read v. Scott Fetzer Co.*, 990 S.W.2d 732 (Tex. 1998) (negligence action brought by a customer against manufacturer and distributor who operated as an independent contractor); *Williams v. Olivo*, 952 S.W.2d 523 (Tex. 1996) (negligence action brought by independent contractor's employee against general contractor and its on-site representative); *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426 (Tex. 1996) (tortious interference with contract, fraud, conspiracy and breach of contract action brought by a partnership against other corporations and officers).

Significantly, in *Palmer*, the plaintiff filed a slip and fall claim in state court against Sam's Club, Wal-Mart, and the store manager for the Sam's Club where the incident took place. Defendants removed the case to federal court, contending that the store manager had been fraudulently joined to avoid diversity jurisdiction. The Court held that the plaintiff failed to allege that the store manager had any independent duty of reasonable care toward the plaintiff, apart from that which Sam's Club owed any store patron. *Palmer*, No. CIV. A. G-99-523, 1999 WL 759804, at * 2. The Court noted that there were no allegations that the store manager committed any intentional torts. The Court stated that "[p]laintiff merely claims that [the store manager] was 'negligent in allowing the defect to exist on the premises in the Defendants' store.' Hence Plaintiff simply alleges that [the store manager] is liable for some action plainly committed within the course and scope of his employment as a Sam's Club manager. In light of the controlling <u>Leitch</u> precedent, the joinder of [the store manager] for purposes of defeating diversity jurisdiction *borders on being sanctionable*." *Id.* (emphasis added).

Plaintiffs cannot show that Prebula owed any duty outside of his employment with CITGO.

> **2.    Plaintiffs Cannot Establish that Defendant Zachry Owed Them a Legal Duty**

Plaintiffs have also fraudulently joined Zachry, because they cannot state an "arguably reasonable basis for predicting that state law might impose liability" against Zachry. *Tedder v. F.M.C. Corp.*, 590 F.2d 115, 117 (5th Cir. 1979). The essential elements of a negligence action are : 1) existence of a duty; 2) breach of that duty; and 3) damages proximately caused by the breach. *C.J. Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995); *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). The threshold inquiry is whether the defendant owes a legal duty to the plaintiff. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995); *Greater Houston Transp. Co.*, 801 S.W.2d at 525. The plaintiffs must show both the existence of a duty and the breach of that duty to establish liability. *Centeq Realty*, 899 S.W.2d at 197; *Greater Houston Transp. Co.*, 801 S.W.2d at 525. The existence of a duty is a question of law for the court. *Id.* There are no facts or law to support an argument that Zachry, as a contractor under CITGO's control, owed a duty to plaintiffs. Yet, establishment of this duty is essential to maintain an action for negligence. *See Thompson v. Graham*, 333 S.W.2d 663, 667 (Tex. Civ. App.—Eastland 1960, writ ref'd n.r.e.).

Under its contract with CITGO, Zachry was only to perform work specified by CITGO. Exhibit 2 of Exhibit E of Defendants' Notice of Removal. There has never been any question that Zachry completed the work it was responsible for performing. Moreover, the refinery was owned by CITGO, plaintiffs do not dispute this; therefore, unless plaintiffs can show some contractual duty on behalf of Zachry to perform such an inspection or determination, Zachry cannot be held liable.

Plaintiffs have not and cannot show such a duty. Lacking any duty or obligation under the contract, Zachry could have no duty, as a matter of law, to the plaintiffs. *See Thompson*, 333 S.W.2d at 667. Accordingly, Zachry should be stricken from the pleadings and its presence should not be considered in determining diversity jurisdiction pursuant to 28 U.S.C. § 1332.

## III.  CONCLUSION

Plaintiffs are attempting to deny CITGO its right to invoke the jurisdiction of this Court. As shown above, this Court has jurisdiction, pursuant to 28 U.S.C. §1332, as the plaintiffs are unable to assert a cause of action against Defendants Prebula and Zachry in this case and the actual amount in controversy exceeds $75,000. The negligence claim that plaintiffs assert against Prebula is not valid under Texas law because it does not arise out of a duty assignable to Prebula personally and independently of his duties as a CITGO employee. Similarly, the negligence claim that plaintiffs assert against Zachry is not valid under Texas law because it does not arise out of any legal duty owed to these plaintiffs by Zachry. Furthermore, plaintiffs have fraudulently pled that their damages do not exceed $75,000.

WHEREFORE, PREMISES CONSIDERED, Defendants CITGO and Al Prebula, respectfully request that the Court deny Plaintiffs' Motion to Remand.

43256:915754.1:032700

10

Respectfully submitted,

By: _Ralph F. Meyer_____

Ralph F. Meyer
State Bar No. 13994300
S.D. Tex. Bar No. 2831
Jack C. Partridge
State Bar No. 15534600
S.D. Tex. Bar No. 10470
ROYSTON, RAYZOR, VICKERY &
WILLIAMS, L.L.P.
1700 Wilson Plaza West
606 N. Carancahua
Corpus Christi, Texas 78476
361/884-8808
361/884-7261 (FAX)

Jeffrey K. Sherwood
State Bar No. 24009354
S.D. Tex. Bar No. 21427
Cheryl A. Falvey
S.D. Tex. Bar No. 21658
Tracy B. McKibben
Akin, Gump, Strauss, Hauer & Feld, L.L.P.
AKIN, GUMP, STRAUSS, HAUER &
FELD, L.L.P.
1333 New Hampshire Avenue, N.W.
Suite 400
Washington, D.C.  20036
(202) 887-4000
(202) 887-4288 (FAX)

ATTORNEYS FOR DEFENDANTS
CITGO REFINING COMPANY, L.P.,
CITGO REFINING & CHEMICALS, L.P.,
CITGO PETROLEUM CORPORATION and
AL PREBULA

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon the

following counsel of record, via certified mail, return receipt requested, this _27__ day of March, 2000.

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
HALL & BATES, L.L.P.
Thomas C. Hall
Charles Court
205 N. Presa Street
Building B, Suite 300
San Antonio, Texas  78205

Of Royston, Rayzor, Vickery & Williams, L.L.P.

43256:915754.1:032700                                        12

United States District Court
Southern District of Texas
ENTERED

FEB 2 3 2000

Michael N. Milby, Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

ANA AGUIRRE, ET AL. §
§
VS. §                    C.A. NO. C-00-61
§
CITGO PETROLEUM CORP., ET AL. §

### MEMORANDUM AND ORDER

The Court is very dubious that the amount in controversy exceeds $75,000 per

plaintiff. The parties are ordered to confer on amount-in-controversy jurisdictional issues and

file no later than March 3, 2000, a discovery plan to ascertain the damages claimed by the

plaintiffs, which, at a minimum, would include injuries sustained, treatment received, medical

costs paid, together with a description of any present injuries or illnesses still being suffered

and demand made. Within 30 days thereafter, all information on damages will be furnished by

plaintiffs to defendants in an electronic format. Failure to furnish the information in a timely

fashion is grounds for dismissal.

The Court also orders the Citgo defendants to furnish Al Prebula for deposition on the

issue of fraudulent joinder. The deposition will be concluded within 30 days from the date of

this order. The deposition will not exceed four hours in length. The Court anticipates an

order similar to this to be entered in other Citgo explosion cases. The deposition is to be

consolidated for these cases. All plaintiffs in all cases are to share the four hours. The



deposition taken will be filed with the Court and serve as the basis of any motion on the part of plaintiffs to remand[1].

In furtherance of this litigation, plaintiffs will furnish to defendants within 90 days the identity of ALL experts that will appear and testify, including but not limited to air modelers and medical causation experts. Within 30 days thereafter, plaintiffs will furnish to defendants a copy of each expert's COMPLETE REPORT. The Defendants shall do the same on that date. Experts not timely designated WILL NOT TESTIFY. Experts will not be allowed to testify at trial outside of their expert report. Motions to challenge the qualifications of the experts must be filed within 10 days after the expert's report is furnished, together with a request for hearing if a hearing is desired.

No trial date will be given until plaintiffs furnish all of the information ordered. The parties shall also proceed with mandatory disclosures under Fed. R. Civ. P. Rule 26 if not already accomplished.

ORDERED this ___22___ day of ___Feb_____, 2000.


_____
H. W. HEAD, JR.
UNITED STATES DISTRICT JUDGE


---

[1] A motion to remand for lack of subject matter jurisdiction may be filed at any time before final judgment. *See Cavillini v. State Farm Mut. Auto Ins. Co.*,, 44 F.3d 256, 264 (5th Cir. 1995); *see also Williams v. Spark Plugs Div. Of General Motors Corp.*, 985 F.2d 783, 786 (5th Cir. 1993).

Case 2:00-cv-00061   Document 9   Filed in TXSD on 03/27/2000   Page 15 of 107

# UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF TEXAS

**MICHAEL N. MILBY**
CLERK OF COURT
P O BOX 61010
HOUSTON, TEXAS 77208

www.txs.uscourts.gov

02/23/00

To:     Ralph F Meyer (aty)

Re:     1.  Notice from the Court
        2.  Notice of Entry of Order of Judgment

---

1.      Enclosed is a notice from The United States District Court for the Southern
        District of Texas.


2.      Enclosed Order of Judgment entered in:

        case number:      2:00-cv-00061

        instrument number: 3



If after three attempts this fax fails, then we will print this notice and mail it to you.  For questions,
please call (713) 250-5768.

Number of pages including cover sheet:    4



The United States Courts for the Southern District of Texas is proud to introduce Web Pacer for Civil, Criminal and Bankruptcy cases. Since PACER's original release in 1991, Pacer has added new features such as Attorney Information, Scanned Orders and the ability to retrieve new case listings by date range. Cost per page view is $.07. Dial-Up Pacer will continue to be at $.60 per minute while you're logged on.

Dial-up Pacer and WebPacer will continue to be maintained and serviced in Houston. Registration will be administered by the Pacer Billing Center in San Antonio Texas.

If you would like to register for *Pacer / WebPacer, please call 1-800-676-6856.

Thank you for being a PACER subscriber.

Sites to visit:

Texas Southern District:
http://www.txs.uscourts.gov

Web Pacer:
http://pacer.txs.uscourts.gov

U.S. Party / Case Index:
http://pacer.uspci.uscourts.gov

(If you're a current PACER subscriber, you're already set up for WebPacer)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

ANA AGUIRRE, ET AL.                    §
                                       §
          Plaintiffs,                  §
                                       §
VS.                                    §      CIVIL ACTION NO. C-00-61
                                       §
CITGO PETROLEUM CORPORATION,           §
et al.                                 §
          Defendants.                  §
                                       §

## DEFENDANTS' REPORT OF THE MEETING
## AND DISCOVERY PLAN TO ASCERTAIN DAMAGES
## PURSUANT TO THE COURT'S FEBRUARY 22, 2000 ORDER

The Defendants file this, their Discovery Plan to Ascertain Damages, pursuant to the

Court's February 22, 2000 Order.

On February 22, 2000, the Court issued an order in the above-captioned case requiring

the parties to confer and file a discovery plan to ascertain the damages claimed by each plaintiff

by March 3, 2000, and that within 30 days thereafter, Plaintiffs must provide to Defendants all

information on damages in an electronic format.  CITGO has called liaison counsel several times

to discuss this order without success.  CITGO has also corresponded with all counsel with only a

few responses.  The history of these efforts is set forth in Exhibit A.  Therefore, in order to

comply with the Court's order, counsel for Defendants sent another letter to Plaintiffs' counsel

with a proposed discovery plan to be presented to the Court.  Exhibit B (Letter from Jeffrey K.

Sherwood to Counsel of February 29, 2000).  As the letter details, Defendants have made several

43256:912364.1:030300



attempts to reach an agreement with Plaintiffs' counsel whereby plaintiffs would provide information regarding their alleged damages. To date, Plaintiffs have neither agreed to Defendants' proposal, *nor proposed one of their own.*

The proposed discovery plan requires that by April 3, 2000, the plaintiffs to CITGO, in an electronic format, the following information:

1. Complete responses to the questionnaire that Mike Terry and Chris Kesler have developed, and which is attached hereto;

2. Identify each symptom, injury, illness and disease alleged to be the result of the May 12 Event or for which each plaintiff otherwise intend to seek damages, including but not limited to physical, mental, emotional or psychological injuries; please state what injury is claimed, and:

   A. When the injury or illness occurred.

   B. Please provide dates associated with each such symptom or complaint, including duration.

   C. What specific materials are claimed to have caused the alleged physical, mental, emotional or psychological injury or illness?

   D. Whether the plaintiff has recovered from any such physical, mental, emotional or psychological injury or illness?

   E. Whether the plaintiff has seen a doctor, psychologist, psychiatrist, curandero, or other counselor because of this alleged mental, emotional or psychological injury or illness, and if so, answer the following for each doctor, psychologist, psychiatrist, curandero or other counselor:

1.   Name and address of this person.

2.   Describe what treatment, if any, you received from this person, including

     any medications prescribed.

3.   The dates of first and last consultation with this person and how many

     times this person has been consulted for this injury or illness?

4.   How much has this person charged you for all visits related to this injury

     or illness?

5.   Did this person refer the plaintiff to any other doctor, psychiatrist,

     psychologist or other counselor because of any such injury or illness, and

     if so, to whom (name and address)?

6.   Medical authorizations for all health care providers identified in

     response to Number 2 above shall be provided as follows: at the

     plaintiff's option, such authorization may be produced to defense

     counsel, or may be provided to Sparkling City Records, such that

     all such records may be ordered at any time thereafter by defense

     counsel.  It is understood that Sparkling City will advise plaintiffs

     of any such order and, upon request and payment by plaintiffs, will

     provide a copy of all records ordered to the plaintiffs;

7.   State whether each plaintiff is claiming lost wages or earnings,

     including any business damage or business losses as a result of the

     injuries alleged in your Petition, and for each period during which any

     such plaintiff allegedly lost wages or earnings:

A.   the dates upon which each such period began and ended;

B.   the total amount of wages or earnings allegedly lost during each such period up to and including the date of the answer hereto;

C.   the reason why any such plaintiff was unable to work or otherwise lost wages or earnings; and

D.   if any such plaintiff suffered any business damage or business losses, the name, address and nature of the business, how the damage occurred, and the amount of the damage or the loss; or

E.   if any such plaintiff is claiming any loss of future earnings please state the date upon which such person became totally or partially unable to work and the total amount of future lost wages or earnings attributed to the occurrences referred to in the Petition;

6.   State the nature and amount of each item of damage and expense, other than as listed above, incurred by each plaintiff that is alleged to have been caused by the occurrences alleged in your Petition; if any plaintiff asserts property damage or devaluation, describe all such damage claimed, including for the use and enjoyment of your property, when and where any alleged property damage occurred, the monetary amount of the damage or devaluation, and whether any insurance claim has been made or will be made for such damage; if such expenses are claimed to be unknown or cannot be determined, state the reason for this assertion;

7.   Production of all documents that verify any and all claims of economic damages, property damage, lost earning capacity, lost income, or out of pocket expenses that

any plaintiff allegedly incurred as a result of the May 12th event; and

8.  Whether each plaintiff will seek punitive damages against CITGO with respect to the

allegations set forth in the respective Petitions.

Respectfully submitted,

By: _____

Ralph F. Meyer
State Bar No. 13994300
S.D. Tex. Bar No. 2831
Jack C. Partridge
State Bar No. 15534600
S.D. Tex. Bar No. 10470
ROYSTON, RAYZOR, VICKERY &
WILLIAMS, L.L.P.
1700 Wilson Plaza West
606 N. Carancahua
Corpus Christi, Texas 78476
361/884-8808
361/884-7261 Facsimile

Jeffrey K. Sherwood
State Bar No. 24009354
S.D. Tex. Bar No. 21427
Cheryl A. Falvey
S.D. Tex. Bar No. 21658
Tracy B. McKibben
AKIN, GUMP, STRAUSS, HAUER &
        FELD, L.L.P.
1333 New Hampshire Avenue, N.W.
Suite 400
Washington, D.C.  20036
(202) 887-4000
(202) 887-4288 (FAX)

ATTORNEYS FOR DEFENDANTS CITGO
PETROLEUM CORPORATION, and
CITGO REFINING & CHEMICALS,
COMPANY, L.P.

SO ORDERED this _____ day of March, 2000, that such information for each and every plaintiff shall be provided to CITGO on or before April 3, 2000.

The failure of any plaintiff to provide this information shall result in dismissal of such plaintiff's claims with prejudice.  The statement by any plaintiff that he or she is not seeking punitive damages shall be treated by the Court as consent to dismissal with prejudice of such punitive damage claims and dismissal shall be ordered accordingly.

_____

UNITED STATES  DISTRICT JUDGE

-6-

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon the following counsel of record, via certified mail, return receipt requested, this 3ᵈ day of March, 2000.

**CERTIFIED MAIL**
**Return Receipt Requested**

Thomas C. Hall, Esq.
Hall & Bates, L.L.P.
Charles Court
205 N. Presa Street
Building B, Suite 300
San Antonio, TX  78205

Of Royston, Rayzor, Vickery & Williams, L.L.P.

Case 2:00-cv-00061  Document 9  Filed in TXSD on 03/27/2000  Page 24 of 107

# AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P

ATTORNEYS AT LAW

AUSTIN
BRUSSELS
DALLAS
HOUSTON
LONDON
LOS ANGELES
MOSCOW
NEW YORK
PHILADELPHIA
SAN ANTONIO
WASHINGTON, D.C.

RIYADH – IN AFFILIATION WITH
LAW OFFICE OF ABDULAZIZ H FAHAD

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
1333 NEW HAMPSHIRE AVENUE, N.W
SUITE 400
WASHINGTON, DC  20036
(202) 887-4000
FAX (202) 887-4288
www.akingump.com

WRITER'S DIRECT DIAL NUMBER 202 887-4440
WRITER'S EMAIL ADDRESS jsherwood@akingump.com

August 19, 1999

**_VIA FACSIMILE  (361) 883-7221_**

Michael G. Terry, Esq.
Edwards, Perry & Haas, L.L.P.
2100 Frost Bank Plaza
P.O. Box 480
Corpus Christi, TX  78403

Re:   *Bobby Abram, et al. v. CITGO Petroleum Corporation; Angel Abrego, et al. v.
CITGO Corporation; David M. Acosta v. CITGO Petroleum Corporation; Ashley
Acuna, et al. v. CITGO Petroleum Corporation; Delia Aguilar, et al. v. CITGO
Petroleum Corporation; Ana Aguirre, et al. v. CITGO Petroleum Corporation;
Paula Avila, et al. v. CITGO Petroleum Corporation; Humberto Barrera, et al. v.
CITGO Petroleum Corporation; Charles Henry Cavada, et al. v. CITGO
Petroleum Corporation; Agustina Reyna Gonzalez, et al. v. CITGO Petroleum
Corporation; Stanley Haak, et al. v. CITGO Petroleum Corporation; Juan
Martinez, et al. v. CITGO Petroleum Corporation; Esteyan Pena v. CITGO
Petroleum Corporation; Benjamin Shurtloff, et al. v. CITGO Petroleum
Corporation; and Seledonio M. Vela, et al. v. CITGO Petroleum Corporation*

Dear Mike:

This will reflect the agreements that we have reached with respect to plaintiffs' responses
to defendants' initial discovery requests served in the above-captioned cases.  The defendant's
discovery requests remain outstanding and this agreement is without prejudice to the plaintiffs'
obligation to respond to all interrogatories, document requests, and requests for admissions at a
later date to be decided.  Also, this agreement does not address the requests for disclosures that
have been served upon the plaintiffs.

You have agreed to provide to the defendant, retrievable through a commercial off-the-
shelf database program, the following information:



EXHIBIT
A

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.

Michael G. Terry, Esq.
August 19, 1999
Page 2

1.  Complete responses by all plaintiffs in all of the above captioned cases to the
    questionnaire that you and Chris Kesler have developed, and which is attached hereto,
    and which will provide answers to Defendant's Interrogatory Nos. 1 & 2;

2.  Identification of health care providers: (a) seen in the last 10 years; (b) seen with
    respect to any alleged chemical exposure; (c) seen in conjunction with any
    workmen's compensation claim; (d) seen in connection with any personal injury
    claim; and (e) seen in connection with any hospitalization;

3.  Responses to Interrogatory Nos. 14 & 22;

4.  Medical authorizations for all health care providers identified in response to
    Interrogatory No. 6 shall be provided as follows: at the plaintiff's option, such
    authorization may be produced to defense counsel, or may be provided to Sparkling
    City Records, such that all such records may be ordered at any time thereafter by
    defense counsel.  It is understood that Sparkling City will advise plaintiffs of any
    such order and, upon request and payment by plaintiffs, will provide a copy of all
    records ordered to the plaintiffs;

5.  Production of all documents sought pursuant to Document Request Nos. 18 & 32,
    except that Request No. 18 shall be modified to require production of documents that
    verify any and all claims of lost earning capacity, lost income, or out of pocket
    expenses that any plaintiff allegedly incurred as a result of the May 12th event; and

6.  Responses to Requests for Admissions Nos. 1 & 2.

It is further understood that these responses shall be factual in nature and not simply
objections to the discovery requests, the parties having negotiated an agreement, as reflected
by this letter, as to the permissible scope of these discovery requests.  The one possible
exception is that you have objected to Request No. 2 as impermissible.  We disagree and will
raise the matter with the court at our earliest opportunity in the event that an objection is
lodged.  You further stated that unless Request No. 2 is actually denied, you have no
obligation to answer Interrogatory No. 22.  We agreed, however, that unless Request No. 2 is
admitted, you will answer Interrogatory No. 22.

It is further agreed that the responses to this discovery shall be served upon the defendant
by August 28, 1999.  During the interim, the parties will discuss the timing for responses by
the plaintiffs to the remaining discovery requests by the defendant.  It was agreed that this
agreement shall include and apply to the following cases removed to federal court, *Barrera,
Cavada* and *Vela*, provided that counsel for the plaintiffs in those cases agree to use best
efforts to answer all defense discovery by August 28, 1999.

Case 2:00-cv-00061   Document 9   Filed in TXSD on 03/27/2000   Page 26 of 107

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.

Michael G. Terry, Esq.
August 19, 1999
Page 3

You agreed to recommend this discovery to the other plaintiffs' counsel, except for Mike O'Briant, and to obtain their consent and approval. This agreement will serve as a Rule 11 agreement in the state court cases, as evidenced by your signature below. We have also provided a signature block for the other counsel to evidence their agreement as well.

Lastly, you inquired about certain discovery of the defendant. We are prepared to be reasonable and responsive to your discovery requests. For several reasons, however, we asked that you reduce your specific requests to writing. Once you have done so, we will undertake to respond promptly.

Sincerely yours,

Jeffrey K. Sherwood

cc: Karen Kennedy, Esq.
    Ralph F. Meyer, Esq.


SEEN AND AGREED TO:


_____
Michael G. Terry
Edwards, Perry & Haas, L.L.P.


_____
Steve T. Hastings
Huerta, Hastings & Allison


_____
Christopher A. Kesler
Fleming & Associates, L.L.P.


_____
Diana M. Martinez
Law Offices of Rene Rodriguez

# AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P

### ATTORNEYS AT LAW

AUSTIN
BRUSSELS
DALLAS
HOUSTON
LONDON
LOS ANGELES
MOSCOW
NEW YORK
PHILADELPHIA
SAN ANTONIO
WASHINGTON, D.C.

RIYADH – IN AFFILIATION WITH
LAW OFFICE OF ABDULAZIZ H. FAHAD

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
1333 NEW HAMPSHIRE AVENUE, N.W.
SUITE 400
WASHINGTON, DC  20036
(202) 887-4000
FAX (202) 887-4288
www.akingump.com

WRITER'S DIRECT DIAL NUMBER 202 887-4440
WRITER'S E-MAIL ADDRESS jsherwood@akingump.com

September 21, 1999

## *VIA FACSIMILE*

Michael G. Terry, Esq.
Edwards, Perry & Haas, L.L.P.
2100 Frost Bank Plaza
P.O. Box 480
Corpus Christi, TX  78403

Steve Hastings, Esq.
Huerta, Hastings & Allison
P.O. Box 23080
924 Leopard Street
Corpus Christi, TX 78403

Alfred Montelongo, Esq.
Montelongo & Montelongo
4824 Korstoryz
Corpus Christi, TX 78415

Hector Rene' Rodriquez, Esq.
Law Offices of Rene Rodriquez
433 S. Tancahua
Corpus Christi, TX 78401

George M. Fleming
Chris A. Kesler
Fleming & Associates, L.L.P.
1330 Post Oak Blvd., Ste. 3030
Houston, TX 77056

Thomas C. Hall, Esq.
Hall & Bates, L.L.P.
205 N. Presa Street
Building B., Ste. 300
San Antonio, TX 78205

Thomas J. Henry
The Law Offices of Thomas J. Henry
5425 S. Padre Island Drive, Ste. 180
Corpus Christi, TX 78411

Charles C. Webb, Jr., Esq.
Law Office of Charles Webb, P.C.
710 Mesquite Street
Corpus Christi, TX 78401

Arnold G. Gonzalez, Esq.
Gonzalez & Gonzalez, L.L.P.
5959 S. Staples Street, Ste. 205
Corpus Christi, TX 78413

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.

September 21, 1999

Page 2

      Re:   *Bobby Abram, et al. v. CITGO Petroleum Corporation; Angel Abrego, et al. v. CITGO Corporation; David M. Acosta v. CITGO Petroleum Corporation; Ashley Acuna, et al. v. CITGO Petroleum Corporation; Delia Aguilar, et al. v. CITGO Petroleum Corporation; Ana Aguirre, et al. v. CITGO Petroleum Corporation; Paula Avila, et al. v. CITGO Petroleum Corporation; Agustina Reyna Gonzalez, et al. v. CITGO Petroleum Corporation; Stanley Haak, et al. v. CITGO Petroleum Corporation; Juan Martinez, et al. v. CITGO Petroleum Corporation; Estevan Pena v. CITGO Petroleum Corporation; Benjamin Shurtloff, et al. v. CITGO Petroleum Corporation; and Seledonio M. Vela, et al. v. CITGO Petroleum Corporation*

Dear Counsel:

      As you may be aware, CITGO has agreed to extend the deadline for plaintiffs' responses to defendants' initial discovery requests served in the respective above-captioned cases until September 30, 1999. As the attached letter indicates, we agreed to allow plaintiffs to provide limited responses by September 30, 1999, if the parties signed the agreement regarding plaintiffs' limited responses to defendants' discovery requests. This agreement is without prejudice to plaintiffs' obligation to respond to all interrogatories and document requests at a later date to be decided.

      This letter is to notify the plaintiffs that they must sign the agreement and/or provide responses to all the items outlined in the attached letter or provide responses to all discovery on September 30, 1999.

                        Sincerely yours,

                        Jeffrey K. Sherwood

Enclosure

cc:  Ralph F. Meyer, Esq.

Case 2:00-cv-00061   Document 9   Filed in TXSD on 03/27/2000   Page 29 of 107

# AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P

ATTORNEYS AT LAW

AUSTIN
BRUSSELS
DALLAS
HOUSTON
LONDON
LOS ANGELES
MOSCOW
NEW YORK
PHILADELPHIA
SAN ANTONIO
WASHINGTON, D.C.

RIYADH — IN AFFILIATION WITH
LAW OFFICE OF ABDULAZIZ H. FAHAD

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
1333 NEW HAMPSHIRE AVENUE, N.W.
SUITE 400
WASHINGTON, DC 20036
(202) 887-4000
FAX (202) 887-4288
www.akingump.com

WRITER'S DIRECT DIAL NUMBER 202 887-4440
WRITER'S E-MAIL ADDRESS jsherwood@akingump.com

September 15, 1999

*VIA FACSIMILE  (361) 883-7221*

Michael G. Terry, Esq.
Edwards, Perry & Haas, L.L.P.
2100 Frost Bank Plaza
P.O. Box 480
Corpus Christi, TX 78403

Re:   *Bobby Abram, et al. v. CITGO Petroleum Corporation; Angel Abrego, et al. v. CITGO Corporation; David M. Acosta v. CITGO Petroleum Corporation; Ashley Acuna, et al. v. CITGO Petroleum Corporation; Delia Aguilar, et al. v. CITGO Petroleum Corporation; Ana Aguirre, et al. v. CITGO Petroleum Corporation; Paula Avila, et al. v. CITGO Petroleum Corporation; Humberto Barrera, et al. v. CITGO Petroleum Corporation; Charles Henry Cavada, et al. v. CITGO Petroleum Corporation; Agustina Reyna Gonzalez, et al. v. CITGO Petroleum Corporation; Stanley Haak, et al. v. CITGO Petroleum Corporation; Juan Martinez, et al. v. CITGO Petroleum Corporation; Estevan Pena v. CITGO Petroleum Corporation; Benjamin Shurtloff, et al. v. CITGO Petroleum Corporation; and Seledonio M. Vela, et al. v. CITGO Petroleum Corporation*

Dear Mike:

This letter is sent as a second attempt to reflect what was previously agreed to with respect to plaintiffs' responses to defendants' initial discovery requests served in the respective above-captioned cases, and to respond to your letter dated September 1, 1999.

We agreed that plaintiffs would provide to the defendant, retrievable through a commercial off-the-shelf database program, the following information:

1.  Complete responses by all plaintiffs in all of the above captioned cases to the questionnaire that you and Chris Kesler have developed, and which is attached hereto, and which will provide answers to Defendant's Interrogatory Nos. 1 & 2;

Case 2:00-cv-00061   Document 9   Filed in TXSD on 03/27/2000   Page 30 of 107

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.

Michael G. Terry, Esq.
September 15, 1999
Page 2

2. Identification of health care providers: (a) seen in the last 10 years; (b) seen with respect to any alleged chemical exposure; (c) seen in conjunction with any workmen's compensation claim; (d) seen in connection with any personal injury claim; and (e) seen in connection with any hospitalization;

3. Responses to Interrogatory Nos. 14 & 22;

4. Medical authorizations for all health care providers identified in response to Interrogatory No. 6 shall be provided as follows: at the plaintiff's option, such authorization may be produced to defense counsel, or may be provided to Sparkling City Records, such that all such records may be ordered at any time thereafter by defense counsel. It is understood that Sparkling City will advise plaintiffs of any such order and, upon request and payment by plaintiffs, will provide a copy of all records ordered to the plaintiffs;

5. Production of all documents sought pursuant to Document Request Nos. 18 & 32, except that Request No. 18 shall be modified to require production of documents that verify any and all claims of lost earning capacity, lost income, or out of pocket expenses that any plaintiff allegedly incurred as a result of the May 12th event; and

6. Responses to Requests for Admissions Nos. 1 & 2.

While we do not object to the questionnaire attached to your letter, it does not satisfy plaintiffs' obligations with respect to our previous agreement as reflected in my August 19, 1999 letter. Specifically, the questionnaire does not entail responses to items 3-6 above. We agreed that plaintiffs would provide responses to all the items outlined above.

It is understood that the responses to defendants' requests shall be factual in nature and not simply objections to the discovery requests, the parties having negotiated an agreement, as reflected by this letter, as to the permissible scope of these discovery requests. We agreed that unless Request for Admission No. 2 is admitted, you would answer Interrogatory No. 22.

It is further agreed that the responses to this discovery shall be served upon the defendant by September 30, 1999. The defendant's discovery requests remain outstanding and this agreement is without prejudice to the plaintiffs' obligation to respond to all interrogatories, document requests, and requests for admissions at a later date to be decided. If we are unable to reach an agreement regarding limited responses to the discovery served upon plaintiffs, responses to all discovery will be due on September 30, 1999. Also, this agreement does not address the requests for disclosures that have been served upon the plaintiffs, as responses to these requests are due immediately.

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.

Michael G. Terry, Esq.
September 15, 1999
Page 3

　　　If the parties sign this agreement regarding plaintiffs' limited responses to defendants' discovery requests, we will discuss the timing for responses by the plaintiffs to the remaining discovery requests.  It was agreed that this agreement shall include and apply to the following cases removed to federal court, *Barrera, Cavada* and *Vela*, provided that counsel for the plaintiffs in those cases agree to use best efforts to answer all defense discovery by September 30, 1999.

　　　You agreed to recommend this discovery to the other plaintiffs' counsel, except for Mike O'Briant, and to obtain their consent and approval.  This agreement will serve as a Rule 11 agreement in the state court cases, as evidenced by your signature below.  We have also provided a signature block for the other counsel to evidence their agreement as well.

Sincerely yours,

Jeffrey K. Sherwood

cc:  Karen Kennedy, Esq.
　　　Ralph F. Meyer, Esq.

SEEN AND AGREED TO:


Michael G. Terry
Edwards, Perry & Haas, L.L.P.


Steve T. Hastings
Huerta, Hastings & Allison


Christopher A. Kesler
Fleming & Associates, L.L.P.


Diana M. Martinez
Law Offices of Rene Rodriguez

# AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.

ATTORNEYS AT LAW

AUSTIN
BRUSSELS
DALLAS
HOUSTON
LONDON
LOS ANGELES
MOSCOW
NEW YORK
PHILADELPHIA
SAN ANTONIO
WASHINGTON, D C

RIYADH - IN AFFILIATION WITH
LAW OFFICE OF ABDULAZIZ H FAHAD

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
1333 NEW HAMPSHIRE AVENUE, N.W.
SUITE 400
WASHINGTON, DC 20036
(202) 887-4000
FAX (202) 887-4288
www.akingump.com

WRITER'S DIRECT DIAL NUMBER 828-4460
WRITER'S E-MAIL ADDRESS jshankcoc@akingump com

October 1, 1999

Michael G. Terry, Esq.
2100 Frost Bank Plaza
P.O. Box 480
Corpus Christi, TX  78403

Steve T. Hastings, Esq.
Huerta, Hastings & Allison
P.O. Box 23080
924 Leopard Street
Corpus Christi, TX  78403

Alfred Montelongo, Esq.
Montelong & Montelongo
4824 Kostoryz
Corpus Christi, TX  78415

Thomas J. Henry, Esq.
The Law Offices of Thomas J. Henry
5425 S. Padre Island Drive, Suite 180
Corpus Christi, TX  78411

Re:  *Humberto Barrera, et al. v. CITGO Petroleum Corporation, et al.; Seledonio M.
     Vela, et al. v. CITGO Petroleum Corporation, et al.; Charles Henry Cavada, et
     al. v. CITGO Petroleum Corporation, et al.; David M. Acosta, et al. v. CITGO
     Petroleum Corporation, et al.; Paula Avila, et al. v. CITGO Petroleum
     Corporation, et al.*

Dear Counsel:

    At the hearing on September 17, 1999, Judge Head ordered the parties to confer
regarding a procedure for disclosure of all damages information.  My notes reflect that the judge

CC-002020

CC-002020

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.

Michael G. Terry, Esq.
Steve T. Hastings, Esq.
Alfred Montelongo, Esq.
Thomas J. Henry, Esq.
October 1, 1999
Page 2

required disclosure of information, on a per plaintiff basis, of all claims for physical or personal injuries, all claims for property damages (which would include all alleged economic damages such as lost wages), and a binding statement as to whether such plaintiff is seeking to recover punitive damages. For every damage claim, a value must also be specifically stated. The Court ordered the parties to confer on this matter within 20 days, and stated that it would enter an order requiring the production of such information within 30-60 days of the hearing if the parties could not otherwise agree.

As you know, we have previously conferred on your clients' responses to CITGO's discovery. I attach the relevant correspondence for your convenience. Most recently, we sent Mike Terry a letter that recited the agreement reached in his offices on July 20. That letter has never been signed by any plaintiff's lawyer, or even acknowledged. We are still agreeable to your production of the information required by Judge Head in these cases by an electronic format, which we understand you were planning to provide for all plaintiffs in all cases (except those filed by Mike O'Briant) by September 30. It is our belief that this information is, or should be, immediately forthcoming. Having heard nothing from any of you, however, we have prepared the attached order for your review and comment. Please contact us by October 4, 1999, so that we may discuss and possibly resolve this issue before the time set by the Court.

Sincerely yours,

Jeffrey K. Sherwood

JKS/pmj
Enclosures

CC-002021

CC-002021

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.

Michael G. Terry, Esq.
Steve T. Hastings, Esq.
Alfred Montelongo, Esq.
Thomas J. Henry, Esq.
October 1, 1999
Page 4

Jeff Mehrer

bbc:    Cheryl A. Falvey, Esq.
        Tracy B. McKibben, Esq.
        Scott E. Seewald, Esq.

CC-002022

CC-002022

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| HUMBERTO BARRERA, ET AL. | ) | |
| | ) | |
| v. | ) | CASE NO. 99-2591-E |
| | ) | |
| CITGO PETROLEUM CORPORATION, ET AL. | ) | |
| | ) | |
| | ) | |
| SELEDONIO M. VELA, ET AL. | ) | |
| | ) | |
| v. | ) | CASE NO. 99-1573-B |
| | ) | |
| CITGO PETROLEUM CORPORATION, ET AL. | ) | |
| | ) | |
| | ) | |
| CHARLES HENRY CAVADA, ET AL. | ) | |
| | ) | |
| v. | ) | CASE NO. 99-2592-C |
| | ) | |
| CITGO PETROLEUM CORPORATION, ET AL. | ) | |
| | ) | |
| | ) | |
| DAVID M. ACOSTA, ET AL. | ) | |
| | ) | |
| v. | ) | CASE NO. 99-2542-A |
| | ) | |
| CITGO PETROLEUM CORPORATION, ET AL. | ) | |
| | ) | |
| | ) | |
| PAULA AVILA, ET AL. | ) | |
| | ) | |
| v. | ) | CASE NO. 99-2551-H |
| | ) | |
| CITGO PETROLEUM CORPORATION, ET AL. | ) | |

## ORDER

Upon all the reasons and considerations stated in court on September 17, 1999, it is

ORDERED that the plaintiffs in each of these cases shall provide to the Court and to defendant

CC-002023

CC-002023

CITGO a complete statement of the nature and amount of all damages sought by each plaintiff herein, including, without limitation, all claims for personal injury and emotional distress, all claims for property damage, and all claims for economic injury of any type, together with a binding statement as to whether such plaintiff intends to seek punitive damages from the defendants, or any of them. Such information for each and every plaintiff shall be provided to the Court and to CITGO on or before November 2, 1999. Such information shall be provided in written form, and may be provided in an electronic format using a standard commercially available software program, and shall be accompanied by a statement from counsel that such counsel has full knowledge of such damage claims, and that the information provided is true, complete and accurate to the best of counsel's knowledge.

The failure of any plaintiff to provide this information shall result in dismissal of such plaintiff's claims with prejudice. The statement by any plaintiff that he or she is not seeking punitive damages shall be treated by the Court as consent to dismissal with prejudice of such punitive damage claims and dismissal shall be ordered accordingly.

Signed this _____ day of _____, 1999.

_____

United States District Judge

CC-002024

CC-002024

## AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P

ATTORNEYS AT LAW

AUSTIN
BRUSSELS
DALLAS
HOUSTON
LONDON
LOS ANGELES
MOSCOW
NEW YORK
PHILADELPHIA
SAN ANTONIO
WASHINGTON, D.C.

RIYADH - N AFFILIATION WITH
THE LAW OFFICE OF ABDULAZIZ H. FAHAD

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
1333 NEW HAMPSHIRE AVENUE, N.W.
SUITE 400
WASHINGTON, DC 20036
(202) 887-4000
FAX (202) 887-4288
www.akingump.com

WRITER'S DIRECT DIAL NUMBER (202) 887-4395
WRITER'S E-MAIL ADDRESS imckibben@akingump.com

February 29, 2000

## VIA FACSIMILE AND FIRST CLASS MAIL

William D. Bonilla, Esq.
Bonilla & Berlanga, Inc.
2727 Morgan Avenue
Corpus Christi, Texas 78405-1821

Steve T. Hastings, Esq.
Karen Kenney, Esq.
Huerta, Hastings & Allison
P.O. Box 23080
924 Leopard Street
Corpus Christi, Texas 78403

Lucinda M. Juarez, P.C.
326 S. Enterprise Parkway
Corpus Christi, Texas 78405

Arnold G. Gonzalez, Esq.
Gonzalez & Gonzalez, L.L.P.
5959 S. Staples Street, Suite 205
Corpus Christi, Texas 78413

Hector Rene' Rodriguez
Law Offices of Rene Rodriguez
433 S. Tancahua
Corpus Christi, TX 78401

Michael G. Terry, Esq.
Edwards, Perry & Haas, L.L.P.
2100 Frost Bank Plaza
P.O. Box 480
Corpus Christi, Texas 78403

Thomas C. Hall, Esq.
Hall & Bates, L.L.P.
Charles Court
205 N. Presa Street
Building B, Suite 300
San Antonio, Texas 78205

Hector Rene Gonzalez, Esq.
Law Office of Hector Rene Gonzalez, P.C.
2818 S. Port Avenue
Corpus Christi, Texas 78405

George M. Fleming, Esq.
Chris A. Kesler, Esq.
Fleming & Associates, L.L.P.
1330 Post Oak Blvd., Ste. 3030
Houston, Texas 77056

Re:   *Angel Abrego, et al. v. CITGO Corporation; Delia Aguilar, et al. v. CITGO Petroleum Corporation; Ana Aguirre, et al. v. CITGO Petroleum Corporation; Humberto Barrera, et al. v. CITGO Petroleum Corporation; Charles Henry Cavada, et al. v. CITGO Petroleum Corporation; Estevan Pena v. CITGO Petroleum Corporation;*



EXHIBIT
B

Case 2:00-cv-00061   Document 9   Filed in TXSD on 03/27/2000   Page 38 of 107

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
Gentlemen
February 29, 2000
Page 2

> *Benjamin Shurtloff, et al. v. CITGO Petroleum Corporation; and Seledonio M. Vela, et*
> *al. v. CITGO Petroleum Corporation*

Dear Counsel:

As you may now be aware, the Court in the above-referenced cases issued orders requiring the parties to confer on the amount-in-controversy jurisdictional issues and file by March 3, 2000, a discovery plan to ascertain the damages claimed by the plaintiffs in these actions.

Through several exchanges of correspondence with Mike Terry and other plaintiffs' counsel we attempted to memorialize the agreement reached in Mr. Terry's offices on July 20, 1999, regarding the information plaintiffs in several cases, including the above-captioned ones, would produce in response to CITGO's discovery requests. That letter was only signed by plaintiffs' lawyer in the *Barrera, Cavadu, Vela* and *Abrego* cases. However, we have not received the information which we were told would be provided by September 30, 1999.

CITGO made several attempts to reach an agreement regarding the production by all the plaintiffs, including Alky Unit cases other than the above-referenced, of information regarding their damages following the Court's ruling during the hearing on September 17, 1999, whereby Judge Head ordered the parties to confer regarding a procedure for disclosure of all damages information. It was our understanding then as it is now, that the judge required disclosure of information, on a per plaintiff basis, of all claims for physical or personal injuries, all claims for property damages (which would include all alleged economic damages such as lost wages), and as to whether such plaintiff is seeking to recover punitive damages.

This letter is sent as an attempt to reflect what was previously agreed to with respect to plaintiffs' responses to defendants' initial discovery requests served in the respective above-captioned cases, as well as to comply with the Court's February 22, 2000 orders issued in the cases.

We agree that by April 3, 2000, each plaintiff will provide to CITGO, in an electronic format, the following information:

1.  Complete responses to the questionnaire that Mike Terry and Chris Kesler have developed, and which is attached hereto;

2.  Identify each symptom, injury, illness and disease alleged to be the result of the May 12 Event or for which each plaintiff otherwise intend to seek damages, including but not limited to physical, mental, emotional or psychological injuries; please state what injury is claimed, and:

   A.   When the injury or illness occurred.

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
Gentlemen
February 29, 2000
Page 3

B.   Please provide dates associated with each such symptom or complaint, including duration.

C.   What specific materials are claimed to have caused the alleged physical, mental, emotional or psychological injury or illness?

D.   Whether the plaintiff has recovered from any such physical, mental, emotional or psychological injury or illness?

F.   Whether the plaintiff has seen a doctor, psychologist, psychiatrist, curandero, or other counselor because of this alleged mental, emotional or psychological injury or illness, and if so, answer the following for each doctor, psychologist, psychiatrist, curandero or other counselor:

   1.   Name and address of this person.

   2.   Describe what treatment, if any, you received from this person, including any medications prescribed.

   3.   The dates of first and last consultation with this person and how many times this person has been consulted for this injury or illness?

   4.   How much has this person charged you for all visits related to this injury or illness?

   5.   Did this person refer the plaintiff to any other doctor, psychiatrist, psychologist or other counselor because of any such injury or illness, and if so, to whom (name and address)?

3.   Medical authorizations for all health care providers identified in response to Number 2 above shall be provided as follows: at the plaintiff's option, such authorization may be produced to defense counsel, or may be provided to Sparkling City Records, such that all such records may be ordered at any time thereafter by defense counsel. It is understood that Sparkling City will advise plaintiffs of any such order and, upon request and payment by plaintiffs, will provide a copy of all records ordered to the plaintiffs;

4.   State whether each plaintiff is claiming lost wages or earnings, including any business damage or business losses as a result of the injuries alleged in your Petition, and for each period during which any such plaintiff allegedly lost wages or earnings:

   (a)   the dates upon which each such period began and ended;

   (b)   the total amount of wages or earnings allegedly lost during each such period up to and including the date of the answer hereto;

   (c)   the reason why any such plaintiff was unable to work or otherwise lost wages or earnings; and

   (d)   if any such plaintiff suffered any business damage or business losses, the name, address and nature of the business, how the damage occurred, and the amount of the damage or the loss; or

Akin, Gump, Strauss, Hauer & Feld, L.L.P.
Gentlemen
February 29, 2000
Page 4

   (e)     if any such plaintiff is claiming any loss of future earnings please state the date upon
           which such person became totally or partially unable to work and the total amount of
           future lost wages or earnings attributed to the occurrences referred to in the Petition;

5.   State the nature and amount of each item of damage and expense, other than as listed
     above, incurred by each plaintiff that is alleged to have been caused by the occurrences
     alleged in your Petition; if any plaintiff asserts property damage or devaluation, describe
     all such damage claimed, including for the use and enjoyment of your property, when
     and where any alleged property damage occurred, the monetary amount of the damage
     or devaluation, and whether any insurance claim has been made or will be made for such
     damage; if such expenses are claimed to be unknown or cannot be determined, state the
     reason for this assertion;

6.   Production of all documents that verify any and all claims of economic damages,
     property damage, lost earning capacity, lost income, or out of pocket expenses that
     any plaintiff allegedly incurred as a result of the May 12th event; and

7.   Whether each plaintiff will seek punitive damages against CITGO with respect to the
     allegations set forth in the respective Petitions.

                                              Sincerely,

                                              Jeffrey K. Sherwood


cc:  Ralph F. Meyer, Esq.

SEEN AND AGREED TO:


_____
Michael G. Terry
Edwards, Perry & Haas, L.L.P.


_____
Steve T. Hastings
Huerta, Hastings & Allison

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.
Gentlemen
February 29, 2000
Page 5

Christopher A. Kesler
Fleming & Associates, L.L.P.


Hector Rene' Rodriguez
Law Offices of Rene Rodriguez


Lucinda M. Juarez, P.C.


Arnold G. Gonzalez, Esq.
Gonzalez & Gonzalez, L.L.P.


Thomas C. Hall, Esq.
Hall & Bates, L.L.P.


Hector Rene Gonzalez, Esq.
Law Office of Hector Rene Gonzalez, P.C.

## CITGO QUESTIONNAIRE

PERSONAL / LOCATION  INFORMATION:

First Name: _____   Last Name: _____   Middle Initial: ____

Present Address: _____   City: _____   State: ___   Zip: ____

Present Home Phone No.: ( __ ) _____   Present Work Phone No.: ( __ ) _____

Home Address on May 12, 1997: _____

Date of Birth: _____   Social Security No.: _____

Driver's License No.: _____

Name of Legal Guardian if client is a minor: _____

Preferred Language:   English_____   Spanish_____

Sex:  Male_____         Female_____

Children's Name:              Date of Birth:

_____      _____

_____      _____

_____      _____

_____      _____

**What was your location and address on the day of the explosion, May 12, 1997, until the following morning?**

| Time | Location | Address | City |
|------|----------|---------|------|
| 9:00-10:00 p.m. | | | |
| 10:00-11:00 p.m. | | | |
| 11:00-12:00 p.m. | | | |
| 12:00 p.m.-1:00 a.m. | | | |
| 1:00-2:00 a.m. | | | |
| 2:00-3:00 a.m. | | | |
| 3:00-4:00 a.m. | | | |
| 4:00-5:00 a.m. | | | |

# EXHIBIT "A"

CC-001729

CC-0017

5:00-6:00 a.m.   _____   _____   _____
6:00-7:00 a.m.   _____   _____   _____
7:00-8:00 a.m.   _____   _____   _____
8:00-9:00 a.m.   _____   _____   _____

## MEDICAL INFORMATION:

Do you think you were exposed to the chemicals released in the explosion?

Yes_____     No_____

Did you see smoke or cloud?     Yes_____     No_____

Did you notice an unusual smell?     Yes_____     No_____

Did you experience the following as a result of the explosion?

## SKIN IRRITATION OR RASH:     Yes_____     No_____

How soon after the explosion did the symptoms begin?

Immediately_____        Within 10 minutes_____        Within 1 hour_____

Within 5 hours_____        Next day_____        Next week_____

Some time later_____

How long did the symptoms last?

_____hrs.   _____days   _____weeks        _____months        _____ongoing

## HEADACHE:     Yes_____     No_____

Immediately_____   Within 10 minutes_____   Within 1 hour_____

Within 5 hours_____        Next day_____        Next week_____

Some time later_____

How long did the symptoms last?

_____hrs.   _____days   _____weeks        _____months        _____ongoing

CC-001730

CC-00

**TOOTHACHE:**    Yes_____    No_____

How soon after the explosion did the symptoms begin?

Immediately_____        Within 10 minutes_____        Within 1 hour_____

Within 5 hours_____        Next day_____    Next week_____

Some time later_____

How long did the symptoms last?

_____hrs.    _____days    _____weeks        _____months        _____ongoing


**ITCHY OR BURNING EYES:**    Yes_____    No_____

How soon after the explosion did the symptoms begin?

Immediately_____        Within 10 minutes_____        Within 1 hour_____

Within 5 hours_____        Next day_____    Next week_____

Some time later_____

How long did the symptoms last?

_____hrs.    _____days    _____weeks        _____months        _____ongoing


**ITCHY OR RUNNY NOSE:**    Yes_____    No_____

How soon after the explosion did the symptoms begin?

Immediately_____        Within 10 minutes_____        Within 1 hour_____

Within 5 hours_____    Next day_____    Next week_____

Some time later_____

How long did the symptoms last?

_____hrs.    _____days    _____weeks        _____months        _____ongoing


CC-001731

CC-00

**NAUSEA, VOMITING OR STOMACH ACHE**        Yes_____        No_____

How soon after the explosion did the symptoms begin?

Immediately_____        Within 10 minutes_____        Within 1 hour_____

Within 5 hours_____        Next day_____        Next week____

Some time later_____

How long did the symptoms last?

_____hrs. _____days _____weeks        _____months        _____ongoing

**COUGHING OR SORE THROAT:**     Yes_____        No_____

How soon after the explosion did the symptoms begin?

Immediately_____        Within 10 minutes_____        Within 1 hour_____

Within 5 hours_____        Next day_____        Next week____

Some time later_____

How long did the symptoms last?

_____hrs. _____days _____weeks        _____months        _____ongoing

**HEARING PROBLEMS:**                Yes_____        No_____

How soon after the explosion did the symptoms begin?

Immediately_____        Within 10 minutes_____        Within 1 hour_____

Within 5 hours_____        Next day_____        Next week____

Some time later_____

How long did the symptoms last?

**DIFFICULTY WITH URINATION:**    Yes_____        No_____

How soon after the explosion did the symptoms begin?

CC-001732

CC-001

Case 2:00-cv-00061   Document 9   Filed in TXSD on 03/27/2000   Page 46 of 107

Immediately_____          Within 10 minutes_____          Within 1 hour_____

Within 5 hours_____       Next day_____    Next week____

Some time later_____

SWELLING OR PAIN IN JOINTS:     Yes____     No_____

How soon after the explosion did the symptoms begin?

Immediately_____          Within 10 minutes_____          Within 1 hour_____

Within 5 hours_____       Next day_____    Next week____

Some time later_____

OTHER:     Yes____     No____

If you noticed any other physical problems, describe the physical problems:

How soon after the explosion did the symptoms begin?

Immediately_____          Within 10 minutes_____          Within 1 hour_____

Within 5 hours_____       Next day_____    Next week____

Some time later_____

**IF YOU WERE UPSET BY THE EXPLOSION AND FIRE, TELL US HOW:**

_____

_____

_____

Have you ever made a claim against a company or person for exposure to chemicals?

Yes____     No____

Name of Company: _____

CC-001733

CC-001

Approximate date of exposure: _____

Type of exposure: _____

ARE THERE ANY OTHER SYMPTOMS:   Yes_____   No_____

If Yes:          How soon after the explosion did the symptoms begin?

Immediately_____          Within 10 minutes_____          Within 1 hour_____

Within 5 hours_____          Next day_____     Next week____

Some time later_____

Did you go to the emergency Room as a result of your symptoms?

          Yes____   No____

Name of Hospital_____

Were you hospitalized?          Yes____   No____

Did you have any diagnostic studies?   Yes____   No____

Were you prescribed medication?   Yes____   No____

Diagnosis_____   Amount charged for visit_____

Did you see any doctors for treatment of your injuries as a result of the explosion?

Yes_____   No_____

If yes, Name of Doctor_____   Date of Visit_____

Medication prescribed:_____   Amount charged for visit_____

Diagnosis_____

Name of Doctor_____   Date of Visit_____

Medication prescribed_____   Amount charged for visit_____

Diagnosis_____

CC-001734

CC-001

Name of Doctor_____   Date of Visit_____

Medication prescribed:_____   Amount charged for visit_____

Diagnosis:_____

Pre-existing medical history:

Asthma:          Yes_____   No_____

Pulmonary:       Yes_____   No_____

Do you smoke:    Yes_____   No_____

PRIOR DOCTORS:

Doctor's Name_____   Address_____

Doctor's Name_____   Address_____

Doctor's Name_____   Address_____

Tell us the name of any doctor or hospital that you have seen, and the time that you saw the doctor or went to the hospital, for the following:

A.   Doctors or hospitals that you have seen for any sort of chemical exposure:

_____

B.   Doctors or hospitals you have seen for any sort of on-the-job injury:

_____

C.   Doctors or hospitals you have seen for any sort of injury lawsuit:

_____

D.   Doctors or hospitals that you have seen for any sort of asthma or other pulmonary condition:

_____

E.   Your family or regular doctors over the last 10 years:

_____

CC-001735

CC-001

## PROPERTY DAMAGE:

Did you suffer any property damage?

Home:     Yes_____    No_____          Car:  Yes_____    No_____

Description of damage: _____

Do you have any photographs of your injuries or damage to your property?

Yes_____    No_____

## EMPLOYMENT INFORMATION:

Please list the last three jobs you had up to the explosion on May 12, 1997:

Job on 5/12/97 or closest to 5/12/97:

Employer's Name: _____

Dates of Employment: _____

Job Duties: _____

Do you work with chemicals in this job?     Yes_____    No_____

If yes, what kind? _____

Previous Job:

Employer's Name: _____

Dates of Employment: _____

Job Duties: _____

Do you work with chemicals in this job?     Yes_____    No_____

If yes, what kind? _____

CC-001738

CC-001

**Previous Job:**

Employer's Name: _____

Dates of Employment: _____

Job Duties: _____

Do you work with chemicals in this job?     Yes_____     No_____

If yes, what kind? _____

Did you lose any wages or income as a result of the explosion?

Yes_____     No_____

Time lost from work:_____

Amount of lost wages or income:_____

Did you have any other kind of out-of-pocket expense or money lost as a result of the explosion of May 12, 1997?

Yes_____     No_____

If yes, what kind of expense or loss, and how much?

Have you ever made a claim against a company or person for exposure to chemicals

**CITGO CONTACT:**

Have you been contacted by any Citgo representatives as a result of the explosion?

Yes_____     No_____

If yes, by phone_____, by letter_____     in person_____

Did you call the Citgo 800 number?     Yes_____     No_____

Claim Number if assigned: _____

CC-001737

CC-0017

# AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.

ATTORNEYS AT LAW

AUSTIN
BRUSSELS
DALLAS
HOUSTON
LONDON
LOS ANGELES
MOSCOW
NEW YORK
PHILADELPHIA
SAN ANTONIO
WASHINGTON, D C.

RIYADH – IN AFFILIATION WITH
THE LAW OFFICE OF ABDULAZIZ H. FAHAD

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS
1333 NEW HAMPSHIRE AVENUE, N.W.
SUITE 400
WASHINGTON, DC  20036
(202) 887-4000
FAX (202) 887-4288
www.akingump.com

WRITER'S DIRECT DIAL NUMBER (202) 887-4395
WRITER'S E-MAIL ADDRESS tmckibben@akingump.com

March 1, 2000

## VIA FACSIMILE AND REGULAR MAIL

Thomas J. Henry.
The Law Offices of Thomas J. Henry
5425 S. Padre Island Drive, Ste. 180
Corpus Christi, TX 78411

> Re:  *Paula Avila, et al. v. CITGO Petroleum Corp., et al*

Dear Mr. Henry:

Attached is a letter that was sent to other counsel in order to comply with the Court's February 22, 2000 orders issued in this and other cases concerning the May 12 event. You were inadvertently omitted from the original letter. Please read the letter and indicate below if you are in agreement.

Sincerely,

Tracy B. McKibben

Enclosure
cc:    Ralph F. Meyer, Esq.

SEEN AND AGREED TO:

_____

Thomas J. Henry, Esq.
The Law Offices of Thomas J. Henry

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

ANA AGUIRRE, ET AL.,           *
                                    *
VS.                          *  CIVIL ACTION NO. C-00-61
                                    *
CITGO PETROLEUM CORP. ET AL.  *

## PLAINTIFFS' ADVISORY TO THE COURT

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Now come the Plaintiffs in the above-entitled and numbered cause, and file this advisory pursuant to the Order of the Court of February 22, 2000, and would show to the Court as follows:

1. A portion of the Order in question orders the parties to produce by March 3, 2000, the following: "The parties are ordered to confer on amount-in-controversy jurisdictional issues and file no later than March 3, 2000, a discovery plan to ascertain the damages claimed by the plaintiffs, which, at a minimum, would include injuries sustained, treatment received, medical costs paid, together with a description of any present injuries or illnesses still being suffered and demand made." It is the belief of the Plaintiffs that questionnaires which currently had been provided to the electronic database for the collective Citgo Plaintiffs satisfies the deadline of March 3, 2000, a copy of which questionnaire is attached hereto, and labeled as Exhibit "A" for purposes of demonstration only.



2. There are some Plaintiffs represented by the undersigned who have nbot completed and returned questionnaires to be filed appropriately, and the Plaintiffs request that the Court order the filing of the unfiled questionnaires within a reasonable time period.

3. If the Court is of the opinion that the questionnaire attached as Exhibit "A" does not satisfy the March 3, 2000 deadline, then the Plaintiffs request a reasonable period of time for compliance.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Plaintiffs be deemed to be in compliance with the March 3, 2000 deadline, or, in the alternative, that the Plaintiffs have a reasonable time within which to comply.

Respectfully submitted,

HALL & BATES, L.L.P.

By:_____
Thomas C. Hall
Charles Court
205 N. Presa Street
Building B, Suite 300
San Antonio, TX 78205
210/222-2000
210/222-1156 (Fax)
State Bar #08774550
ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

A true and correct copy of the above and foregoing Advisory to the Court has been mailed to Ralph F. Meyer and Jack C. Partridge, 1700 Wilson Plaza West, 606 N. Carancahua, Corpus Christi, TX 78476 and to Jeff Sherwood, 1333 New Hampshire Aven., N.W., Suite 400, Washington, D.C. 20036, on this the 3___ day of ___March___, 2000.

_____
Thomas C. Hall

3

CVisPDF - www.texio.com

# EXHIBIT "A"

CiltsPDF – www.fastio.com

# CITGO QUESTIONNAIRE

**PERSONAL / LOCATION INFORMATION:**

First Name: _____   Last Name: _____   Middle Initial: ____

Present Address: _____   City: _____   State: ____   Zip: _____

Present Home Phone No.: (___)_____   Present Work Phone No.: (___)_____

Home Address on May 12, 1997: _____

Date of Birth: _____   Social Security No.: _____

Driver's License No.: _____

Name of Legal Guardian if client is a minor: _____

Preferred Language:   English_____   Spanish_____

Sex:   Male_____   Female_____

Children's Name:                     Date of Birth:

_____               _____

_____               _____

_____               _____

_____               _____

What was your location and address on the day of the explosion, May 12, 1997, until the following morning?

| Time | Location | Address | City |
|------|----------|---------|------|
| 9:00-10:00 p.m. | _____ | _____ | _____ |
| 10:00-11:00 p.m. | _____ | _____ | _____ |
| 11:00-12:00 p.m. | _____ | _____ | _____ |
| 12:00 p.m.-1:00 a.m. | _____ | _____ | _____ |
| 1:00-2:00 a.m. | _____ | _____ | _____ |
| 2:00-3:00 a.m. | _____ | _____ | _____ |
| 3:00-4:00 a.m. | _____ | _____ | _____ |
| 4:00-5:00 a.m. | _____ | _____ | _____ |

5:00-6:00 a.m. _____   _____   _____
6:00-7:00 a.m. _____   _____   _____
7:00-8:00 a.m. _____   _____   _____
8:00-9:00 a.m. _____   _____   _____

## MEDICAL INFORMATION:

Do you think you were exposed to the chemicals released in the explosion?

Yes_____      No_____

Did you see smoke or cloud?      Yes_____      No_____

Did you notice an unusual smell?      Yes_____      No_____

Did you experience the following as a result of the explosion?

SKIN IRRITATION OR RASH:      Yes_____      No_____

How soon after the explosion did the symptoms begin?

Immediately_____      ·      Within 10 minutes_____      Within 1 hour_____

Within 5 hours_____      Next day_____      Next week_____

Some time later_____

How long did the symptoms last?

_____hrs.      _____days      _____weeks      _____months      _____or.going

HEADACHE:      Yes_____      No_____

Immediately_____      Within 10 minutes_____      Within 1 hour_____

Within 5 hours_____      Next day_____      Next week_____

Some time later_____

How long did the symptoms last?

_____hrs.      _____days      _____weeks      _____months      _____ongoing

TOOTHACHE:    Yes_____    No_____

How soon after the explosion did the symptoms begin?

Immediately_____        Within 10 minutes_____        Within 1 hour_____

Within 5 hours_____        Next day_____    Next week____

Some time later_____

How long did the symptoms last?

_____hrs.    ____days    ____weeks        ____months        ____ongoing


ITCHY OR BURNING EYES:   Yes_____    No_____

How soon after the explosion did the symptoms begin?

Immediately_____        Within 10 minutes_____        Within 1 hour_____

Within 5 hours_____        Next day_____    Next week____

Some time later_____

How long did the symptoms last?

_____hrs.    ____days    ____weeks        ____months        ____ongoing


ITCHY OR RUNNY NOSE:    Yes_____    No_____

How soon after the explosion did the symptoms begin?

Immediately_____        Within 10 minutes_____        Within 1 hour_____

Within 5 hours_____        Next day_____    Next week____

Some time later_____

How long did the symptoms last?

_____hrs.    ____days    ____weeks        ____months        ____ongoing

NAUSEA, VOMITING OR STOMACH ACHE        Yes_____      No_____

How soon after the explosion did the symptoms begin?

Immediately_____        Within 10 minutes_____        Within 1 hour_____

Within 5 hours_____        Next day_____      Next week____

Some time later_____

How long did the symptoms last?

_____hrs.      _____days      _____weeks        _____months        _____ongoing

COUGHING OR SORE THROAT:        Yes_____      No_____

How soon after the explosion did the symptoms begin?

Immediately_____        Within 10 minutes_____        Within 1 hour_____

Within 5 hours_____        Next day_____      Next week____

Some time later_____

How long did the symptoms last?

_____hrs.      _____days      _____weeks        _____months        _____ongoing

HEARING PROBLEMS:        Yes_____      No_____

How soon after the explosion did the symptoms begin?

Immediately_____        Within 10 minutes_____        Within 1 hour_____

Within 5 hours_____        Next day_____      Next week____

Some time later_____

How long did the symptoms last?

DIFFICULTY WITH URINATION:      Yes_____      No_____

How soon after the explosion did the symptoms begin?

Immediately_____     Within 10 minutes_____     Within 1 hour_____

Within 5 hours_____     Next day_____     Next week____

Some time later_____

SWELLING OR PAIN IN JOINTS:     Yes____     No_____

How soon after the explosion did the symptoms begin?

Immediately_____     Within 10 minutes_____     Within 1 hour_____

Within 5 hours_____     Next day_____     Next week____

Some time later_____

OTHER:     Yes____     No_____

If you noticed any other physical problems, describe the physical problems:

How soon after the explosion did the symptoms begin?

Immediately_____     Within 10 minutes_____     Within 1 hour_____

Within 5 hours_____     Next day_____     Next week____

Some time later_____

IF YOU WERE UPSET BY THE EXPLOSION AND FIRE, TELL US HOW:

_____

_____

_____

Have you ever made a claim against a company or person for exposure to chemicals?

Yes_____     No_____

Name of Company: _____

Approximate date of exposure: _____

Type of exposure: _____

ARE THERE ANY OTHER SYMPTOMS:   Yes_____   No_____

If Yes:          How soon after the explosion did the symptoms begin?

Immediately_____          Within 10 minutes_____          Within 1 hour_____

Within 5 hours_____          Next day_____          Next week_____

Some time later_____

Did you go to the emergency Room as a result of your symptoms?

          Yes_____   No_____

Name of Hospital_____

Were you hospitalized?          Yes_____   No_____

Did you have any diagnostic studies?   Yes_____   No_____

Were you prescribed medication?   Yes_____   No_____

Diagnosis_____   Amount charged for visit_____

Did you see any doctors for treatment of your injuries as a result of the explosion?

Yes_____   No_____

If yes, Name of Doctor_____   Date of Visit_____

Medication prescribed_____   Amount charged for visit_____

Diagnosis_____

Name of Doctor_____   Date of Visit_____

Medication prescribed_____   Amount charged for vis.t_____

Diagnosis_____

Name of Doctor_____ Date of Visit_____

Medication prescribed_____ Amount charged for visit_____

Diagnosis_____

Pre-existing medical history:

Asthma:          Yes_____    No_____

Pulmonary:       Yes_____    No_____

Do you smoke:    Yes_____    No_____

PRIOR DOCTORS:

Doctor's Name_____    Address_____

Doctor's Name_____    Address_____

Doctor's Name_____    Address_____

Tell us the name of any doctor or hospital that you have seen, and the time that you saw the doctor or went to the hospital, for the following:

A.    Doctors or hospitals that you have seen for any sort of chemical exposure:

_____

B.    Doctors or hospitals you have seen for any sort of on-the-job injury:

_____

C.    Doctors or hospitals you have seen for any sort of injury lawsuit:

_____

D.    Doctors or hospitals that you have seen for any sort of asthma or other pulmonary condition:

_____

E.    Your family or regular doctors over the last 10 years:

_____

## PROPERTY DAMAGE:

Did you suffer any property damage?

Home:      Yes_____      No_____              Car:  Yes_____        No_____

Description of damage: _____

Do you have any photographs of your injuries or damage to your property?

Yes_____      No_____

## EMPLOYMENT INFORMATION:

Please list the last three jobs you had up to the explosion on May 12, 1997:

Job on 5/12/97 or closest to 5/12/97:

Employer's Name: _____

Dates of Employment: _____

Job Duties: _____

Do you work with chemicals in this job?      Yes_____      No_____

If yes, what kind? _____

Previous Job:

Employer's Name: _____

Dates of Employment: _____

Job Duties: _____

Do you work with chemicals in this job?      Yes_____      No_____

If yes, what kind? _____

Previous Job:

Employer's Name: _____

Dates of Employment: _____

Job Duties: _____

Do you work with chemicals in this job?    Yes_____    No_____

If yes, what kind? _____

Did you lose any wages or income as a result of the explosion?

Yes_____    No_____

Time lost from work:_____

Amount of lost wages or income:_____

Did you have any other kind of out-of-pocket expense or money lost as a result of the explosion of May 12, 1997?

Yes_____    No_____

If yes, what kind of expense or loss, and how much?

Have you ever made a claim against a company or person for exposure to chemicals

CITGO CONTACT:

Have you ben contacted by any Citgo representatives as a result of the explosion?

     Yes_____    No_____

If yes, by phone_____    by letter_____    in person_____

Did you call the Citgo 800 number?    Yes_____    No_____

Claim Number if assigned: _____

**ST. PAUL REINSURANCE COMPANY, LTD., Plaintiff–Appellant,**

v.

**Larry GREENBERG, Defendant–Appellee.**

**No. 97–20294.**

United States Court of Appeals, Fifth Circuit.

Feb. 10, 1998.

Insurer brought declaratory judgment action arising from its denial of insured's claim under homeowner's policy for loss suffered when home was destroyed by arson. Insured moved to dismiss for lack of subject matter jurisdiction. The United States District Court for the Southern District of Texas, Kenneth M. Hoyt, J., granted motion. Insurer appealed. The Court of Appeals, Wiener, Circuit Judge, held that: (1) neither insured's counterclaim in declaratory judgment action nor his state court petition could be considered in testing whether amount in controversy in declaratory judgment action satisfied diversity jurisdiction requirements, and (2) statutory damages imposed under Texas law for failure to pay insurance claim in timely manner had to be included in calculating amount in controversy in insurer's declaratory action.

Reversed and remanded.

**1. Federal Courts ⟨⟩776**

Court of Appeals reviews dismissals for lack of subject matter jurisdiction de novo, applying same standard as that applied by district court.

**2. Federal Courts ⟨⟩812**

Court abuses its discretion when its ruling is based on erroneous view of the law.

**3. Federal Courts ⟨⟩336.1**

For purposes of diversity jurisdiction, "amount in controversy" in action for declaratory or injunctive relief is value of right to

be protected or extent of injury to be prevented. 28 U.S.C.A. § 1332.

See publication Words and Phrases for other judicial constructions and definitions.

**4. Federal Courts ⟨⟩336.1**

For purposes of determining whether amount in controversy requirement for diversity jurisdiction is satisfied when insurer seeks declaratory judgment regarding coverage provided by insurance policy, object of litigation is policy and value of right to be protected is plaintiff's potential liability under that policy. 28 U.S.C.A. § 1332.

**5. Federal Courts ⟨⟩336.1, 337, 338**

In addition to policy limits and potential attorney fees, items to be considered in ascertaining amount in controversy for diversity jurisdiction purposes, when insurer could be liable for those sums under state law, are, inter alia, penalties, statutory damages, and punitive damages. 28 U.S.C.A. § 1332.

**6. Federal Courts ⟨⟩34**

Burden of establishing subject matter jurisdiction in federal court rests on party seeking to invoke it.

**7. Removal of Cases ⟨⟩107(7)**

In removal practice, when complaint does not allege specific amount of damages, party invoking federal jurisdiction must prove by a preponderance of the evidence that amount in controversy exceeds jurisdictional amount; test is whether it is more likely than not that amount of claim will exceed $50,000. 28 U.S.C.A. § 1332.

**8. Removal of Cases ⟨⟩75, 107(7)**

In removal practice, when complaint does not allege specific amount of damages, district court must first examine complaint to determine whether it is facially apparent that claims exceed jurisdictional amount; if it is not, court may rely on "summary judgment-type" evidence to ascertain amount in controversy. 28 U.S.C.A. § 1332.

**9. Federal Courts ⟨⟩29.1**

Jurisdictional facts must be judged as of time complaint is filed; subsequent events cannot serve to deprive court of jurisdiction once it has attached.

**10. Federal Courts ⚷312.1**

Conclusional allegations are insufficient to establish diversity jurisdiction.

**11. Federal Courts ⚷357.1**

In addition to complaint itself, Court of Appeals had to look to other evidence relevant at time insurer filed its complaint for declaratory relief to determine whether diversity jurisdiction's amount in controversy requirement was met. 28 U.S.C.A. § 1332.

**12. Federal Courts ⚷336.1, 352**

Neither insured's counterclaim in insurer's declaratory judgment action nor insured's state court petition could be considered in testing whether amount in controversy in declaratory judgment action satisfied diversity jurisdiction requirements, given that neither of insured's pleadings were filed until after insurer's complaint. 28 U.S.C.A. § 1332.

**13. Removal of Cases ⚷75**

In Texas, litigants who want to prevent removal must file binding stipulation or affidavit with their complaints showing amount in controversy does not exceed jurisdictional amounts.

**14. Federal Courts ⚷342**

Statutory damages imposed under Texas law for failure to pay insurance claim in timely manner had to be included in calculating amount in controversy in insurer's declaratory action arising from its denial of insured's claim under homeowner's policy; although described in terms of per annum percentage for calculation purposes, statutory exaction was element of damages, not "interest," for purposes of diversity jurisdiction statute. 28 U.S.C.A. § 1332; V.A.T.S. Insurance Code, art. 21.55, § 6.

**15. Insurance ⚷602.1**

Under Texas law, statutory damages for failure to pay insurance claim in timely manner attach as long as insurer is found to be liable under policy, even if insurer had reasonable basis for denying coverage. V.A.T.S. Insurance Code, art. 21.55, § 6.

Edward B. Chatelain, III, Clint W. Lewis, Lewis & Henry, Beaumont, TX, for Plaintiff–Appellant.

Jim Alan Adams, Richmond, TX, for Defendant–Appellee.

Appeal from the United States District Court for the Southern District of Texas.

Before DAVIS, WIENER and PARKER, Circuit Judges.

WIENER, Circuit Judge:

In this declaratory judgment action, Plaintiff–Appellant St. Paul Reinsurance Company, Ltd. (St. Paul) appeals the district court's grant of Defendant–Appellee Larry Greenberg's motion to dismiss for lack of subject matter jurisdiction, finding that St. Paul's complaint failed to satisfy the amount in controversy requirement for diversity jurisdiction under 28 U.S.C. § 1332. After reviewing the record and the arguments of counsel, and applying the applicable law, we conclude that the district court erred in dismissing the action. Accordingly, we reverse and remand.

I.

FACTS AND PROCEEDINGS

In August 1995, Greenberg purchased a homeowner's policy from St. Paul. In March 1996, the home covered by that policy was destroyed by arson. After Greenberg filed a sworn proof of loss in July 1996 in the amount of $35,000—the policy's limits of coverage—St. Paul denied coverage. It asserted, *inter alia*, that (1) Greenberg had increased the risk of hazard, (2) the property was vacant for more than thirty days prior to the fire, and (3) Greenberg had misrepresented material facts concerning the property.

On September 20, 1996, Greenberg's counsel wrote to St. Paul demanding that it acknowledge coverage under the policy within ten days or Greenberg would file suit seeking "all damages available to him under the various common laws or statutes relative to this case." On October 10, 1996, Greenberg's attorney wrote again, demanding coverage and stating, "Obviously, if we file suit, we will

seek additional damages including any penalties and interest to which Mr. Greenberg may be entitled."

A week later St. Paul filed a complaint for declaratory relief in federal district court. St. Paul pleaded the following facts in its complaint:

1.01  Plaintiff, St. Paul Reinsurance Company, Ltd., is a foreign corporation, incorporated and having its principal place of business in London, England.

1.02  Defendant, Larry Greenberg, is a citizen of Texas.

2.01  The jurisdiction of this Court is based on diversity of citizenship pursuant to 28 U.S.C. § 1332. This is a civil action in which the matter in controversy exceeds the sum of $50,-000.00, exclusive of interest and costs.

In response, Greenberg filed a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, arguing that he was seeking only $45,500 in the aggregate, comprising the $35,000 policy limits and attorney's fees not to exceed $10,500,[1] so that St. Paul's claim did not meet the amount in controversy requirement of § 1332.[2] Included with Greenberg's Rule 12(b) motion was his counterclaim for that amount. While Greenberg's motion to dismiss was pending in federal court, he filed a petition in state court requesting the $35,000 limits of the policy plus $10,500 in attorney's fees and alleging that St. Paul violated the Texas Deceptive Trade Practices Act (DTPA)[3] and the Texas Insurance Code.

The district court granted Greenberg's motion, dismissing St. Paul's complaint for declaratory relief. In its order, the court explained:

The plaintiff cannot bring a suit for declaratory relief on a claim that does not exceed $50,000 and create federal jurisdiction by stating all of the possible claims for relief that a defendant may bring. There is nothing in the plaintiff's counterclaim that suggests that the defendant's claim will exceed $50,000.

After the court denied St. Paul's motions for reconsideration, rehearing, or, in the alternative, a new trial, St. Paul timely appealed.

## II.

## DISCUSSION

### A. Standard of Review

[1, 2] We review dismissals for lack of subject matter jurisdiction *de novo*, applying the same standard as that applied by the district court.[4]

### B. Applicable Law

[3–5] "The amount in controversy, in an action for declaratory or injunctive relief, is

---

1. Attorney's fees for a valid claim for breach of an insurance contract are recoverable pursuant to Tex.Civ.Prac. & Rem.Code Ann. § 38.001(8) (West 1997). In addition, Tex.Ins.Code Ann. art. 21.21 § 16(b)(1) (West Supp.1997), Tex.Ins.Code Ann. art. 21.55 § (6) (West Supp.1997), and Tex. Bus. & Com.Code Ann. § 17.50(d) (West Supp. 1997) allow a plaintiff prevailing in an action brought under any of those statutes to recover attorney's fees and costs.

2. At the time this action was filed, the amount in controversy for diversity jurisdiction had to exceed $50,000, exclusive of costs and interest.

3. Tex.Bus. & Com.Code Ann. §§ 17.41 to 17.63 (West 1987).

4. *International Paper Co. v. Denkmann Assocs.*, 116 F.3d 134, 136 n. 4 (5th Cir.1997). Both parties to this appeal urge that we should review the trial court's determination of the amount in controversy for an abuse of discretion, citing *Dassinger v. South Central Bell Telephone Co.*, 505 F.2d 672 (5th Cir.1974). In *Dassinger*, we cited *Gibbs v. Buck*, 307 U.S. 66, 59 S.Ct. 725, 83 L.Ed. 1111 (1939), for the proposition that "discretion is vested in the trial court to determine whether the claim meets the jurisdictional amount." *Id.* at 673. Our understanding of *Gibbs* is that the trial court has discretion in the procedure it uses for determining the jurisdictional amount when the statute is silent. We need not and therefore do not resolve this apparent inconsistency, however; given the district court's erroneous view of the law regarding the inclusion of statutory penalties in the calculation of the amount in controversy, *see infra*, we would reverse even under the more deferential abuse of discretion standard. "A court abuses its discretion when its ruling is based on an erroneous view of the law." *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir.1995) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990)).

Case 2:00-cv-00061   Document 9   Filed in TXSD on 03/27/2000   Page 68 of 107

the value of the right to be protected or the extent of the injury to be prevented." [5] When an insurer seeks a declaratory judgment regarding the coverage provided by an insurance policy, "the 'object of the litigation' is the policy and the 'value of the right to be protected' is plaintiff's potential liability under that policy." [6] Thus, in addition to policy limits and potential attorney's fees, items to be considered in ascertaining the amount in controversy when the insurer could be liable for those sums under state law are *inter alia* penalties, statutory damages, and punitive damages—just not interest or costs.[7] In this case, St. Paul contends that we should include the penalties and treble damages available under the DTPA and the Texas Insurance Code in determining the amount in controversy.

[6] The burden of establishing subject matter jurisdiction in federal court rests on the party seeking to invoke it.[8] It has long been recognized that "unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith."[9] To justify dismissal, "it must appear to a legal certainty that the claim is really for less than the jurisdictional amount."[10] We have previously indicated,

however, that this "legal certainty" test has limited utility—in fact is inapplicable—when the plaintiff has alleged an indeterminate amount of damages.[11] Furthermore, "bare allegations [of jurisdictional facts] have been held insufficient to invest a federal court with jurisdiction."[12]

[7–9] Although most of our caselaw regarding § 1332's amount in controversy requirement has arisen in the context of removal from state to federal court, we find the procedures developed in those cases to be instructive in the converse context of declaratory judgment actions such as the one now before us. In removal practice, when a complaint does not allege a specific amount of damages, the party invoking federal jurisdiction must prove by a preponderance of the evidence that the amount in controversy exceeds the jurisdictional amount.[13] The district court must first examine the complaint to determine whether it is "facially apparent" that the claims exceed the jurisdictional amount.[14] If it is not thus apparent, the court may rely on "summary judgment-type" evidence to ascertain the amount in controversy.[15] Importantly, the jurisdictional facts must be judged as of the time the complaint is filed; subsequent events cannot serve to

---

5. *Leininger v. Leininger*, 705 F.2d 727, 729 (5th Cir.1983). *See also Allstate Ins. Co. v. Hilbun*, 692 F.Supp. 698, 700 (S.D.Miss.1988) ("In actions for declaratory or injunctive relief, the amount in controversy is measured by the value of the object of the litigation.").

6. *Hilbun*, 692 F.Supp. at 700 (quoting *Leininger*, 705 F.2d at 729). *See, e.g., Stonewall Ins. Co. v. Lopez*, 544 F.2d 198, 199 (5th Cir.1976) (holding that amount in controversy exceeded the requisite $10,000, as the plaintiff insurer would be required to provide a defense to its insured in a pending state court action if the court found that the policy provided coverage).

7. *See Foret v. Southern Farm Bureau Life Ins. Co.*, 918 F.2d 534, 536 (5th Cir.1990) ("[A]ttorney's fees may be included in determining the jurisdictional amount."); *Hilbun*, 692 F.Supp. at 700 ("Punitive damages can be included to reach the amount in controversy if, under the governing law of the suit, they are recoverable.") (citing *Bell v. Preferred Life Assurance Soc'y*, 320 U.S. 238, 64 S.Ct. 5, 88 L.Ed. 15 (1943)).

8. *Gaitor v. Peninsular & Occidental Steamship Co.*, 287 F.2d 252, 253–54 (5th Cir.1961).

9. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938); *De Aguilar v. Boeing Co.*, 47 F.3d 1404, 1408 (5th Cir.), *cert. denied*, 516 U.S. 865, 116 S.Ct. 180, 133 L.Ed.2d 119 (1995).

10. *St. Paul Mercury*, 303 U.S. at 289, 58 S.Ct. at 590.

11. *De Aguilar*, 47 F.3d at 1409.

12. *Asociacion Nacional de Pescadores a Pequena Escala o Artesanales de Colombia v. Dow Quimica de Colombia S.A.*, 988 F.2d 559, 566 (5th Cir.1993), *cert. denied*, 510 U.S. 1041, 114 S.Ct. 685, 126 L.Ed.2d 653 (1994) (discussing a removal petition which "merely states, without any elaboration, that 'the matter in controversy exceeds $50,000....'").

13. *Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1335 (5th Cir.1995). The test is whether it is more likely than not that the amount of the claim will exceed $50,000. *Id.* at 1336.

14. *Id.* at 1335.

15. *Id.* at 1336.

deprive the court of jurisdiction once it has attached.[16]

[10] Applying this test solely to the facts pleaded by St. Paul in its complaint for declaratory relief, we cannot conclude that the amount in controversy will likely exceed $50,000. St. Paul sets out its reasons for denying coverage under the policy, but asserts neither that Greenberg has expressly threatened to seek statutory penalties or punitive damages nor that St. Paul has acted with bad faith or intent. Similarly, St. Paul's complaint contains no prayer for a declaration of nonliability under the DTPA or the Texas Insurance Code. Conclusional allegations are insufficient to establish jurisdiction.[17]

[11] This is not the end of our inquiry, however. In addition to the complaint itself, we must look as well to other evidence relevant at the time St. Paul filed its complaint for declaratory relief.

[12, 13] The district court based its determination of the amount in controversy on Greenberg's counterclaim, in which he sought only the $35,000 policy limits and attorney's fees not to exceed $10,500. But this was

error as a matter of law, given that neither this counterclaim nor Greenberg's state court petition were filed until after the filing of St. Paul's declaratory judgment complaint.[18] Thus, neither of these pleadings may be considered in testing the amount here in controversy.

[14, 15] The only pre-complaint evidence of Greenberg's potential claim against St. Paul are the letters from Greenberg's attorney, demanding coverage under the policy and threatening to seek "all *damages* available to [Greenberg] under the various common laws or statutes relative to this case"[19] and "any *penalties* and interest to which Mr. Greenberg may be entitled."[20] One such penalty is found in § 6 of Article 21.55 of the Texas Insurance Code, which provides for statutory "damages" in the amount of "18 percent per annum" for failure timely to pay an insurance claim.[21] The district court and Greenberg summarily concluded that "a statutory penalty that requires no adjudication cannot be used to establish threshold jurisdiction." But this is simply an incorrect statement of the law in this circuit. Although not cited by either party or the dis-

---

16. *St. Paul Mercury,* 303 U.S. at 292, 58 S.Ct. at 592; *Seafoam, Inc. v. Barrier Sys., Inc.,* 830 F.2d 62, 66 (5th Cir.1987).

17. *Allen,* 63 F.3d at 1335.

18. We have considered a post-removal *affidavit* when the jurisdictional amount was ambiguous on the face of the state petition. *See Asociacion Nacional de Pescadores,* 988 F.2d at 565. In doing so, however, we explained that the affidavit helped clarify the jurisdictional facts *"as of the time of removal." Id.* (emphasis added). We have nevertheless remained vigilant to the potential for manipulation by the plaintiff who prays for damages below the jurisdictional amount even though he knows that his claim is actually worth more. This is one reason why we have held that if a state court defendant can show that the amount in controversy actually exceeds the jurisdictional amount, then the state court plaintiff who is seeking to prevent removal must be able to show that, as a matter of law, it is certain that he will not be able to recover more than the damages for which he has prayed in his state court complaint. *DeAguilar,* 47 F.3d at 1411. It would avail Greenberg nothing to argue that his counterclaim or subsequent state petition would merely clarify ambiguity regarding the amount in controversy, because—at least in Texas—"litigants who want to prevent removal must file a

binding stipulation or affidavit with their complaints." *Id* at 1412. (citation omitted). No such binding stipulation or affidavit was filed by Greenberg.

19. Letter from Jim Alan Adams, counsel for Greenberg, to Peter B. Thompson, Independent Surplus Underwriters, Inc., of September 20, 1996 (emphasis added).

20. Letter from Adams to Edward Chatelain III, counsel for St. Paul, of October 10, 1996 (emphasis added).

21. Section 6, entitled "Damages," provides:

In all cases where a claim is made pursuant to a policy of insurance and the insurer liable therefor is not in compliance with the requirements of this article, such insurer shall be liable to pay the holder of the policy ...., in addition to the amount of the claim, 18 percent per annum of the amount of such claim, as *damages,* together with reasonable attorney fees.

Tex.Ins.Code Ann. art 21.55 § 6 (West Supp. 1997) (emphasis added). As long as the insurer is found to be liable under the policy, this *fee* attaches, even if the insurer had a reasonable basis for denying coverage. *Higginbotham v. State Farm Mut. Auto. Ins. Co.,* 103 F.3d 456, 461 (5th Cir.1997).

trict court, this issue is controlled by our decision in *Buras v. Birmingham Fire Insurance Co. of Pennsylvania.*[22]

In *Buras,* we considered whether a "penalty" of six percent per annum mandated under a Louisiana statute for the unjustified failure to pay a life insurance claim timely should be included in the jurisdictional amount. Noting that the exaction was not due at all if the claim settled within sixty days, we held that the charge was "intended to be in the nature of a coercive penalty towards prompt settlement" as opposed to interest.[23] As such, the penalty could serve to establish jurisdiction.

We discern no distinguishing characteristics between the penalty assessed under the Louisiana statute analyzed in *Buras* and the damages provided in § 6 of Article 21.55 of the Texas Insurance Code. The latter impost is labeled "damages" in the statute and applies over and above any other recovery. Moreover, the Texas statute specifically states that its purpose is "to obtain prompt payment of claims made pursuant to policies of insurance."[24] We also find persuasive the fact that on no less than two occasions the Texas Supreme Court has referred to § 6 of Article 21.55 as a "penalty."[25] And, like the Louisiana provision examined in *Buras,* the Texas penalty applies automatically if the claim is not paid within the period allowed. Therefore, according to *Buras*—and the inability of one panel of this court to overrule another—we hold that here the statutory damages under Article 21.55 of the Texas Insurance Code must be included in calculating the amount in controversy for § 1332. Despite being described in terms of a per annum percentage for purposes of calculation, the statutory exaction here is not "interest" within the contemplation of § 1332; it clearly is an element of damages. Indeed, if Greenberg is successful in recovering under the St. Paul policy, he will automatically recover 18 percent per annum damages.

Compared to the highly conjectural element of punitive damages, late settlement damages under the Texas Insurance Code, with no exception for excusable neglect or justifiable delay, is a lay down hand. It would be ludicrous, then, to include something as speculative as punitive damages—which all agree is properly includible—while excluding the automatic penalty provided in the insurance code. Given the policy's limits of $35,000, attorney's fees, and the 18 percent per annum statutory damages which have been accruing ever since March 12, 1996, we conclude that Greenberg's claim—and St. Paul's potential liability under the policy—would likely exceed $50,000, exclusive of costs and interest.

### III.

### CONCLUSION

Based on our *de novo* review of the record and applicable law, we must conclude that the district court erred in dismissing St. Paul's complaint for declaratory relief for lack of subject matter jurisdiction. This error resulted from failure to include in the court's calculation the statutory damages of 18 percent per annum under the Texas Insurance Code. Consequently, the judgment of dismissal by the district court is reversed and this action is remanded for further proceedings in that court.

REVERSED and REMANDED.



22. 327 F.2d 238 (5th Cir.1964).

23. *Id.* at 238–39.

24. Tex.Ins.Code Ann. art. 21.55 § 8 (West Supp. 1997).

25. *See Maryland Ins. Co. v. Head Indus. Coatings and Servs., Inc.,* 938 S.W.2d 27, 28 (Tex.1996); *State Farm Fire and Cas. Co. v. Gandy,* 925 S.W.2d 696, 714 (Tex.1996).

Case 2:00-cv-00061   Document 9   Filed in TXSD on 03/27/2000   Page 70 of 107

Troy WATSON, et al., Plaintiffs–
Appellees,

v.

SHELL OIL COMPANY and Brown &
Root, U.S.A., Inc., Defendants–
Appellants.

Robert ADAMS, Sr., et al.,
Plaintiffs–Appellees,

v.

SHELL OIL COMPANY and Brown &
Root, U.S.A., Inc., Defendants–
Appellants.

No. 91–3449.

United States Court of Appeals,
Fifth Circuit.

Dec. 7, 1992.

In mass tort litigation arising out of an explosion at an oil refinery, the United States District Court for the Eastern District of Louisiana, Henry A. Mentz, Jr., J., 136 F.R.D. 588, entered orders defining the class and class issues, designating class representatives, and setting a trial plan. The defendants filed an interlocutory appeal. The Court of Appeals, Politz, Chief Judge, held that: (1) proposed trial plan did not violate requirements for mass tort litigation involving punitive damages; (2) there was no indication that trial court tended to unduly limit application of federal rules of civil procedure and evidence; (3) complaint seeking over $32 billion in damages for plaintiff class composed of over 18,000 members satisfied amount in controversy requirement for diversity action; and (4) proposed classes and subclasses satisfied numerosity, commonality of issues, and "superiority" requirements for class actions.

Affirmed.

1. Damages ⬅87(1)

The law permits punitive damage awards primarily to punish defendant guilty of egregious misconduct and to deter such conduct in the future, and thus the punitive damages inquiry focuses primarily on the egregiousness of the defendant's conduct.

2. Damages ⬅94, 221(5)

Trial plan in mass tort litigation, involving claims by more than 18,000 plaintiffs arising out of explosion at oil refinery, was not invalid on the ground that the plan called for jury, having found punitive damage liability, to determine compensatory damages in 20 fully tried sample plaintiff cases, and then establish the ratio of punitive damages to compensatory damages for each class member based on the findings in those cases, as the determination of punitive damages focused primarily on the egregiousness of the defendant's conduct, which should not markedly vary when considered with respect to different plaintiffs.

3. Constitutional Law ⬅303
   Federal Civil Procedure ⬅1951

In mass tort litigation involving claims by more than 18,000 plaintiffs arising out of oil refinery explosion, trial plan under which jury, after finding punitive damages liability, would determine compensatory damages in 20 fully tried sample cases, then establish the ratio of punitive damages to compensatory damages for each class member did not, on its face, violate due process, even though proposed procedure did not provide precise mechanisms of punitive damage trial or detail subsequent judicial review. U.S.C.A. Const.Amends. 5, 14.

4. Federal Courts ⬅13

Challenge to proposed trial plan for mass tort litigation involving over 18,000 claims arising out of oil refinery explosion, on ground that plan did not indicate that district court intended to comply with federal rules of civil procedure and evidence, was not ripe for review; the plan did not indicate the district court's intent to act impermissibly.

5. Federal Civil Procedure ⬅181

Decision to permit class action arising out of oil refinery explosion to proceed against manufacturer of pipe which allegedly permitted escape of vapor cloud of

combustible gases, instead of permitting manufacturer to defend negligence claims in separate proceeding was not an abuse of discretion, despite grant of summary judgment in its favor on strict liability and punitive damages claim. Fed.Rules Civ. Proc.Rule 23, 28 U.S.C.A.

**6. Federal Courts ⬥346**

In mass tort litigation arising out of oil refinery explosion, district court did not lack subject matter jurisdiction in diversity on ground that some of the over 18,000 plaintiffs asserted only claims for fright and minor property damage, and thus fell short of the required amount in controversy; complaints in the action sought over $32 billion in damages, far in excess of the $10,000 then required for each member of subclass A, punitive damages claim increased amount in controversy for each class member in light of Louisiana law permitting all plaintiffs proving actual damages to share in any punitive damage award, and there was no indication that damage claims were not in good faith. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.; 28 U.S.C.(1982 Ed.) § 1332; LSA-C.C. art. 2315.3.

**7. Federal Courts ⬥352**

In mass tort litigation, dismissal of punitive damages claim against manufacturer of pipe alleged to have permitted escape of combustible gases, resulting in oil refinery explosion, did not affect determination that amount requested by plaintiff satisfied amount in controversy requirement for diversity jurisdiction in action seeking over $32 billion in damages. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.; 28 U.S.C.(1982 Ed.) § 1332; LSA-C.C. art. 2315.3.

**8. Federal Civil Procedure ⬥181**

In mass tort litigation arising out of oil refinery explosion, fact that subclass B contained only 16 employee claimants, while subclass A included over 18,000 claimants, did not indicate that subclass B failed class action numerosity requirement; subclass B was included in the larger class of more than 18,000 plaintiffs for purpose of litigating liability issue with respect to

refinery owner and manufacturer of allegedly defective pipe, but was identified as separate subclass for purpose of litigating related issue of owner's liability for intentional tort. Fed.Rules Civ.Proc.Rule 23(a)(1), 28 U.S.C.A.

**9. Federal Civil Procedure ⬥181**

Class action involving claims of over 18,000 plaintiffs arising out of explosion at oil refinery satisfied commonality requirements for class actions; claims of all plaintiffs required resolution of refinery owner's liability for punitive damages and of liability for negligence by alleged manufacturer of defective pipe, both of which arose out of the same event, even though not all issues were common to all parties. Fed. Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**10. Federal Civil Procedure ⬥165**

Commonality requirement for class actions focuses on the common issues relevant to claims by or against class members, but did not require that all issues be common to all parties. Fed.Rules Civ.Proc. Rule 23(b)(3), 28 U.S.C.A.

**11. Federal Civil Procedure ⬥181**

In class action arising out of explosion at oil refinery, class issues identified by district court satisfied requirement that they "predominate"; issues to be determined during liability phase form integral elements of the claims asserted by each of more than 18,000 plaintiffs. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

**12. Federal Civil Procedure ⬥181**

In mass tort litigation arising out of explosion at oil refinery, class action proceedings were a "superior" means of litigating pipe manufacturer's negligence liability as to refinery explosion, as required for class action; liability factors to be presented in proposed Phase 1 should not unduly confuse jury, possibility that manufacturer would seek contribution from other contractors did not render class action inappropriate, and defendants failed to show class action would not reduce number of issues or complexity in subsequent phases of trial. Fed.Rules Civ.Proc.Rule 23(b)(3), 28 U.S.C.A.

Case 2:00-cv-00061   Document 9   Filed in TXSD on 03/27/2000   Page 72 of 107

John Cummings, III, New Orleans, La., argued, Robert R. Faucheux, Richard M. Millet, LaPlace, La., Robert F. Fadaol, Gretna, La., Joseph W. McKearn, William C. McGehee, New Orleans, La., Thomas F. Daley, LaPlace, La., Mark Marino, Destrehan, La., Gary D. Irby, Boutte, La., Daniel S. Foley, New Orleans, La., Madeline Jasmine, Edgard, La., Eric A. Holden, Franklin M. Adkins, Jack Stolier, New Orleans, La., James Guest, Kenner, La., John Cummings, III, Daniel Becnel, Jr., Reserve, La., Wendell Gauthier, Metairie, La., Calvin C. Fayard, Jr., Denham Springs, La., Stephen Murray, Morris Reed, New Orleans, La., William Sibley, Greenburg, La., Thomas Kliebert, Jr., Gramercy, La., Joseph Bruno, Eldon E. Fallon, J. Robert Ates, New Orleans, La., Jack W. Harang, Stuart H. Smith, Metairie, La., Robert T. Hughes, New Orleans, La., Steven F. Griffith, Destrehan, La., David W. Robinson, Baton Rouge, La., Frank J. D'Amico, Jr., New Orleans, La., Douglas St. Romain, Thomas G. Milazzo, Metairie, La., Morris W. Reed, Timothy J. Falcon, New Orleans, La., Jude H. Trahant, Jr., Mr. A. Gill Dyer, Metairie, La., Ronald P. Thibodeaux, Gretna, La., Laurence Cohen, Martin E. Regan, Jr., Issidro Rene De Rojas, Deonne DuBarry, David Paul Bains, R. Ray Orrill, Jr., Robert F. Shearman, New Orleans, La., Kernan Hand, David K. Joyce, Kenner, La., David Oestreicher, Curtis J. Coney, Jr., Robert G. Harvey, P. Colleen Coffield, Frank A. Silvestri, New Orleans, La., Darryl J. Carimi, James C. Klick, Gretna, La., Margaret E. Woodward, New Orleans, La., Gerald J. Arceneaux, Westwego, La., Clare Jupiter, New Orleans, La., Thomas C. Cerullo, Patricia M. Franz, Metairie, La., Harry E. Forst, Wayne H. Carlton, Jr., Robert B. Sharp, Orlando G. Bendana, New Orleans, La., Edward J. Schmidt, II, Jefferson, La., Donald F. DeBoisblan, Catherine Leary, Patrick D. McArdle, Laura E. Fahy, Darleen J. Jacobs, Charles W. Dittmer, Eugene G. Taggart, Nora F. McAlister, New Orleans, La., David L. Colvin, Daryl A. Higgins, Windhorst, Gaudry, Talley & Ranson, Gretna, La., John D. Malone, John H. Wells, Herbert A. Cade, Daria L. Burgess, Herman C. Hoffman, New Orleans, La., Paul L. Billingsley, Luling, La., Thomas A. Cardell, New Orleans, La., Kenneth V. Ward, Jr., Metairie, La., Deonne DuBarry, New Orleans, La., Julie Ann Burke, Leon C. Vial, III, Hahnville, La., Vernon P. Thomas, New Orleans, La., Giles Duplechin, Gretna, La., Dennis J. Dannel, Fred J. Cassibry, New Orleans, La., Randy Lewis, Luling, La., Cynthia Davison, New Orleans, La., Ronnie J. Berthelot, Baton Rouge, La., Robert J. Caluda, New Orleans, La., Cassius Bering, Mary Bering, Michael Bering, Norco, La., Nita Gorrell, Special Mawter, Hammond, La., Vincent J. DeSalvo, Baton Rouge, La., Harold J. Lamy, J. Robert Ates, New Orleans, La., for plaintiffs-appellees.

Ellis Young, pro se.

Gary Dennis, pro se.

Gail Simmons, pro se.

Thomas J. Wyllie, argued, James Holmes, New Orleans, La., for defendants-appellants.

Appeal from the United States District Court For the Eastern District of Louisiana.

Before POLITZ, Chief Judge, REYNALDO G. GARZA and WIENER, Circuit Judges.

POLITZ, Chief Judge:

Shell Oil Company and Brown and Root, U.S.A., Inc., defendants in this mass-tort class action, have permissibly appealed interlocutory orders in this diversity suit. The orders at issue define the class and class issues, designate class representatives, and set a trial plan. Finding neither error nor abuse of discretion, for the reasons assigned we affirm the proposed trial plan.

### I. Background

This litigation arises out of an explosion at Shell's manufacturing facility in Norco, Louisiana. At approximately 3:30 a.m. on May 5, 1988, failure of a pipe elbow, allegedly fabricated and installed by Brown & Root, permitted the escape of a vapor cloud

Case 2:00-cv-00061  Document 9  Filed in TXSD on 03/27/2000  Page 74 of 107

of combustible gases. The vapor ignited and a massive explosion ripped through the plant, causing extensive damage both on the plant site and in the surrounding communities. That same morning the instant federal class action suit was filed. During the next week class action suits were filed in Louisiana state courts and were removed to federal court. The claims against Shell are founded on Louisiana law theories of negligence, strict liability and intentional tort. Plaintiffs assert claims in negligence and strict liability against Brown & Root.[1] Plaintiffs also seek punitive damages against both defendants.[2]

The actions were consolidated and referred to a magistrate judge with instructions to conduct an evidentiary hearing and to submit a report and recommendation regarding designation of class representatives and subclass definitions. The district court substantially adopted the magistrate judge's recommendations, certified the litigation as a class action under Fed.R.Civ.P. 23(b)(3), defined the plaintiff class,[3] and, pursuant to Fed.R.Civ.P. 23(c)(4), defined the "outside the gate" and "inside the

gate" subclasses ("Subclass A" and "Subclass B", respectively).[4] Subclass A includes in excess of 18,000 claimants.[5] Subclass B has sixteen Shell employee claimants.[6] The district court established notification and opt-out procedures and approved a Plaintiffs' Legal Committee to represent the class.

The district court identified as liability issues common to both subclasses the determination of fault: (1) as it relates to compensatory damage claims, and (2) whether it is sufficient to warrant imposition of punitive damages. As to Subclass B only, the court identified as additional issues: (1) whether the fault of Shell Oil or any other person claiming benefit of workers compensation immunity was intentional thus obviating the immunity, and (2) whether punitive damages are available if workers compensation is the exclusive remedy.[7] The district court thereafter established a procedure for identifying absent class members and obtaining information relating to their claims.

After extensive briefing by the parties, the district court issued orders detailing a

1. See La.Civ.Code Ann. arts. 2315, 2316, 2317, 2322 (West 1979 & Supp.1992).

2. See La.Civ.Code Ann. art. 2315.3 (West Supp. 1992). After certifying the orders on appeal pursuant to 28 U.S.C. § 1292(b), the district court granted summary judgment in favor of Brown & Root on plaintiffs' strict liability and punitive damages claims. See *In re Shell Oil Refinery*, 769 F.Supp. 214 (E.D.La.1991) (punitive damages); *In re Shell Oil Refinery*, 765 F.Supp. 324 (E.D.La.1991) (strict liability). As the district court did not certify those rulings for interlocutory appeal, they are not now before us.

3. The district court defined the plaintiff class as: All persons or entities who were physically present or owned property within the Parishes of St. Charles, St. John the Baptist, St. James, Orleans, or Jefferson on May 5, 1988, and who sustained injuries or damages as a result of the explosion at the Shell Oil Refinery in Norco, Louisiana.
See *In re Shell Oil Refinery*, 136 F.R.D. 588, 590 & n. 1 (E.D.La.1991).

4. See *id.* Subclass A is defined as:
Those persons or entities having claims for damages or injuries caused by the explosion on the premises of the Shell Oil Company

Refinery at Norco, Louisiana, on May 5, 1988, and who or which own property, or operated businesses, or were physically present within the area encompassed by the jurisdictional limits of the United States District Court for the Eastern District of Louisiana, at the time of the explosion.
Subclass B is defined as:
Those persons having claims for injuries to or death of employees at Shell Oil Company, or contractors thereof, sustained in the course of their employment and caused by the explosion on the premises of the Shell Oil Company Refinery at Norco, Louisiana, on May 5, 1988, to the extent that such claims may be subject to the exclusion of the remedy of the Louisiana Workman's Compensation Act.

5. Shell has conceded strict liability under La. Civ.Code art. 2317 to any member of subclass A who proves damages legally caused by the May 5 explosion.

6. See *In re Shell*, 136 F.R.D. at 590 n. 3. Shell informs that persons within Subclass B have brought fourteen personal injury claims and six wrongful death claims.

7. See *In re Shell*, 136 F.R.D. at 590.

four-phase plan for trial.[8]  In Phase 1 a jury would determine common issues of liability.[9]  If the jury found punitive damage liability it would then perform the Phase 2 function and determine compensatory damages in 20 fully-tried sample plaintiff cases.[10]  Based on the findings in these cases, the jury would then establish the ratio of punitive damages to compensatory damages for each class member.  If the jury finds no punitive damage liability in Phase 1, Phase 2 is to be omitted.

In Phase 3, a different jury is to resolve issues unique to each plaintiff's compensatory damage claims, e.g. injury, causation, and quantum.  Phase 3 calls for trials in waves of five, scheduled according to a format based upon factors,[11] including location of the injured person or property at the time of the explosion and extent and nature of the damages.  The district court anticipates that "after several waves are tried, a reasonable judgment value for each category of claims would emerge so as to facilitate settlements."[12]  In Phase 4 the district court is to compute, review, and award punitive damages, if any are established in Phase 1, for the plaintiffs awarded compensatory damages.

Based on the district court's certification under 28 U.S.C. § 1292(b), Shell and Brown & Root timely sought leave for an interlocutory appeal which we granted.

## II.  Analysis

We revisit the problem of mass tort litigation recently addressed.[13]  The instant litigation, involving claims by more than 18,000 plaintiffs, starkly presents the nearly insurmountable problems of balancing procedural fairness with judicial efficiency in the management of mass tort litigation.  At the threshold we must note that in many respects this appeal presents only the broad outlines of the district court's trial plan and, to a large extent, appellate review must await its implementation.  Keenly mindful of the magnitude of the mass litigation problem, its increasing frequency, and the need for innovative solutions, we review the present challenges to the district court's orders.

A.  The Trial Plan: Punitive Damage Concerns

### 1.  Applicability of Fibreboard

Shell and Brown & Root first argue that Phase 2 violates principles enunciated in In re Fibreboard Corp.  In that case the panel reluctantly vacated a trial plan in mass tort litigation involving the claims of 3,031 plaintiffs asserting asbestos-related injuries.  The dispute in Fibreboard centered on the aspect of the plan that called for a jury to ascertain damages for the entire class on the basis of a trial of the specific claims of eleven class representatives, together with such evidence as the parties presented about the claims of thirty illustrative plaintiffs, and the testimony of experts about damages to the entire class.  We found the Fibreboard scheme infirm for two reasons.  First, the proposed plan failed to require each claimant to prove both causation and damages, as required by Texas law.  Second, because the proceeding was to ascertain damages for a group of claimants who suffered widely divergent injuries essentially on the basis of a statistical profile, the plan failed to qualify as a "trial" in the sense contemplated by Article III of the Constitution, and

8.  See id. at 593–96.

9.  We previously approved this mass tort case procedure in Jenkins v. Raymark Inds., Inc., 782 F.2d 468 (5th Cir.1986).

10.  Under the Plan the district court would select a group of 100 claimants at random.  The three parties would then designate claimants they would accept as having "representative claims." The first 20 three-way matches would serve as plaintiffs in the punitive damages trials.  In the event that the parties are in agreement as to fewer than twenty from the group selected, the

trial plan provides that "the Court will select the remaining number of names, for a total of twenty names." Order of May 3, 1991, at 2.

11.  The district court apparently intends to employ a court selected statistician to analyze the damage claims for the purpose of establishing these groupings.

12.  In re Shell, 136 F.R.D. at 596.

13.  See, e.g., In re Fibreboard Corp., 893 F.2d 706 (5th Cir.1990); Jenkins, supra.

Case 2:00-cv-00061 Document 9 Filed in TXSD on 03/27/2000 Page 76 of 107

was thus beyond the authority of an Article III court. We find the instant case distinguishable from *Fibreboard* because the Phase 2 jury is to make a determination about punitive damages in a mass-disaster context, rather than compensatory damages in products liability litigation.

[1, 2] The law permits punitive damage awards primarily to punish the defendant guilty of egregious misconduct and to deter such conduct in the future.[14] It need hardly be emphasized that the punitive damages inquiry—unlike that for compensatory damages—focuses primarily on the egregiousness of the defendant's conduct.[15] As the trial court aptly noted, the degree of culpability underlying a single act—and hence the propriety of imposing punitive damages as a result of that act—should not markedly vary in a setting such as is here presented, when considered with respect to different plaintiffs. Because of this minimal variance, assessing the propriety of punitive damages on the basis of the claims of a cross-section of the plaintiff class should not, in the words of *Fibreboard*, require "lift[ing] the description of the claims to a level of generality that tears

them from their substantively required moorings."[16] That the Phase 2 jury will consider only punitive damages in a mass tort case materially distinguishes this case from *Fibreboard*.[17]

More importantly, the Phase 2 jury is not to extrapolate punitive damages but, rather, is to determine a basis for assessment of punitive damages in the form of a ratio. One might argue that the logic of *Fibreboard*, if not its narrow holding, prohibits use of the Phase 2 procedure to determine quantitatively the amount of actual punitive damages. But Phase 2 purports to do no such thing.[18] Unlike the plan in *Fibreboard*, Phases 2 and 3 appropriately enforce the Louisiana law requirement that a claimant must prove both causation and damage to recover compensatory and punitive damages.[19]

### 2. Applicability of Haslip

[3] Shell and Brown & Root also claim that Phase 2 runs afoul of the latest Supreme Court teaching on punitive damages, *Pacific Mutual Life Insurance Co. v. Haslip*.[20] Essentially reiterating their *Fibre-*

14. *See, e.g., Pacific Mut. Life Ins. Co. v. Haslip*, — U.S. —, —, 111 S.Ct. 1032, 1042, 113 L.Ed.2d 1, 21 (1991); *Creamer v. Porter*, 754 F.2d 1311, 1319 (5th Cir.1985) (federal law); *Karavokiros v. Indiana Motor Bus Co.*, 524 F.Supp. 385, 387 (E.D.La.1981) (citing Restatement (Second) of Torts § 908 (1965)); *Sharp v. Daigre*, 564 So.2d 303, 303 (La.1990) (dissenting opinion); *Creech v. Aetna Cas. & Sur. Co.*, 516 So.2d 1168, 1173 (La.App.1987), *writ denied*, 519 So.2d 128 (La.1988); W. Page Keeton, et al., Prosser & Keeton on Torts, § 2, at 9 (5th ed. 1984).

15. *See Jenkins*, 782 F.2d at 474.

16. *Cf. Sterling v. Velsicol Chemical Corp.*, 855 F.2d 1188, 1197 (6th Cir.1988) (issue of defendant's liability properly resolved on class-wide basis where single course of conduct identical for each plaintiff caused disaster).

17. Shell accurately notes that the Phase 2 jury will, in making its punitive damages determination, consider a "statistical profile" of the claims asserted by the entire class. However, we have previously recognized that ascertainment of punitive damage liability in a class action on the basis of evidence concerning the claims of representative plaintiffs and statistical information about the entire class, before litigation of indi-

vidual damage claims, presents no constitutional infirmity where the court adequately apprises the jury of the nature of the information before it. *See Jenkins*, 782 F.2d at 474. Because Fibreboard involved use of statistical profiles for quantitative assessment of compensatory damages rather than for determination of a basis on which to assess punitive damages, we cannot conclude, as Shell urges, that *Fibreboard* overruled *Jenkins*.

18. Notably, the district court's plan, in compliance with *Fibreboard*, 893 F.2d at 711–12, permits no extrapolation of individual compensatory damage claims: the parties must try in Phase 3 any claims not settled.

19. The similarity of each plaintiff's claim for punitive damages further underscores this point, because the proof offered in Phase 2 should apply to the punitive damage claims of all plaintiffs. To the extent that class members' punitive damage claims differ, we note the generality of the plan, and the potential for further refinement when the district court implements it. Such refinement might, for example, take the form of setting different ratios for different types of claims.

20. *Supra*, n. 14.

board arguments, Shell and Brown & Root claim that because the Phase 2 plan determines damages on the basis of class representation and extrapolation it violates the *Haslip* due process requirements. Shell also argues that the Phase 2 plan violates the rule that punitive damages must bear a reasonable relationship to compensatory damages.

Shell and Brown & Root at best present premature *Haslip* concerns. *Haslip*, while not a class action or a case purporting to address the concerns which might arise relative to punitive damages in a case involving more than 18,000 compensatory claims, does stand for the general proposition that a punitive damage award by a properly instructed jury, where there is adequate post-verdict review, will not violate due process.[21] In addition to recognizing the fundamental purpose of punitive damage awards—to punish the defendant and deter future misconduct—*Haslip* appears to require that the award have a reasonable basis in the conduct and degree of fault of the defendant, and an understandable relationship to compensatory damages.[22] We cannot, at this early stage, conclude that the plan at bar will not satisfy these criteria. The proposed procedure does not provide for the precise mechanisms of the Phase 2 punitive damage trial nor does it detail the Phase 4 judicial review. However, the absence in Louisiana law of a scheme for review of punitive damages awards such as that approved in *Haslip* should not impede the district court's Erie-mandated effort to act as a dutiful Louisiana trial court mindful of the Supreme Court's teaching in *Haslip*. We hold that Phase 2 of the instant plan, on its face, adequately satisfies *Haslip's* command.

**B. Phase 3 Trial Rules and Procedures**

[4] Shell and Brown & Root maintain that the Plan is constitutionally unsound

because the district court intends to limit traditional trial rules in Phase 3. The district court indicates that Phase 3 will "not necessarily [involve] full-blown trials," and that "traditional trial procedures, methods of proof, and evidentiary rules will be abbreviated and simplified to shorten trial time."[23] Further quoting *Newberg on Class Actions*, the trial court states that, in class actions, "[p]leadings, discovery, and strict application of rules of evidence associated with normal adjudication processes for individual lawsuits are often replaced with greatly simplified, informal procedures, often summary in nature...." Appellants insist that this language evinces an intent to limit unduly the application of the Federal Rules of Civil Procedure and Federal Rules of Evidence in Phase 3 proceedings.

At this point we can only speculate about how the district court will fill in the broad outlines of its plan in Phase 3. Such speculative concerns do not, however, present an issue ripe for review at this time. While we do not read the plan, as a whole, as indicating the district court's intent to act impermissibly, we simply remind all that the federal rules have the force of law.[24] The secondary source quoted by the district court offers no credible support for the proposition that our rules of evidence and procedure may be altered or diminished in any manner, in actions of this kind, other than those recognized to be within the sound discretion of the district court. We express our confidence that the district court will adhere to acceptable norms in the shaping of the rules to meet the judicial crisis presented by the instant litigation.

**C. Class Certification**

[5] Brown & Root vigorously opposes litigation of the claims as a class action. Relying on the district court's grant of

---

21. *See id.*, —— U.S. at ——— ———, 111 S.Ct. at 1044–45, 113 L.Ed.2d at 20–22.

22. *See id.* at ——, 111 S.Ct. at 1045, 113 L.Ed.2d at 22.

23. *In re Shell*, 136 F.R.D. at 596 (citing H. Newberg, *Newberg on Class Actions*, §§ 9.63, 9.64).

24. *Societe Nationale Industrielle Aerospatiale v. United States District Court*, 482 U.S. 522, 533, 107 S.Ct. 2542, 2550, 96 L.Ed.2d 461, 477 (1987); 4 C. Wright & A. Miller, Federal Practice & Procedure: Civil § 1030, at 125 (2d ed. 1987); see 28 U.S.C. § 2072.

summary judgment in its favor on the strict liability and punitive damage claims, Brown & Root argues that subject matter jurisdiction concerns militate against maintenance of a class action against it, and that such a class action would violate Fed. R.Civ.P. 23. Brown & Root thus suggests that we should sever it from this class action, and permit it to defend the negligence claims in separate proceedings. These contentions lack merit. We review district court class certification decisions only for abuse of discretion;[25] we find no such abuse here.

### 1. Federal Subject Matter Jurisdiction—Amount in Controversy

[6] Brown & Root urges that the Supreme Court's holding in *Zahn v. International Paper Co.*[26] counsels against class certification against it. *Zahn* teaches that each plaintiff in a class action under Fed. R.Civ.P. 23(b)(3), where subject matter jurisdiction is founded on diversity of citizenship, must independently meet the 28 U.S.C. § 1332 jurisdictional amount requirement.[27] Brown & Root contends that the claims of a substantial number of Subclass A plaintiffs fall short of the required amount in controversy because they assert only claims for fright and minor property damage, and because the district court has granted summary judgment for Brown & Root on punitive damages. Because the *Zahn* rule will require dismissal of the claims against it by an unknown number of Subclass A members, it argues that we

should limit the class action proceedings for that subclass to claims against Shell.

Brown & Root fails to consider four principles which guide application of the *ad damnum* requirement. The Supreme Court has held the amount claimed in good faith by initial pleadings controls the question of amount in controversy.[28] Further, it must appear to a legal certainty that the claim is for less than the jurisdictional amount before a court may dismiss for lack of quantum. Third, subsequent events generally will not deprive the federal court of its jurisdiction.[29] Finally, when a claim includes compensatory and punitive damages, both must be considered in determining the amount in controversy.[30]

The complaints in this action seek over $32,750,000,000 in damages—far in excess of the $10,000 then required for each member of Subclass A.[31] Further, because Louisiana law permits all plaintiffs proving actual damages to share in any punitive damages award,[32] the claim for punitive damages increases the amount in controversy for each class member. There is no suggestion that plaintiffs made their damage claims other than in good faith. There is no record basis upon which such a finding can be made at this time. The district court here has not, in contrast to the *Zahn* trial court, found to a legal certainty that any plaintiff had suffered damages of less than $10,000. Brown & Root's jurisdictional argument based on quantum fails.

---

25. Jenkins, 782 F.2d at 472 (citing *Horton v. Goose Creek Independent School District*, 690 F.2d 470, 483 (5th Cir.1982), *cert. denied*, 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983); *Boggs v. Alto Trailer Sales, Inc.*, 511 F.2d 114, 117 (5th Cir.1975)).

26. 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973).

27. As this action was commenced prior to May 18, 1989, the $10,000 amount in controversy requirement in effect before the 1988 amendments to 28 U.S.C. § 1332 applies.

28. See *St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 58 S.Ct. 586, 82 L.Ed. 845 (1938).

29. See *id.*; *Seafoam, Inc. v. Barrier Systems, Inc.*, 830 F.2d 62, 66 (5th Cir.1987).

30. *Bell v. Preferred Life Assur. Soc.*, 320 U.S. 238, 64 S.Ct. 5, 88 L.Ed. 15 (1943).

31. A review of the damages sought in the instant action finds one complaint seeking $30,000,000,-000 (Watson), another seeking $2,750,000,000 (Cauley), and a third, the "Master Pleadings," seeking unspecified and unlimited punitive damages. The essence of Shell's argument is that 18,000 class members multiplied by $10,000 is only 180 million dollars, an amount well below the total of the good faith *ad damnum* prayers.

32. See La.Civ.Code Ann. art. 2315.3 (West Supp. 1992).

[7] The dismissal of the punitive damages claims against Brown & Root does not alter this conclusion. In *Seafoam* we found that dismissal by summary judgment of one of plaintiff's claims as time barred did not warrant dismissal of the other for lack of subject matter jurisdiction, even though the remaining claim was for less than the jurisdictional amount. The summary judgment in favor of Brown & Root on the punitive damages issue presents an analogous situation. We therefore conclude that consistent with *Zahn, Red Cab* and *Seafoam*, the voiced subject matter jurisdiction concerns do not militate against class certification of the claims against Brown & Root.

### 2. Numerosity of Subclass B

[8] Pointing to the fact that Subclass B contains only 16 plaintiffs, Brown & Root argues that this subclass fails the numerosity requirement of Rule 23(a)(1). That requirement imposes no mechanical rules,[33] turning instead on the practicability of joining all class members individually.[34] We previously have noted that while the number of claimants is relevant to this determination, a court also may consider other factors, including the nature of the action. In the instant case, the district court's class certification includes Subclass B in a larger class of more than 18,000 plaintiffs for the purposes of litigating liability issues with respect to Shell and Brown & Root. Considering the nature of this action, we cannot say that identifying Subclass B for the purpose of litigating the related issue of Shell's liability for intentional tort, amount-

ed to an abuse of the trial court's broad discretion.

### 3. Predominant Common Issues

[9, 10] Brown & Root, citing *Jenkins,* urges that the absence of issues common to both defendants requires its dismissal from the class action. Brown & Root misperceives controlling law. The commonality requirement of Fed.R.Civ.P. 23(b)(3) is intended to ensure that the disallowance of individual trials is warranted by a sufficient gain in efficiency.[35] Rule 23(b)(3) accordingly requires that "resolution of the common questions affect all or a substantial number of the *class members."* [36] The commonality requirement focuses on the common issues relevant to claims by or against the class members; it does not require that all issues be common to all parties. In the litigation at bar the claims of all plaintiffs require resolution of Shell's liability for punitive damages and of Brown & Root's liability for negligence, both arising out of the same event.[37] That the plaintiffs assert different theories against Shell and Brown & Root does not obviate the commonality of issues.

[11] Brown & Root further suggests that the class issues thus far identified will not "predominate" as required by Fed. R.Civ.P. 23(b)(3). In the context of mass tort litigation, we have held that a class issue predominates if it constitutes a significant part of the individual cases.[38] The class issues to be determined by the Phase 1 jury form integral elements of the claims asserted by each of the more than 18,000 plaintiffs.[39] There can be no serious con-

---

33. *General Telephone Co. v. Equal Employment Opportunity Comm'n,* 446 U.S. 318, 330, 100 S.Ct. 1698, 1706, 64 L.Ed.2d 319 (1980).

34. *Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1038 (5th Cir. July 1981) (citations omitted).

35. *Jenkins,* 782 F.2d at 472; 7A C. Wright & A. Miller, *supra,* § 1777, at 519.

36. *Jenkins,* 782 F.2d at 472 (emphasis added).

37. Brown & Root also points to *Yandle v. PPG Industries, Inc.,* 65 F.R.D. 566 (E.D.Tex.1974) and the Advisory Committee note to Fed. R.Civ.P. 23(b)(3) in support of its proposition

that. because mass tort cases often present disparate issues, they are generally inappropriate for class action litigation. These authorities have no application to the instant litigation in which many people suffered injury resulting from a common disaster and seek recovery on identical theories.

38. *Jenkins,* 782 F.2d at 472.

39. To the extent that Brown & Root argues that the main issue in this litigation is Shell's liability for punitive damages and that the issue of its liability does not predominate, Brown & Root's argument fails to persuade. The plaintiff class has asserted claims for negligence against

tention that the district court abused its discretion in determining that these issues predominate for the purpose of class certification.

### 4. Superiority

[12] Brown & Root finally contends that class proceedings are not a "superior" means of litigating its negligence liability, as required by Fed.R.Civ.P. 23(b)(3). Pointing to *In re Tetracycline Cases*,[40] Brown & Root argues that the variety of class issues will confuse the Phase 1 jury. It further suggests that because it will seek contribution from other contractors, the class action is not a superior means for litigating its negligence liability. Brown & Root insists that class litigation will not reduce complexity and will not substantially reduce the number of issues left for decision in the Phase 3 trials. These arguments fail to persuade.

The proposed Phase 1 should not unduly confuse the jury. This litigation differs markedly from toxic tort cases such as *Jenkins, Fibreboard*, and *Tetracycline*, in which numerous plaintiffs suffer varying types of injury at different times and through different causal mechanisms, thereby creating many separate issues. The case at bar actually will present fewer and simpler issues to the Phase 1 jury. Further, we cannot find that the trial court abused its discretion in opting to utilize the class action in this case simply because Brown & Root may seek contribution from other contractors. Finally, because of the great import of the class issues to the claims of each plaintiff, we cannot agree with defendants' contention that class litigation will not reduce the number of issues or complexity in the Phase 3 trials. To the contrary, after the Phase 1 resolution, only causation and damages will remain in each plaintiff's claim against Brown & Root. In light of the massive proportions of this

litigation, and the need to reduce the systemic burden it will impose, we cannot conclude that the district court abused its discretion in fashioning this class-litigation format.

### III. Conclusion

In *Fibreboard* we reluctantly issued a writ of mandamus, vacating a portion of the trial plan in that case. In so doing, however, we closed with a salute to the trial judge:

> We admire the work of our colleague, Judge Robert Parker, and are sympathetic with the difficulties he faces. This grant of the petition for writ of mandamus should not be taken as a rebuke of an able judge, but rather as another chapter in an ongoing struggle with the problems presented by the phenomenon of mass torts.[41]

Judge Parker had 3,031 cases consolidated in one action. Judge Henry Mentz has more than 18,000 plaintiffs in the case now before him. We express our admiration for the manner in which Judge Mentz, aided by a very able magistrate judge and equally able trial counsel, has woven our mass tort case law into an acceptable and workable trial plan. We AFFIRM the district court's orders establishing that trial plan and return this case to the district court for further proceedings.



---

Brown & Root. The plaintiffs must therefore prove Brown & Root's negligence and even though they may be more interested in punitive damages from Shell than in recovering compensatory damages from Brown & Root, issues with respect to Brown & Root predominate for the purposes of Fed.R.Civ.P. 23(b)(3).

40. 107 F.R.D. 719 (W.D.Mo.1985).

41. *Fibreboard*, 893 F.2d at 712.

individual liability. I would affirm on that basis.



**WESTFALL FAMILY FARMS, INC.,
G. David Westfall, and Chris
Westfall, Appellants,**

v.

**KING RANCH, INC., Appellee.**

No. 05–92–00262–CV.

Court of Appeals of Texas,
Dallas.

March 4, 1993.

Plaintiff moved for sanctions against defendants for abuse of discovery. The 86th District Court, Kaufman County, Glen M. Ashworth, J., struck defendants' pleadings and counterclaim and entered default judgment against them, and they appealed. The Court of Appeals, Baker, J., held that trial court abused its discretion in ordering "death penalty" sanctions.

Reversed and remanded.

**1. Pretrial Procedure** ⟸**44.1, 46**

"Death penalty sanction" is term given to trial court's option to strike pleadings of party for abuse of discovery, dismissing with or without prejudice party's action or rendering default judgment against party. Vernon's Ann.Texas Rules Civ.Proc., Rule 215, subd. 2, par. b(5).

See publication Words and Phrases for other judicial constructions and definitions.

**2. Pretrial Procedure** ⟸**44.1**

Trial court's imposition of discovery sanctions is within its discretion. Vernon's Ann.Texas Rules Civ.Proc., Rule 215.

**3. Appeal and Error** ⟸**961**

Court of Appeals sets aside trial court's decision to impose discovery sanctions only upon showing of clear abuse of discretion.

**4. Appeal and Error** ⟸**946**

Test for abuse of discretion is not whether, in opinion of reviewing court, facts present proper case for trial court's action, but, rather, whether trial court acted without reference to any guiding rules or principles, that is, whether trial court's action was arbitrary and capricious.

**5. Pretrial Procedure** ⟸**44.1**

In determining discovery sanctions, trial court may consider entire record and all of offending party's conduct during litigation. Vernon's Ann.Texas Rules Civ.Proc., Rule 215.

**6. Appeal and Error** ⟸**946**

That trial court decided matter within its discretionary authority in way different from that in which appellate court might rule under similar circumstances does not show that trial court abused its discretion.

**7. Appeal and Error** ⟸**1043(6)**

To support reversal, trial court's imposition of requested discovery sanctions must amount to such denial of appellant's rights as was reasonably calculated to cause, and probably did cause, rendition of improper judgment. Rules App.Proc., Rule 81(b)(1).

**8. Pretrial Procedure** ⟸**44.1**

Trial court abuses its discretion if discovery sanction it imposes does not further one of purposes of such sanctions.

**9. Pretrial Procedure** ⟸**44.1**

Purposes of discovery sanctions are to secure parties' compliance with discovery rules, deter other litigants from violating rules, and punish parties who violate rules. Vernon's Ann.Texas Rules Civ.Proc., Rule 215.

**10. Pretrial Procedure** ⟸**44.1**

Trial court must reserve "death penalty" discovery sanctions for circumstances in which party has so abused procedural rules that, despite imposition of lesser

Case 2:00-cv-00061   Document 9   Filed in TXSD on 03/27/2000   Page 82 of 107

1998 U.S. Dist. LEXIS 15544 printed in FULL format.

SHELTON I. GOLDSTEIN, et al., Plaintiffs, vs. VICKI DICKINSON, Defendant.

Civil Action No. 3:98-CV-1597-D

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

1998 U.S. Dist. LEXIS 15544

September 25, 1998, Decided

September 25, 1998, Filed; September 28, 1998, Entered on Docket

DISPOSITION: [*1] Plaintiffs' motion to remand denied.

COUNSEL: For SHELTON I GOLDSTEIN, TIMELESS COLLECTIBLES INC, plaintiffs: Larry Ray Boyd, Attorney at Law, Abernathy Roeder Robertson & Joplin, McKinney, TX USA.

For VICKI DICKINSON, defendant: Mark Ian Agee, Attorney at Law, Law Office of Mark I Agee, Dallas, TX USA.

For VICKI DICKINSON, defendant: Roy S Dickinson, Attorney at Law, Law Office of Roy S Dickinson, Norman, OK USA.

JUDGES: SIDNEY A. FITZWATER, UNITED STATES DISTRICT JUDGE.

OPINIONBY: SIDNEY A. FITZWATER

OPINION: MEMORANDUM OPINION AND ORDER

Plaintiffs Shelton I. Goldstein ("Goldstein") and Timeless Collectibles, Inc. ("Timeless") move to remand this removed action to Texas state court, contending the amount in controversy is not sufficient to confer jurisdiction upon this court. The court denies the motion.

I

Goldstein, a Texas citizen, and Timeless, a Texas corporation that maintains its principal place of business in Dallas, Texas, initiated this action in Texas state court against defendant Vicki Dickinson ("Dickinson"), an Oklahoma citizen. In their original state court petition, Goldstein and Timeless allege claims for breach of contract and negligent misrepresentation. Plaintiffs [*2] seek an accounting and actual damages in the amount of $ 60,000 plus punitive damages and attorney's fees and costs. Dickinson removed the case to this court based on diversity jurisdiction. Plaintiffs now move to remand, contending the amount in controversy is below the statutory minimum.

II

Removal on the basis of diversity of citizenship is not available unless the matter in controversy exceeds the sum or value of $ 75,000, exclusive of interest and costs. See 28 U.S.C. § 1332(a). There is no dispute that the parties are diverse citizens. The court therefore turns to the second requirement for diversity jurisdiction--an amount in controversy that exceeds $ 75,000.

In considering whether the jurisdictional amount is present, the court looks to the amount in controversy rather than to the actual damages sustained. See Garza v. Rodriguez, 559 F.2d 259, 260 (5th Cir. 1977). Although defendant bears the burden of proving the jurisdictional amount, removal is proper if there is a "reasonable probability of an amount in controversy exceeding the jurisdictional amount" and that "amount can be ascertained pursuant to some realistic formula." Ezon v. Cornwall Equities Ltd., [*3] 540 F. Supp. 885, 889 (S.D. Tex. 1982) (citation omitted). The court must consider the amount of punitive damages and attorney's fees in determining whether the requisite amount in controversy exists. See St. Paul Reinsurance Co. v. Greenberg, 134 F.3d 1250, 1253 (5th Cir. 1998). Plaintiffs' petition asserts a claim for negligent misrepresentation and seeks to recover $ 95,000, including $ 60,000 for actual damages, $ 25,000 for punitive damages, and $ 10,000 for attorney's fees. Pet. at 7, PP 6.3

   

Case 2:00-cv-00061    Document 9    Filed in TXSD on 03/27/2000    Page 83 of 107

& 6.4. The amount in controversy is therefore sufficient to confer subject matter jurisdiction on this court, and the motion to remand is denied.

  SO ORDERED.

September 25, 1998.

SIDNEY A. FITZWATER

UNITED STATES DISTRICT JUDGE

  

# ENVIRONMENTAL/TOXIC EXPOSURE CASES
## DAMAGES SOUGHT/ AWARDED

| Name | Court | Type | Amount of Damages Sought/ Awarded | Comments |
|------|-------|------|-----------------------------------|----------|
| Balboa v. Kerr-McGee Corporation | 28th Nueces County, Corpus Christi, Texas 91-2907A | Hydrofluoric Alkylation Explosion | $6,000,000.00 | Damages awarded for injuries suffered as a result of explosion at a hydrofluoric alkylation unit refinery |
| DeLelosSantos v. Occidental Chemical Corp. | 933 S.W.2d 493 (Tex. 1996) | Toxic Cloud Case | $65,700,000.00 | Damages awarded 8,600 residents for exposure to butadiene |
| Herman v. Sunshine Chem. Specialties | 627 A.2d 1081 (N.J. 1993) | Toxic Exposure | $810,000.00 | Damages awarded for exposure to caustic soda in cleaning product |
| Loughridge v. Stan Trans, Inc. | 94 CV 0521 Galveston County, Galveston, Texas | Toxic Exposure | $4,374,140.00 | Damages sought for release of vapors |
| Louisville and Nashville Road v. Hickman | 445 So.2d 1023 (Fla. Dist. Ct. App. 1983). | Toxic Exposure | $7,050,000.00 | Damages awarded for release of poisonous gas |
| Orias v. Louisiana - Pacific Corp. | 31 F.3d 995 (10th Cir.) | Toxic Cloud Case | $2,300,000.00 | Damages sought for release of ashes and organic compounds from wafer board factory |
| Smith v. City of San Antonio | 81-CI-15,966 San Antonio, Texas | Negligence and Nuisance Case | $1,168,000.00 | Plaintiff settled for $61,000 for injuries caused by ingestion of harmful and hazardous gases and chemicals |

create and post such a plan. Herrera did not post a classroom discipline plan. These requirements, according to the court of appeals, are ministerial. Accordingly, because Herrera did not create or post a classroom discipline plan, the court of appeals held that she did not have immunity.

The Texas Education Code provides:

A professional employee of a school district is not personally liable for any act that is incident to or within the scope of the duties of the employee's position of employment and that involves the exercise of judgment or discretion on the part of the employee, except in circumstances in which a professional employee uses excessive force in the discipline of students or negligence resulting in bodily injury to students.

Tex.Educ.Code § 22.051(a). Here, Downing does not dispute that Herrera is a professional employee and that her acts were in the scope of her duties as a school district employee. Therefore, the only issue is whether Herrera's actions were ministerial or "required the exercise of judgment or discretion." We hold that maintaining classroom discipline requires the exercise of judgment or discretion. Therefore, Herrera has immunity in this case.

[1, 2] Ministerial acts are those "[w]here the law prescribes and defines the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *City of Lancaster v. Chambers*, 883 S.W.2d 650, 654 (Tex.1994). Ministerial actions require obedience to orders or the performance of a duty to which the actor has no choice. *Chambers*, 883 S.W.2d at 654. On the other hand, if an action involves personal deliberation, decision and judgment, it is discretionary. *Chambers*, 883 S.W.2d at 654.

[3, 4] In our view, maintaining classroom discipline involves personal deliberation, decision and judgment. Moreover, LISD's policy does not define teachers' responsibilities with such precision to leave nothing to the exercise of a teacher's judgment or discretion. To the contrary, the plan gave Herrera no guidelines about: (1) the contents and substance of the discipline management plan she was to develop and maintain for her class-

room, (2) what types of disciplinary techniques to use, (3) what forms of student misconduct should result in disciplinary sanctions, (4) when or where to discipline her students, (5) which students should be referred to the principal's office for discipline, (6) how to develop such a discipline management plan for her classroom, or (7) how to maintain such a plan. Each of these decisions, which Texas schools routinely leave to its teachers, require the use of professional judgment and discretion. *See, e.g.,* Tex. Educ.Code § 37.002; *see also Burton v. Kirby,* 775 S.W.2d 834, 836 (Tex.App.—Austin 1989, no writ).

The court of appeals' analysis of whether Herrera's actions required discretion or judgment was too narrow. The court of appeals focused solely on whether Herrera created and posted a written classroom discipline plan. However, the focus should remain on whether maintaining classroom discipline is a discretionary function. *See Chambers*, 883 S.W.2d at 653. To separate the actions of creating and posting a classroom discipline plan from the broad responsibility of maintaining classroom discipline undermines the effect of the qualified immunity the Legislature meant for § 22.051 to provide.

Accordingly, without hearing oral argument, the Court grants Herrera's application for writ of error and denies Downing's application for writ of error. Tex. R.App. P. 170. We reverse the court of appeals in part and render judgment for Herrera.



**Russell LEITCH, Hal Crews, and Pro Com Marketing Services, Inc., Petitioners,**

v.

**Grady HORNSBY, Respondent.**

No. 94–1323.

Supreme Court of Texas.

Argued Sept. 5, 1996.

Decided Dec. 13, 1996.

Injured employee brought negligence action against his corporate employer and two

Case 2:00-cv-00061   Document 9   Filed in TXSD on 03/27/2000   Page 86 of 107

of its officers. The 225th District Court, Bexar County, John Specia, Jr., J., entered judgment upon jury verdict against employer and officers. Employer and officers appealed. The Court of Appeals, 885 S.W.2d 243, affirmed. On application for writ of error, the Supreme Court, Baker, J., held that: (1) officers could not be held individually liable for employee's injury, and (2) no evidence supported jury's finding that employee's back injury was proximately caused by employer's breach of alleged duty to provide lifting equipment.

Reversed.

Abbott, J., concurred with opinion.

**1. Employers' Liability ⚖11**

Employer is not insurer of its employees' safety at work; however, employer does have duty to use ordinary care in providing safe workplace.

**2. Corporations ⚖306**

When employer is corporation, law charges corporation itself, not individual corporate officer, with duty to provide employee safe workplace.

**3. Corporations ⚖306**

Corporate officer or agent can be liable to others, including other company employees, for his or her own negligence; however, individual liability arises only when officer or agent owes independent duty of reasonable care to injured party apart from employer's duty.

**4. Corporations ⚖1.6(13), 306**

Unless alter ego is established, corporate officers and agents are subject to personal liability for their actions within employment context only when they breach independent duty of care.

**5. Corporations ⚖1.6(13), 306**

Corporate officers could not be held individually liable in negligence action for injuries sustained by employee of corporation, where jury found that corporation was not alter ego of officers, and record did not indicate that officers had breached any independent duty of care apart from employer's nondelegable duty to provide safe workplace.

**6. Appeal and Error ⚖930(3), 1001(3)**

When reviewing no evidence claim, Supreme Court considers only evidence and inferences tending to support jury's fact-finding and disregards all contrary evidence and inferences; if there is any evidence of probative force to support finding, Court overrules point of error and upholds jury's finding.

**7. Appeal and Error ⚖1001(3)**

If there is scintilla of probative evidence in record to support finding, no evidence challenge fails.

**8. Negligence ⚖56(1.3), 59**

Plaintiff in negligence action must plead and prove that defendant's negligence is proximate cause of his or her injury; proximate cause consists of cause in fact and foreseeability.

**9. Negligence ⚖59**

Foreseeability of plaintiff's back injury in connection with regular lifting of heavy objects is judged by reasonable person standard, for purposes of determining existence of proximate cause in negligence action.

**10. Damages ⚖185(1)**

Where there is no medical testimony linking alleged negligence to injury, claimant must provide probative evidence, through expert testimony, connecting injury to alleged negligence.

**11. Appeal and Error ⚖1001(3)**
  **Evidence ⚖568(1)**

Incompetent opinion testimony is not evidence, and finding supported only by such testimony cannot survive no evidence challenge.

**12. Negligence ⚖134(11)**

Proof of causation in negligence action cannot turn upon speculation or conjecture.

**13. Employers' Liability ⚖206.1**

No evidence supported jury's finding, in injured employee's negligence action against employer, that employee's back injury was proximately caused by employer's breach of alleged duty to provide lifting equipment;

employee's treating physician refused to comment as to whether employee's injury could have been prevented by use of lift belt, and co-worker's unqualified expert testimony that use of lift belt would have eliminated employee's injury had no probative worth.

_____

Charles M. Jefferson, San Antonio, for Petitioners.

Charles A. Nicholson, San Antonio, for Respondent.

BAKER, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and GONZALEZ, HECHT, CORNYN, ENOCH and OWEN, Justices, join.

Grady Hornsby sued his employer, Pro Com Marketing Services, Inc., for damages for back injuries Hornsby suffered when he lifted a cable reel. Hornsby also joined Russell Leitch and Hal Crews, officers, directors, and stockholders of Pro Com as defendants. The trial court rendered judgment on a jury verdict against Pro Com, Leitch, and Crews, jointly and severally for almost $700,000. The court of appeals affirmed the trial court's judgment. 885 S.W.2d 243.

This appeal raises the issue of the corporate officers' personal liability and whether there is some evidence of negligence and causation for Hornsby's injury. We conclude the court of appeals erred in affirming the trial court's judgment holding Leitch and Crews individually liable. We also conclude that Hornsby produced no probative evidence to prove causation between his back injury and Pro Com's alleged negligence. Accordingly, we reverse the court of appeals' judgment and render judgment that Grady Hornsby take nothing from Pro Com Marketing Services, Inc., Russell Leitch, and Hal Crews.

## I. BACKGROUND

### A. FACTS

Pro Com is a cable television servicing company. In 1989, Pro Com began installing cable wire for households to which it had sold cable services. When it began installation of

cable wire, Pro Com hired Grady Hornsby to be its technical manager. As technical manager, Pro Com placed Hornsby in charge of cable installation, including the training and supervision of other Pro Com employees. While preparing to go to a job site for a Pro Com contract, Hornsby began unloading equipment from his truck including a reel of cable. Hornsby did not wear a lift belt, nor did he have a dolly available to unload the cable reel. The reel weighed about 65 pounds. When he lifted the reel he injured his back.

Before working for Pro Com, Hornsby had worked for eight to ten different cable companies. None of these companies had provided lifting belts for its employees. Hornsby testified some of his previous employers had provided their workers with safety belts but not lifting belts. Some of the companies had supplied dollies for their employees. Hornsby requested Pro Com to furnish some of this equipment. Pro Com refused to do so.

### B. THE TRIAL AND APPEAL

At the time of Hornsby's injury, Pro Com did not subscribe to workers' compensation insurance. Consequently, Hornsby sued Pro Com, Leitch, and Crews for common law negligence. Hornsby asserted that all three defendants did not provide a safe work place and equipment, did not provide proper equipment, did not provide a protective lift belt, and did not give safety instructions and training. The jury found that Hornsby's injury occurred while he acted as a Pro Com employee, that the negligence of Pro Com, Leitch, and Crews proximately caused Hornsby's injuries, that Hornsby's damages were $594,000, and that Pro Com was not the alter ego of Leitch and Crews. The trial court rendered judgment on the jury verdict and held Pro Com, Leitch, and Crews jointly and severally liable for the damages the jury awarded together with prejudgment interest. The court of appeals affirmed the trial court's judgment.

## II. OFFICER'S LIABILITY

Leitch and Crews contend that the court of appeals erred in affirming the trial court's

judgment that they were individually liable for Hornsby's injuries. The court of appeals noted that the jury found both Leitch and Crews guilty of negligence proximately causing Hornsby's injury. The court of appeals held that a corporate officer may be personally liable for corporate wrongdoing when that officer is an active participant in the tortious conduct or has actual or constructive knowledge of the corporation's tortious conduct. The court of appeals observed that imposing personal liability on a corporate agent presupposes the agent participated in the wrongdoing or that the agent had knowledge of and consented to the wrongdoing. Leitch and Crews argue that this presupposition is erroneous because Leitch and Crews, as corporate officers, owed no individual duty to Hornsby as a Pro Com employee.

Hornsby argues that he sued Leitch and Crews as individuals and not as corporate officers. He asserts that because the jury found both Leitch and Crews individually liable the court of appeals correctly affirmed the trial court's judgment. Hornsby argues that Leitch and Crews are individually responsible because of their positions at Pro Com, their knowledge of the work, and the fact that an employer has a nondelegable and continuous duty to an employee to provide a safe place to work.

## A. APPLICABLE LAW

[1, 2] An employer is not an insurer of its employees' safety at work; however, an employer does have a duty to use ordinary care in providing a safe work place. *I.M. Werner v. Colwell*, 909 S.W.2d 866, 869 (Tex.1995). For decades, this Court has recognized that this duty is an implied part of the employer-employee relationship. *See Missouri, Kan. & Tex. Ry. v. Hennig*, 91 Tex. 347, 43 S.W. 508, 510 (1897). When the employer is a corporation, the law charges the corporation itself, not the individual corporate officer, with the duty to provide the employee a safe workplace. *Fort Worth Elevators Co. v. Russell*, 123 Tex. 128, 70 S.W.2d 397, 401 (1934), *disapproved on other grounds*, 725 S.W.2d 712, 714 (Tex.1987); *Harrison v. Oliver*, 545 S.W.2d 229, 230 (Tex.Civ.App.—Houston [1st Dist.] 1976, writ dism'd); *see*

*also J. Weingarten, Inc. v. Moore*, 449 S.W.2d 452, 453 (Tex.1970) (no liability against corporate agent absent individual duty to fellow employee).

[3] A corporate officer or agent can be liable to others, including other company employees, for his or her own negligence. However, individual liability arises only when the officer or agent owes an independent duty of reasonable care to the injured party apart from the employer's duty. *See Colwell*, 909 S.W.2d at 868; *Karl & Kelly Co. v. McLerran*, 646 S.W.2d 174, 175 (Tex.1983); RESTATEMENT (SECOND) OF AGENCY § § 343, 350 (1958). For example, an agent whose negligence causes an auto accident may be held individually liable along with his or her employer when driving in the course and scope of employment. *See Schneider v. Esperanza Transmission Co.*, 744 S.W.2d 595, 596–97 (Tex.1987)(liability for negligent entrustment "rests upon the combined negligence of the owner [employer] ... and negligence of the driver"); *Le Sage v. Pryor*, 137 Tex. 455, 154 S.W.2d 446, 448 (App.1941) (employer and employee subject to liability for auto accident). Because the agent owes a duty of reasonable care to the general public regardless of whether the auto accident occurs while driving for the employer, individual liability may attach. *See Schneider*, 744 S.W.2d at 596–97.

[4] Thus, unless alter ego is established, corporate officers and agents are subject to personal liability for their actions within the employment context only when they breach an independent duty of care. *See Colwell*, 909 S.W.2d at 868; *Fort Worth Elevators*, 70 S.W.2d at 401; *see also Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex.1995).

## B. APPLICATION OF LAW TO FACTS

[5] Here, the jury found that Pro Com, Leitch, and Crews were each negligent and responsible for Hornsby's injuries. However, the jury also found that Hornsby was Pro Com's employee and failed to find Pro Com was the alter ego of Leitch and Crews. The court of appeals held that a corporate officer is not shielded from personal liability and that an officer may be found negligent for the officer's own acts. The court of appeals

noted that there was evidence that Leitch and Crews, officers and shareholders of Pro Com, took an active role in the managing the daily operations of Pro Com, Hornsby's employer. The court of appeals concluded that when an officer performs duties for his principal. the officer owes a duty to avoid negligence. whether active or passive. Based on the evidence in the record and the legal conclusions it reached, the court of appeals affirmed the trial court's judgment. We conclude the court of appeals erred because it did not properly analyze the source of the duty breached in this case.

Leitch and Crews were not Hornsby's employers. The jury found that Pro Com was Hornsby's employer. As Hornsby's employer, Pro Com had the nondelegable duty to use ordinary care in providing Hornsby with a safe workplace. *Werner,* 909 S.W.2d at 869; *Harrison,* 545 S.W.2d at 230. However, the jury did not find that Pro Com was the alter ego of Leitch and Crews. Accordingly, under the record and as a matter of law, Leitch and Crews were acting within their capacities as officers of Pro Com and not in their individual capacities. The alleged actions by Leitch and Crews, whether active or passive, were actions of a corporate officer on behalf of Pro Com and deemed Pro Com's acts. *Holloway,* 898 S.W.2d at 795. Leitch and Crews had no individual duty as corporate officers to provide Hornsby with a safe workplace. The duty to provide a safe workplace was a nondelegable duty imposed on, and belonging solely to, Pro Com. *Fort Worth Elevators,* 70 S.W.2d at 401; *Harrison,* 545 S.W.2d at 230. The record does not show a breach of any other duty by Leitch and Crews. Because a corporate officer acting on the corporation's behalf does not owe a corporate employee an individual duty to provide that employee with a safe work place, and because Leitch and Crews did not breach any separate duty, the court of appeals erred in affirming their individual liability. We hold Leitch and Crews are not individually liable.

## III. NEGLIGENCE AND CAUSATION

Although Hornsby alleged Pro Com did not provide proper safety instructions and training, Hornsby's evidence focused on Pro Com's failure to provide proper lifting equipment. Hornsby produced no evidence of lack of proper training. Moreover, Hornsby testified that as Pro Com's technical manager, he knew how to properly lift cable wire. Pro Com, Leitch, and Crews contend that the basis of Hornsby's complaint is that he would not have injured his back if he had been furnished a lift belt or other equipment to lift the cable reel out of his truck. They argue that the evidence shows that business custom in the cable installation industry is that the industry does not provide its installers with lifting equipment such as lift belts. They assert this is evidence that they were not negligent when they declined to provide Hornsby with lifting equipment. Pro Com, Leitch, and Crews also argue that, assuming they owed a duty to furnish Hornsby with lifting equipment, their breach of such a duty was not the cause of Hornsby's injury. Finally, they assert Hornsby did not present any evidence to show his injury would not have happened if he had been provided with and had been using a lift belt or other lifting equipment.

### A. APPLICABLE LAW

#### 1. No Evidence—Standard of Review

[6, 7] When we review a no evidence claim, we consider only the evidence and inferences tending to support the jury's fact finding. We disregard all contrary evidence and inferences. *See Transport Ins. Co. v. Faircloth,* 898 S.W.2d 269, 275–76 (Tex.1995); *Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993). If there is any evidence of probative force to support the finding, we overrule the point of error and uphold the jury's finding. *Southern States Transp., Inc. v. State.* 774 S.W.2d 639, 640 (Tex.1989); *Stafford v. Stafford.* 726 S.W.2d 14, 16 (Tex. 1987). If there is more than a scintilla of probative evidence in the record to support the finding, a no evidence challenge fails. *Stafford.* 726 S.W.2d at 16.

#### 2. Proximate Cause

[8–12] A plaintiff must plead and prove that the defendant's negligence is the proximate cause of his injury. Proximate cause consists of cause in fact and foreseeability. *See Farley v. M M Cattle Co.,* 529 S.W.2d

Case 2:00-cv-00061 Document 9 Filed in TXSD on 03/27/2000 Page 90 of 107

751, 755 (Tex.1975). The foreseeability of a back injury in connection with regular lifting of heavy objects is judged by a reasonable person standard. *See Exxon Corp. v. Roberts,* 724 S.W.2d 863, 867 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.). In a case like this one, where there is no medical testimony linking the alleged negligence to the injury, a claimant must provide probative evidence, through expert testimony, connecting the injury to the alleged negligence. *See Lenger v. Physician's Gen. Hosp., Inc.,* 455 S.W.2d 703, 706 (Tex.1970); *Sears, Roebuck & Co. v. Hurst,* 652 S.W.2d 563, 565 (Tex.App.—Fort Worth 1983, writ ref'd n.r.e.); *Orkin Exterminating Co. v. Davis,* 620 S.W.2d 734, 736–37 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.); *cf. Royal Globe Ins. Co. v. Suson,* 626 S.W.2d 161, 163–64 (Tex.App.—Fort Worth 1981, writ ref'd n.r.e.)(holding that expert testimony not required to establish link between back injury and on-the-job incident). Whether proper lifting equipment would have prevented the injury is not a question that can be answered by general experience. *See Lenger,* 455 S.W.2d at 706. Incompetent opinion testimony is not evidence, and a finding supported only by such testimony cannot survive a no evidence challenge. *See Missouri Pac. R.R. Co. v. Buenrostro,* 853 S.W.2d 66, 77 (Tex.App.—San Antonio 1993, writ denied); Calvert, *"No Evidence" & "Insufficient Evidence" Points of Error,* 38 Tex L.Rev. 361, 362–63 (1960). Proof of causation cannot "turn upon speculation or conjecture." *Lenger,* 455 S.W.2d at 706.

## B. Application of Law to Facts

[13] Hornsby pleaded that Pro Com did not provide him with proper equipment to lift heavy objects and other gear related to the business. Hornsby testified that he had to carry heavy reels of cable for Pro Com. Hornsby said he frequently requested safety equipment from Pro Com such as dollies, lift belts or truck mounted reels. One of Hornsby's co-workers testified that he and Hornsby requested dollies and holders for the spools. Hornsby also testified that he had previously worked for eight to ten cable installation companies and that none of those companies had furnished lift belts. The evidence also showed that Hornsby and others requested Pro Com to provide lift belts, dollies, or truck mounted reels and Pro Com refused to do so.

We assume, without deciding, that Pro Com had a duty to provide Hornsby with proper lifting equipment. We also assume, without deciding, that Hornsby's back injury was caused by lifting the cable reel. Despite these assumptions, the record is clear, and we conclude, that no probative evidence exists that Hornsby's injury was proximately caused by the breach of any such duty.

The record shows Hornsby's treating physician testified that lifting the cable reel caused Hornsby's back injury. However, in response to a question about whether Hornsby's injury could have been prevented by the use of a lift belt, Hornsby's treating physician testified: "I would be unable to comment. I don't think there is anything that would be available to say yes or no in that respect." This testimony is no evidence of causation. *See Lenger,* 455 S.W.2d at 706–07.

Hornsby's co-worker, Larry Whidden, did not witness the incident in question. Hornsby did not offer Whidden as an expert witness. Nevertheless, Whidden expressed his opinion that the use of a lift belt would have eliminated Hornsby's injury. Pro Com argues that Whidden's testimony is no evidence, because as Pro Com objected at trial, Whidden was not qualified to testify about whether lifting equipment would have prevented Hornsby's injury. We agree. Whidden's testimony has no probative worth and is not proper evidence of causation because his testimony amounts to mere conjecture, and because he was not qualified to testify about what type of lifting devices might have prevented Hornsby's injuries. *See* Tex. R.Civ.Evid. 702; *Lenger,* 455 S.W.2d at 706; *Buenrostro,* 853 S.W.2d at 77. Therefore, this is no evidence to support the jury's verdict.

There is no other evidence in the record connecting Hornsby's injury with Pro Com's failure to provide proper lifting equipment. Thus, we conclude that the court of appeals erred in holding that there was legally sufficient evidence to support the jury's finding that

Pro Com's failure to furnish appropriate lifting equipment was a cause in fact of Hornsby's back injury.

## IV. CONCLUSION

Because the duty to furnish a safe work place is the duty of Pro Com, Hornsby's employer, and not that of Pro Com's employees in their individual capacities, we hold that the court of appeals erred in holding Leitch and Crews individually liable for Pro Com's alleged negligence. We also hold that Hornsby did not provide legally sufficient evidence of causation between his back injury and Pro Com's alleged negligence. Accordingly, the court of appeals erred in holding that Hornsby carried his burden of proof on the causation issue.

Therefore, we reverse the court of appeals' judgment. We render judgment that Grady Hornsby take nothing from Pro Com Marketing Services, Inc., Russell Leitch, and Hal Crews.

ABBOTT, J., filed a concurring opinion.

SPECTOR, J., not sitting.

ABBOTT, Justice, concurring.

I agree with the Court's judgment and with most of its opinion. I write separately only to provide a more detailed discussion of why no evidence supports the jury's verdict.

Because of constitutionally mandated limitations on our review of facts, this Court should tread very carefully whenever we are requested to determine that no evidence supports a jury's verdict. Well-established law guides our evaluation of a no evidence point of error. The Texas Constitution requires that "the decision of [the courts of appeals] shall be conclusive on all questions of fact brought before them on appeal or error." Tex.Const. art. V, § 6. This provision "restrict[s], in express terms, the jurisdiction of the supreme court, and . . . confine[s] it to questions of law." *Choate v. San Antonio & A.P. Ry. Co.*, 91 Tex. 406, 44 S.W. 69, 69 (1898); *see Coulson v. Lake LBJ Municipal Util. Dist.*, 781 S.W.2d 594, 597 (Tex.1989) (acknowledging that this Court has no jurisdiction to undertake factual sufficiency review); *Gulf, Colorado & Santa Fe Ry. Co. v. Deen*, 158 Tex. 466, 312 S.W.2d 933, 938 (1958) (Texas Supreme Court cannot conduct factual sufficiency review); *Wilson v. Wilson*, 145 Tex. 607, 201 S.W.2d 226, 227 (1947) ("the Supreme Court is not invested with the power to determine facts."); *see also* Hall, *Revisiting Standards of Review in Civil Appeals*, 24 St. Mary's L.J. 1045, 1139 (1993) (constitutional "provision . . . acts as a limitation on the judicial authority of the supreme court and confines its jurisdiction to questions of law").

When determining a no evidence point of error in accordance with these constitutional limitations, this Court "must consider only the evidence and inferences tending to support the jury's finding, viewed most favorably in support of the finding, and disregard all contrary evidence and inferences." *Harvier v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 458 (Tex.1992); *see Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965); *Cartwright v. Canode*, 106 Tex. 502, 171 S.W. 696, 698 (1914). If there is any evidence of probative force to support the finding, we overrule the point of error and uphold the jury's finding. *Southern States Transp., Inc. v. State*, 774 S.W.2d 639, 640 (Tex.1989). If more than a scintilla of evidence exists, the claim is sufficient as a matter of law, and any challenges go merely to the weight to be accorded the evidence. *See Stafford v. Stafford*, 726 S.W.2d 14, 16 (Tex.1987); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

The limitations on this Court's ability to review evidence do not mandate, however, that we abstain from reviewing a jury's verdict when a party fails to offer *any* evidence on an element of a cause of action. Simply because a party presents several days of testimony for the jury's consideration does not mean that this Court is exceeding its constitutional limitations by requiring that the testimony amount to a scintilla of evidence in support of the legal elements of the cause of action. While jurors are vested with the authority to evaluate the evidence and weigh the credibility of witnesses, some legally sufficient evidence must nevertheless exist to support their verdict.

Mr. Hornsby claimed that the defendants were negligent by failing to supply him a lift belt and a dolly to help him lift the cable reel and by failing to provide a safe place to work. To succeed on his negligence claims, Mr. Hornsby had to offer at least some evidence establishing that the defendants' alleged acts or omissions proximately caused his injuries.

The record shows that twelve witnesses were called to testify at trial. Only two of them, Dr. Paul Geibel and Larry Whidden, were asked a question concerning proximate cause. Dr. Geibel provided the following testimony:

Q. And could you please tell the jury what in your opinion is the cause of his [Mr. Hornsby's] injuries?

A. Well, he has been symptomatic from the three-level disc herniating in his back and the spondylolisthesis at the bottom level, the instability. By his history this became symptomatic at the time of his lifting injury in September of 1990.

This answer demonstrates that Mr. Hornsby's injury was caused by lifting the reel, but it offers nothing regarding whether acts or omissions of the defendants were the proximate cause of that injury.

Later, Dr. Geibel provided some testimony regarding the lift belts:

Q. Okay. Now getting back to the belts, if they are to provide this support as you testified, how wide do they have to be to do an effective job?

A. I don't think there is any studies proving the amount of belts or use of them or degrees of width or anything that would predict any—any decrease in amount of injuries or anything along that nature.

Q. Okay. To followup on that just a little bit, Doctor, I get the impression that you don't think perhaps the belt is necessarily a preventative device; is that a fair statement?

A. I don't feel that it's as totally preventative as one would feel it would be. It doesn't hurt anything.

Q. Doesn't hurt but it doesn't necessarily help?

A. Correct.

Q. As far as if an accident of this nature were to occur and cause a three-level disc herniating, is that something that you think could have been prevented by the use of a belt such as we've been talking about?

A. I would be unable to comment. I don't think there is anything that would be available to say yes or no in that respect.

The testimony quoted above is the only evidence provided by Dr. Geibel regarding proximate cause and no other questions were posed to him on that issue. Dr. Geibel's testimony demonstrates that he has no opinion on the proximate cause issue. Clearly, this evidence does not constitute any legally sufficient evidence of causation.

Mr. Hornsby's co-worker, Larry Whidden, offered only the following testimony about the proximate cause issue:

Q. And what kind of equipment did you request from them?

A. Dollies for the cable, lift belts, something, you know, that would make the job a little bit easier, less strain, because the equipment, most of the equipment was on the heavy side.

Q. And in your opinion, would this equipment have assisted you in lifting these cable reels?

A. Lift belt would have eliminated this injury.

Mr. Walton (counsel for defense): Your Honor, I'm going to object to that. I think that calls for an expert opinion, that is well beyond any demonstrated knowledge he has.

The Court: Sustained.

Q. In any event, sir, do you believe this equipment you are talking about, the dollies and the safety belt, from your experience of lifting these cables, do you think that would have helped you?

A. Yes, it would have.

Q. All right.

Mr. Walton: Your Honor, again, I'm going to object as far as that calls for speculation, it's not something that he

has any specialized knowledge with regard to what lift belts and cable dollies did.

The Witness: Well, Your Honor, I've worked with those before.

The Court: Sir, I can handle it all by myself. Okay. Overruled.

The last answer demonstrates nothing more than Mr. Whidden's belief that the safety equipment would have helped Mr. Whidden and Mr. Hornsby do their jobs. It certainly does not provide even a scintilla of probative evidence connecting Mr. Hornsby's injury to the alleged negligence of the defendants.

Mr. Whidden's earlier answer, that the "lift belt would have eliminated this injury," would establish proximate cause if Whidden had been a properly qualified expert witness. However, Mr. Walton's sustained objection properly challenged Mr. Whidden's ability to provide expert testimony. Earlier testimony developed Mr. Whidden's expertise as a cable worker and as a person who has used safety equipment, but there is no testimony developing Mr. Whidden's expertise regarding the causal connection between the use of safety belts and the prevention of herniated discs. Just like an ordinary automobile driver is not qualified to testify that a seatbelt can prevent a herniated disc, Mr. Whidden was not qualified to testify that the lift belt would have prevented Mr. Hornsby's injury.

Other than the testimony detailed in this concurring opinion, there is no evidence even arguably linking Mr. Hornsby's injury to the acts or omissions of the defendants. Accordingly, I concur with the Court's judgment that "the court of appeals erred in holding that Hornsby carried his burden of proof on the causation issue."



---

BI–ED, LTD., Petitioner,

v.

Larry RAMSEY, Respondent.

No. 95–0442.

Supreme Court of Texas.

Dec. 13, 1996.

Property owner brought action against city and owner of adjacent property seeking declaratory judgment and damages for alleged wrongful obstruction of access to road. The 296th Judicial District Court, Collin County, Verla Sue Holland, J., entered judgment for defendants. Plaintiff appealed. The Dallas Court of Appeals, 1995 WL 44673, affirmed. Plaintiff filed petition for writ of error. The Supreme Court held that: (1) trial court's withdrawal at conclusion of evidence of summary judgment as to issue of whether defendant property owner reserved one-foot strip of land between road and plaintiff's property, and submission of issue to jury, denied party fair opportunity to present evidence on issue, and (2) plaintiff had standing to appeal.

Reversed and remanded.

1. Trial ⟐145

Trial court's withdrawal of summary judgment as to issue at conclusion of evidence and submission of issue to jury denied party fair opportunity to present evidence on issue.

2. Appeal and Error ⟐151(1)

Plaintiff property owner had standing to appeal judgment against it in action against city and owner of adjacent property for alleged wrongful obstruction of access to road on adjacent property, since trial court's judgment refused to grant any relief sought by plaintiff.

Melvin J. Klein, Robert M. Greenberg, Dallas, for Petitioner.

John M. Gillis, Dallas, for Respondent.

the 1986 model year. Marrs's products liability action creates an "actual conflict" with the Safety Act. *See Taylor*, 875 F.2d at 827; *Wood*, 865 F.2d at 412. Federal law impliedly pre-empts Marrs's no-airbag claim.

We affirm the trial court's judgment.



Raymond PORTLOCK and Mary Portlock, Individually and as Heirs to the Estate of Erica Portlock, Deceased, Appellants,

v.

Kenneth W. PERRY, Appellee.

No. 05-91-01695-CV.

Court of Appeals of Texas, Dallas.

Feb. 19, 1993.

Rehearing Denied March 24, 1993.

Concurring Opinions by Justices Barker and Lagarde on Denial of Rehearing March 24, 1993.

Parents of patient who allegedly died after being administered improper dosage of chloral hydrate at radiology diagnostic center brought action against center, physician, radiological technicians, and center's president alleging medical malpractice and negligence. The 298th Judicial District Court, Dallas County, Adolph Canales, J., entered summary judgment for center's president. Parents appealed. The Court of Appeals, Kinkeade, J., held that: (1) alleged omission of corporate president of radiology diagnostic center in instituting policies, procedures, and quality control for center was not direct participation in center's treatment of patient which resulted in patient's death; therefore, president could not be held liable for center's alleged medical malpractice, and (2) president could not

be held liable for death of patient based on alleged negligent hiring of two business consultants for center.

Affirmed.

Maloney, J., filed a dissenting opinion in which Burnett, Chapman, and Rosenberg, JJ., joined.

Barber and Lagarde, JJ., filed concurring opinions on motion for rehearing.

**1. Judgment ⟐178**

Summary judgment seeks to eliminate patently unmeritorious claims and untenable defenses, not to deny a party its right to a full hearing on the merits of any real issue of fact. Vernon's Ann.Texas Rules Civ.Proc., Rule 166a(c).

**2. Judgment ⟐185(2)**

In summary judgment proceeding, defendant, as movant, must either disprove at least one element of each of plaintiff's theories of recovery, or plead and conclusively establish each essential element of affirmative defense, thereby rebutting plaintiff's cause of action.

**3. Judgment ⟐181(11), 185(2)**

Summary judgment for defendant disposing of entire case is proper only if, as a matter of law, viewing evidence in light most favorable to plaintiff, plaintiff could not succeed upon any theory pleaded.

**4. Corporations ⟐325**

General rule of corporate law is that officers of corporation are insulated from personal liability arising from their activities performed in scope of their duties for corporation.

**5. Corporations ⟐306**

Corporate officer may be held individually liable for corporation's tortious conduct if he knowingly participates in the conduct or has knowledge of tortious conduct, either actual or constructive; instigating, aiding, or abetting wrongdoing constitutes participation.

**6. Corporations ⟐306**

Generally, officer's direct participation in corporation's tortious conduct, which results in liability of officer, is shown by

affirmative acts, not acts of omission, because affirmative act gives rise to a duty; but that is not always the rule.

**7. Negligence ⟨⟩136(14)**

Existence of a legal duty is a question of law for the court.

**8. Corporations ⟨⟩306**

Alleged omission of corporate president of radiology diagnostic center in instituting policies, procedures, and quality control for center was not direct participation in center's treatment of patient which resulted in patient's death; therefore, president could not be held liable for center's alleged medical malpractice.

**9. Corporations ⟨⟩306**

Corporate president of radiology diagnostic center could not be held liable for death of patient based on alleged negligent hiring of two business consultants for center; consultants did not improperly administer drug to patient and thus were not cause in fact of patient's death and alleged negligent hiring of consultants had nothing to do with alleged improper actions of technologists and doctor.

**10. Negligence ⟨⟩56(1.12)**

"Proximate cause" is that cause, unbroken by any new and independent cause, which produces injury and without which injury would not have occurred.

See publication Words and Phrases for other judicial constructions and definitions.

**11. Negligence ⟨⟩56(1.1), 59**

Proximate cause includes two essential elements: (1) cause in fact, and (2) foreseeability; both elements must be present and may be proven by direct or circumstantial evidence.

**12. Negligence ⟨⟩134(11)**

Proximate cause cannot be established by mere guess or conjecture, but rather must be proved by evidence of probative force.

**13. Negligence ⟨⟩56(1.9, 1.12)**

"Cause in fact" means that negligent act at issue was substantial factor in producing injury and without such negligence no harm would have resulted.

See publication Words and Phrases for other judicial constructions and definitions.

**14. Negligence ⟨⟩59**

Foreseeability required to establish proximate cause is satisfied by showing that actor, as a person of ordinary intelligence, should have anticipated danger to others by his negligent act.

---

William A. Newman, Michael S. Box, Dallas, for appellants.

W. Blake Hyde, Keith A. Glover, Dallas, for appellee.

Before the court en banc

## OPINION

KINKEADE, Justice.

Raymond Portlock and Mary Portlock, individually and as heirs to the estate of Erica Portlock, deceased, (the Portlocks) appeal the summary judgment rendered in favor of Kenneth W. Perry in this negligence and medical malpractice cause of action. In two points of error, the Portlocks argue that the trial court erred in granting Perry summary judgment and in denying their motion for rehearing. Because the trial court properly granted Perry summary judgment and properly denied the Portlocks' motion for rehearing, we affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL HISTORY

On October 19, 1989, the Portlocks took their four-and-a-half-year-old daughter Erica to the Duncanville Diagnostic Center (the Center) for routine radiological examinations. During the first exam, Erica became anxious, and Dr. Victor McCall ordered the radiological technologists, Cheryl Heckard and Linda Cole, to sedate her with chloral hydrate. Dr. McCall delegated the responsibility of calculating the dosage to the technologists. The technologists miscalculated the dosage, giving Erica too much. The actual dosage calculated and



given was not recorded. When the Portlocks took Erica home, she was still sleeping. Mr. Portlock called the Center later that day because he was concerned that Erica still had not awakened. The receptionist put Mr. Portlock on hold while she spoke with one of the radiological technologists. The receptionist then told Mr. Portlock not to worry because Erica might sleep well into the evening or next morning and to check Erica's breathing to make sure she was all right. When Erica did not awaken later that evening, the Portlocks took her to the emergency room of Charlton Methodist Hospital in Dallas. The medical examiner pronounced Erica dead and attributed Erica's death to "acute chloral hydrate intoxication."

In 1984, Kenneth Perry, an oil and gas engineer by training, invested in a radiology diagnostic center with Dr. J.W. Fischer, a radiologist who started the Center with Perry. Perry stated that he was strictly an investor in the Center and that Dr. Fischer operated and ran the Center's day-to-day activities. Initially, the Center was called J.W. Fischer, Inc. In 1987, after Dr. Fischer filed personal bankruptcy and the corporation acquired all of his shares, the name was changed to the Duncanville Diagnostic Center pursuant to Dr. Fischer's request. At that time, Perry became president of the corporation.

At first, Dr. Fischer directed the Center's daily activities and was responsible for hiring its employees. Perry received monthly financial reports but did not receive reports on the Center's daily activities. When personnel problems developed as a result of Dr. Fischer's management after the change of ownership, Perry hired Don McCoy in 1987 as a consultant and gave him the responsibility for the Center's daily operations. McCoy previously worked on the business and financial side for hospitals and other medical care groups. He had no experience in providing patient-care services. McCoy hired Jim Thomas as a full-time on-site manager. While McCoy was responsible for hiring Thomas, Perry approved the creation of Thomas's position and the hiring of Thomas. Thomas's previous experience, like McCoy's, was primarily

on the financial side of the health-care industry for hospitals and medical care groups. He also had no experience in patient-care services. McCoy and Thomas were not hired to provide patient-care services. McCoy and Thomas were responsible for the business operations of the Center.

At the time of Erica's death, McCoy spent about three hours a week at the Center and acted as a consultant to the Center. He was unaware of what the Center's procedures and policies were concerning patient care. Thomas managed the Center's daily activities, including the hiring and firing of employees, and reported to McCoy. In 1987, after Dr. Fischer's involvement in the Center ended, Dr. McCall was hired as the Center's radiologist and reported to Thomas. Perry was not present during the administering of the drug to Erica and had no role in or any knowledge of the administering of the drug.

On April 12, 1991, the Portlocks sued the Center, Dr. McCall, and the radiological technologists who administered the sedative, seeking damages for Erica's death on the theories of negligence and medical malpractice. On June 5, 1991, the Portlocks amended their petition to include Perry. The Portlocks settled their claims against Dr. McCall and nonsuited the Center and the technologists. The Portlocks alleged that Perry was negligent because he:

(1) failed to mandate that adequate policies and procedures be in writing and in place for documenting narcotics that were being utilized at the Center;

(2) failed to ensure that adequate policies and procedures were in place at the Center requiring that the physician on duty supervise the administration of potentially fatal narcotics and other drugs to children;

(3) failed to ensure that adequate quality assurance and quality control procedures were in place at the Center;

(4) failed to ensure that policies and procedures were in place for the hiring,

training, and supervision of the Center's radiological technologists;

(5) negligently hired the consultant manager/administrators of the Center without properly checking into their medical background and qualifications for running, managing, and operating a radiology clinic;

(6) failed to ensure that the person and/or persons whom he hired to operate the Center had a sufficient understanding of safety concerns for the patients and was competent to formulate policies and procedures for patient safety and quality assurance;

(7) failed to inquire as to what safety policies and/or procedures, if any, would be put in place at the Center by anyone he hired to run the facility;

(8) failed to ensure and mandate that proper policies and procedures were in place and enforced, regarding the receptionist and her handling and routing of phone calls; and

(9) failed to have someone at the Center to properly train and supervise the receptionist at the clinic.

Additionally, the Portlocks alleged that Perry was negligent for all of the reasons set out in James M. Rauer's affidavit. Dr. Rauer, a board certified radiologist, owned and managed a facility that provided services similar to those that the Center provided. In his affidavit, Dr. Rauer set forth the standard of care for the president of a corporation operating a diagnostic radiology center. Dr. Rauer then opined that Perry fell below that standard because he:

(1) failed to inform himself of the fact that medications were going to be administered to patients coming into the Center;

(2) failed to make any attempt to find out what safety policies and procedures, if any, were going to be put into place at the Center to protect patients from having improper amounts of medication administered to them; and

(3) failed to ascertain the background of personnel such as McCoy and those

hired by McCoy to operate and manage the Center.

The Portlocks further alleged that the above negligent acts and/or omissions constituted gross negligence and that, as a result of these acts, medical expenses were incurred and Erica lost her life.

Perry moved for summary judgment arguing that as president of the corporation he could not be held individually liable for Erica's death. After a hearing, the trial court granted Perry's motion and overruled the Portlocks' motion to reconsider. In two points of error, the Portlocks contend that the trial court erred in granting Perry summary judgment and in denying their motion for rehearing because Perry is not protected by the corporate shield.

## SUMMARY JUDGMENT

[1] Summary judgment may be rendered only if the pleadings, depositions, admissions, and affidavits show (1) that there is no genuine issue as to any material fact, and (2) that the moving party is entitled to judgment as a matter of law. TEX. R.CIV.P. 166a(c); *Rodriguez v. Naylor Indus., Inc.*, 763 S.W.2d 411, 413 (Tex.1989). A summary judgment seeks to eliminate patently unmeritorious claims and untenable defenses, not to deny a party its right to a full hearing on the merits of any real issue of fact. *Gulbenkian v. Penn*, 151 Tex. 412, 416, 252 S.W.2d 929, 931 (1952).

[2, 3] In a summary judgment proceeding, the defendant, as movant, must either (1) disprove at least one element of each of the plaintiff's theories of recovery, or (2) plead and conclusively establish each essential element of an affirmative defense, thereby rebutting the plaintiff's cause of action. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 679 (Tex. 1979). A summary judgment for the defendant disposing of the entire case is proper only if, as a matter of law, viewing the evidence in the light most favorable to the plaintiff, the plaintiff could not succeed upon any theory pleaded. *Delgado v. Burns*, 656 S.W.2d 428, 429 (Tex.1983).

### Corporate Officer Liability

Perry contends that the corporate shield protects him from individual liability for the death of Erica because he did not directly participate in any act which caused her death. The Portlocks allege that Perry was a direct participant because (1) he was negligent in failing to institute certain policies and procedures and quality control for the Center, and (2) he negligently hired McCoy and Thomas on behalf of the Center. The Portlocks argue that such negligence proximately caused Erica's death.

[4, 5]  The general rule of corporate law is that officers of a corporation are insulated from personal liability arising from their activities performed in the scope of their duties for the corporation. *Delaney v. Fidelity Lease Ltd.,* 526 S.W.2d 543 (Tex. 1975). However, a corporate officer may be held individually liable for a corporation's tortious conduct if he knowingly participates in the conduct or has knowledge of the tortious conduct, either actual or constructive. *Leyendecker & Assocs., Inc. v. Wechter,* 683 S.W.2d 369, 375 (Tex.1984); *K & G Tool & Serv. Co. v. G & G Fishing Tool Serv.,* 314 S.W.2d 782, 793 (Tex.1958); *Permian Petroleum Co. v. Barrow,* 484 S.W.2d 631, 634 (Tex.Civ.App.—El Paso 1972, no writ). Instigating, aiding, or abetting the wrongdoing constitutes participation. *Permian Petroleum Co.,* 484 S.W.2d at 634.

The ultimate injury in this case is the death of Erica resulting from the improper administration of the chloral hydrate. The undisputed summary judgment evidence shows that Perry did not administer the drug to Erica, was not present when the drug was administered to Erica, had no knowledge of the administering of the drug to Erica, and did not otherwise instigate, aid, or abet such conduct. Instead, the Portlocks argue that Perry's omission in instituting policies, procedures, and quality control and his affirmative acts of negligently hiring Thomas and McCoy constitute direct participation in Erica's death because such actions proximately caused Erica's death.

### Direct Participation

[6, 7]  Generally, direct participation is shown by affirmative acts, not acts of omission, because an affirmative act gives rise to a duty. But this is not always the rule. *See Seismic Explorations v. Dobray,* 169 S.W.2d 739, 743 (Tex.Civ.App.—Galveston 1943, writ ref'd w.o.m.); *Conrick v. Houston Civic Opera Ass'n,* 99 S.W.2d 382, 384 (Tex.Civ.App.—Amarillo 1936, no writ). In *S.H. Kress & Co. v. Selph,* 250 S.W.2d 883 (Tex.Civ.App.—Beaumont 1952, writ ref'd n.r.e.), the court held that there is no distinction between misfeasance and nonfeasance if nonfeasance means simply omission to do something when there is an affirmative duty to do. *Id.* at 892. There is still a distinction when the omission is of an act which there is no duty to perform. *Id.* The existence of a legal duty is a question of law for the court. *Barham v. Turner Constr. Co. of Tex.,* 803 S.W.2d 731, 735 (Tex.App.—Dallas 1990, writ denied).

### Policies and Procedures

[8]  In this case, we hold, as a matter of law, Perry had no duty to institute policies, procedures, and quality control. Perry had no duty because nothing in the record shows that he undertook an affirmative act to institute policies and procedures and quality control or was otherwise required to do so as an officer of the corporation. In Rauer's affidavit filed by the Portlocks, Rauer did not state that Perry had a duty to institute policies, procedures, and quality control. Rauer merely stated that Perry should have informed himself of the corporation's policies and procedures, *if any.* Further, Perry had no duty because McCoy, Thomas, and Dr. McCall, the physician who treated Erica, were in charge of the Center's day-to-day operations, not Perry. Therefore, Perry's alleged omission to institute policies and procedures does not constitute direct participation because Perry had no affirmative duty to act.

### Negligent Hiring

[9]  Perry, however, may have assumed a duty to hire competent consultants and

administrators when he performed the affirmative acts of hiring McCoy and Thomas. Even assuming such a duty, in order to raise a fact issue on Perry's individual liability, there must be some evidence that Perry's negligent hiring of Thomas and McCoy constitutes direct participation by Perry in Erica's death. In other words, there must be some evidence that the hiring of Thomas and McCoy proximately caused the death of Erica Portlock. *See Dieter v. Baker Serv. Tools*, 739 S.W.2d 405, 408 (Tex.App.—Corpus Christi 1987, writ denied); *see also Permian Petroleum*, 484 S.W.2d at 634; *Sutton v. Gee*, 405 S.W.2d 828, 833 (Tex.Civ.App.—San Antonio 1966, writ ref'd n.r.e.). There is no causal connection between Perry's negligent hiring, if any, of McCoy and Thomas and Erica Portlock's death because the Portlocks neither pled nor offered summary judgment proof that Dr. McCall or the technologists who administered the drug were negligently hired. The Portlocks, however, argue in their response to Perry's motion for summary judgment that proximate cause links Perry, individually, to the death of Erica Portlock and that the evidence shows that such proximate cause exists.

### Proximate Cause

[10–14] Proximate cause is that cause, unbroken by any new and independent cause, which produces injury and without which the injury would not have occurred. Proximate cause includes two essential elements: (1) cause in fact, and (2) foreseeability. Both elements must be present and may be proven by direct or circumstantial evidence. Proximate cause cannot be established by mere guess or conjecture, but rather must be proved by evidence of probative force. *Brown v. Edwards Transfer Co.*, 764 S.W.2d 220, 223 (Tex.1988); *McClure v. Allied Stores of Texas, Inc.*, 608 S.W.2d 901, 903 (Tex.1980); *Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231, 236 (Tex.App.—Dallas 1985, writ ref'd n.r.e.). Cause in fact means that the negligent act at issue was a substantial factor in producing the injury and without such negligence no harm would have resulted.

*Brown*, 764 S.W.2d at 223. Foreseeability is satisfied by showing that the actor, as a person of ordinary intelligence, should have anticipated the danger to others by his negligent act. *McClure*, 608 S.W.2d at 903.

### Cause in Fact

The Portlocks' argument is that, but for Perry's negligent hiring of McCoy and Thomas, the technologists and doctors would not have improperly administered the drug to Erica. McCoy and Thomas did not improperly administer the drug. The negligent hiring, if any, was broken by an independent cause, the negligent administering of the drug by the technologists and McCall. There is no summary judgment proof that links the alleged negligent hiring of McCoy and Thomas to the improper administration of the drug. The alleged negligent hiring of McCoy and Thomas was not a substantial factor in producing Erica's death. The death occurred irrespective of the hiring of McCoy and Thomas. The negligent administering of the drug to Erica by the technologists and McCall was the cause in fact of her death.

### Foreseeability

Perry's alleged negligent hiring of McCoy and Thomas, as consultant and administrator, had nothing to do with the improper actions of the technologists and the doctor. Perry hired the people who hired and supervised the technologists and doctors. There is no summary judgment proof that the technologists and doctors were negligently hired. Perry's actions are too far removed to be a foreseeable cause of the death. Perry could not have anticipated the danger to the Portlocks by hiring McCoy and Thomas because McCoy and Thomas were not hired to provide medical services to patients and there was no evidence that those who did provide medical services were negligently hired.

The summary judgment evidence viewed in the light most favorable to the Portlocks shows that Perry's alleged negligent hiring of McCoy and Thomas did not constitute direct participation in the death of Erica

because it was not the proximate cause of Erica's death.

## CONCLUSION

Because Perry cannot be held individually liable for Erica's death, there are no genuine issues of material fact, and the trial court did not err in granting summary judgment or in denying the Portlocks' motion for rehearing. We overrule both of the Portlocks' points of error. This opinion only addresses the issue of Perry's individual liability. We do not express any opinion with respect to the liability of the corporation or other corporate employees who may have directly participated in Erica Portlock's tragic death.

We affirm the trial court's judgment.

BAKER, LAGARDE, THOMAS, OVARD, BARBER and MORRIS, JJ., join in the majority opinion.

BURNETT, CHAPMAN and ROSENBERG, JJ., join in the dissenting opinion.

WHITTINGTON, J., not participating.

MALONEY, Justice, dissenting.

I dissent.

Although neither appellants nor appellee argue causation on appeal, the majority resolves this case on proximate cause. The majority acknowledges that when Perry hired McCoy and participated in the hiring of Thomas, he may have assumed a duty to hire competent consultants and administrators. However, then the majority concludes as a matter of law that negligent hiring was not a proximate cause of the Portlocks' injuries.

## ISSUE ON APPEAL

Perry moved for summary judgment *solely* on the contention that, as a corporate officer or director, he could not be held personally liable. He maintained he violated no legal duty nor did he owe any legal duty to the Portlocks. He argued below and argues on appeal that his only connection to the Duncanville Diagnostic Center was that he was its president.

The Portlocks did not contend that Perry was responsible for their injuries because he was the clinic's president. They argued that his direct actions in negligent hiring of personnel and failure to implement and monitor patient safety procedure and personnel training caused their injury. Only the Portlocks' summary judgment response mentions proximate cause.

The briefs before this Court explore whether Perry is shielded from liability because he is a corporate officer. Neither brief ever argues that Perry's actions were or were not the proximate cause of the Portlock's injuries. Certainly, neither side brings us any authorities or cites us to any evidence to address the issue of proximate cause.

An appellate court should confine itself to resolution of issues that the parties present and fully argue. *See State v. Valmont Plantations,* 346 S.W.2d 853, 878–79 (Tex. Civ.App.—San Antonio 1961), *aff'd,* 163 Tex. 381, 355 S.W.2d 502 (1962). This Court has previously adhered to this position:

> Our judicial system rests upon the foundation of adversary presentation which affords the theoretical guarantee that diligent antagonists, by developing all aspects of the dispute, will prevent a court from being misled by inadequate understanding of the facts and law and adopting a position unjust to the parties and possibly damaging to the community.

*C & C Partners v. Sun Exploration & Prod. Co.,* 783 S.W.2d 707, 723 (Tex.App.—Dallas 1989, writ denied).

## PROXIMATE CAUSE

The majority summarily concludes as a matter of law that an independent cause—the negligent administering of a drug—broke the causal connection between any negligent hiring and Erica Portlock's death. In reaching this conclusion, it cites no pertinent authority. The majority appears to hold that this negligent administration of the drug was the sole cause in fact of the injury and Perry could not have foreseen its occurrence. The majority states that

Case 2:00-cv-00061  Document 9  Filed in TXSD on 03/27/2000  Page 101 of 107

"Perry merely hired the people who hired and supervised the technicians and doctors." The majority concludes *as a matter of law* that the negligent hiring had *nothing* to do with the improper drug administration. Because the majority opinion reaches beyond the appellate briefs and argument to raise its own issue, lack of proximate cause, I am obligated to address proximate cause.

### 1. Applicable Law

Whether a defendant's negligence was a proximate cause of a plaintiff's injuries is a question of fact. *Clark v. Waggoner*, 452 S.W.2d 437, 440 (Tex.1970). Proximate cause encompasses the elements of cause in fact and foreseeability. *Brown v. Edwards Transfer Co.*, 764 S.W.2d 220, 223 (Tex.1988); *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 549 (Tex. 1985).

### a. Cause in Fact

Cause in fact takes into consideration omissions and affirmative acts. *East Texas Theatres, Inc. v. Rutledge*, 453 S.W.2d 466, 469 (Tex.1970). Cause in fact requires that the negligent act or omission be a substantial factor in causing the injury. In other words, without such negligence no harm would have resulted. *Brown*, 764 S.W.2d at 223; *Nixon*, 690 S.W.2d at 549.

### b. Foreseeability

A person of ordinary intelligence should anticipate the dangers that his negligence creates for others. *Brown*, 764 S.W.2d at 223; *Nixon*, 690 S.W.2d at 549–50. Texas law does not require that an actor foresee the particular accident or injury that occurs, nor does it require that the actor anticipate exactly how the injury will develop from a particular dangerous situation. Foreseeability only requires that the injury be of such a general character as an actor might reasonably have anticipated, and that the injured party be so situated in relation to the negligence that an actor might reasonably have foreseen the injury. *Brown*, 764 S.W.2d at 223–24.

There may be more than one proximate cause of an event. *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex.1991). Proximate cause need not be the immediate or nearest cause. *Atchison v. Texas & Pac. Ry.*, 143 Tex. 466, 473, 186 S.W.2d 228, 231 (1945); *Galveston-Houston Breweries, Inc. v. Naylor*, 249 S.W.2d 262, 268 (Tex.Civ.App.—Galveston 1952, writ ref'd n.r.e.) (op. on reh'g). Even when some new cause or agency combines with the original negligence to produce an injury, the original negligence remains a proximate cause of the injury. The concurring cause or agency does not relieve the original wrongdoer of liability. *Atchison*, 143 Tex. at 473, 186 S.W.2d at 231; *see Northwest Mall, Inc. v. Lubri-lon Int'l, Inc.*, 681 S.W.2d 797, 803–04 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.).

If a separate and *independent* agent's acts or omissions destroy the causal connection between the defendant's original negligence and the injury, we consider those acts or omissions to be a new and independent cause. *Young v. Massey*, 128 Tex. 638, 641, 101 S.W.2d 809, 810 (1937); *Galvan v. Fedder*, 678 S.W.2d 596, 598 (Tex.App.—Houston [14th Dist.] 1984, no writ). However, a new and independent cause must be one which the original wrongdoer, in the exercise of ordinary care, could not have foreseen. *Texas Indus., Inc. v. Lucas*, 634 S.W.2d 748, 755 (Tex.App.—Houston [14th Dist.] 1982), *rev'd on other grounds*, 696 S.W.2d 372 (Tex.1984); *see City of Austin v. Schmedes*, 154 Tex. 416, 424, 279 S.W.2d 326, 331 (1955); *Bell Helicopter Co. v. Bradshaw*, 594 S.W.2d 519, 533 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.).

### 2. Application of Law

The majority concludes, without explanation, that a fact finder could not possibly find for the Portlocks on proximate cause. I am not as confident as the majority that Perry's acts and omissions had nothing to do with the Portlocks' injuries.

The record has ample summary judgment evidence showing that Perry hired McCoy because he had a background in

medical *business* management. Perry's financing bank recommended hiring McCoy to bring the clinics[1] to a better financial level. McCoy had no training in quality control, patient safety, or quality assurance of medical procedures. His determination of hospital staffing levels were for business office purposes and from a cash flow analysis only. McCoy had never operated a free-standing radiology center before he went to Duncanville Diagnostic Center.

Perry approved of McCoy's hiring Thomas even though Perry knew nothing about Thomas's background. Perry interviewed Thomas before he was hired. Although Thomas ran the diagnostic radiology clinic on a day-to-day basis, Perry never inquired if he had any health care expertise. Neither Perry, McCoy, nor Thomas ever inquired if any patient safety procedures existed.

Perry had the ultimate authority to change personnel and make decisions. McCoy had to have Perry's approval in all matters. Because Perry retained ultimate control, I cannot characterize the person or persons who administered the drug as independent from Perry and those whom Perry hired.

When I review this evidence and resolve any doubts in favor of the Portlocks, I do not agree that a jury could not find that:
(1) Perry's negligent hiring of McCoy and Thomas was a substantial factor in bringing about the injury;
(2) the injury would not have occurred absent such negligence; and
(3) Perry should have foreseen that this type of injury could have occurred.

A properly instructed jury could have found that Perry should have foreseen the injury, and that the negligent administration of the drug was a *concurring* cause, not an independent cause.

## CONCLUSION

The majority decides issues as a matter of law that are precisely the issues that should be resolved by a trier of fact. Neither appellant or appellee requested that

this Court decide whether proximate cause existed. That the majority seeks out its own issue suggests unwarranted judicial activism.

The Portlocks may or may not satisfy a jury that Perry's alleged negligent hiring was a proximate cause of their injuries. Nevertheless, they are entitled to an opportunity to try to do so and to have this Court review the issue of proximate cause only after a full adversarial and evidentiary hearing on proximate cause.

Based on the briefs and the record, I would reverse the summary judgment and remand this cause for further proceedings.

## ON MOTION FOR REHEARING

Rehearing denied March 24, 1993.

BARBER, Justice, concurring.

I agree with the majority's decision that the Portlocks' motion for rehearing should be denied. I also agree with the result reached in the majority's opinion. However, I would reach that result based upon the reasoning in the Opinion on Motion for Rehearing by Justice Lagarde.

LAGARDE, Justice, concurring.

I would grant rehearing en banc. Although I would reach the same result reached by the majority, I would do so for different reasons.

The competent summary judgment evidence shows that all of Kenneth W. Perry's acts and omissions were done by him as an agent of the corporation in his official capacity as president of the corporation, Duncanville Diagnostic Center, Inc. As such, his acts and omissions were corporate acts and omissions resulting from furtherance of corporate goals, policies, and business interests, as distinguished from Perry's "own" torts. *Cf. Torregrossa v. Szelc,* 603 S.W.2d 803, 804 (Tex.1980). Consequently, I conclude as a matter of law that based on the facts before us, the corporate veil shields the corporate officer, Perry, from

---

1. Perry owned several clinics as investments. McCoy divided his time between all of the clin-

ics. For purposes of this opinion, the other clinics are immaterial.

--- F.Supp.2d ----
(Cite as: 1999 WL 759804 (S.D.Tex.))

Page  1

Jacqueline PALMER
v.
WAL-MART STORES, INC., Sam's Club,
Inc. and Jon Ainsworth

No. CIV. A. G-99-523.

United States District Court,
S.D. Texas,
Galveston Division.

Sept. 22, 1999.

Store customer who was injured when she slipped in puddle of water on store of floor brought suit in state court against nonresident corporations which operated store, and store manager, who resided in same state as customer. After defendants removed action, customer moved to remand. The District Court, Kent, J., held that store manager was fraudulently joined solely to defeat diversity, and would be dismissed from action, as no possibility of recovery against manager existed under Texas law.

Motion denied, and defendant dismissed with prejudice.

**[1] REMOVAL OF CASES** ⟸ 36
334k36
Burden of persuasion placed upon those who cry "fraudulent joinder" is a heavy one, and to prove that a non-diverse defendant was fraudulently joined in a case to defeat diversity jurisdiction, removing party must show either that there has been outright fraud in the plaintiff's pleadings of jurisdictional facts, or that there is no possibility that the plaintiff would be able to recover against the non-diverse defendant in state court. 28 U.S.C.A. § 1441.

**[1] REMOVAL OF CASES** ⟸ 107(7)
334k107(7)
Burden of persuasion placed upon those who cry "fraudulent joinder" is a heavy one, and to prove that a non-diverse defendant was fraudulently joined in a case to defeat diversity jurisdiction, removing party must show either that there has been outright fraud in the plaintiff's pleadings of jurisdictional

facts, or that there is no possibility that the plaintiff would be able to recover against the non-diverse defendant in state court. 28 U.S.C.A. § 1441.

**[2] REMOVAL OF CASES** ⟸ 36
334k36
If plaintiff has any possibility of recovery under state law against party whose presence defeats diversity, and whose joinder is questioned, then the joinder is not fraudulent in fact or law. 28 U.S.C.A. § 1441.

**[3] REMOVAL OF CASES** ⟸ 107(7)
334k107(7)
In assessing claim that defendant who defeats diversity was fraudulently joined solely to prevent removal, because there is no possibility of recovery against defendant under state law, court must evaluate all of the contested factual allegations in light most favorable to plaintiff, and must resolve any uncertainties concerning the current status of controlling state substantive law in favor of plaintiff. 28 U.S.C.A. § 1441.

**[4] REMOVAL OF CASES** ⟸ 36
334k36
In considering claim of fraudulent joinder which alleges that there is no possibility of recovery under state law, after all disputed questions of fact and all ambiguities in the controlling state law are resolved in favor of the nonremoving party, court determines whether that party has any possibility of recovery against the party whose joinder is questioned. 28 U.S.C.A. § 1441.

**[4] REMOVAL OF CASES** ⟸ 107(7)
334k107(7)
In considering claim of fraudulent joinder which alleges that there is no possibility of recovery under state law, after all disputed questions of fact and all ambiguities in the controlling state law are resolved in favor of the nonremoving party, court determines whether that party has any possibility of recovery against the party whose joinder is questioned. 28 U.S.C.A. § 1441.

**[5] REMOVAL OF CASES** ⟸ 36
334k36



EXHIBIT

Case 2:00-cv-00061   Document 9   Filed in TXSD on 03/27/2000   Page 104 of 107

Plaintiff who brought slip and fall action against corporate owners of department store for injuries sustained when she slipped in puddle of water in store had no possibility of recovery under Texas law against store manager, whose joinder as defendant had defeated diversity, and thus, joinder would be deemed fraudulent, and manager dismissed as party in order to allow removal; Texas law unambiguously barred recovery against manager for negligence in course and scope of his employment, and no allegation was made that manager owed any independent duty of reasonable care apart from that owed by his employer, or committed any intentional torts. 28 U.S.C.A. § 1441.

**[6] CORPORATIONS** ⬥ 306
101k306
or
Under Texas law, corporate employees have no independent duty to furnish a safe workplace, and therefore cannot be held personally liable for the corporation's failure to provide a safe place to work.

Gregory W. Allen, Bieganowski & Allen, Houston, TX, for Jacqueline Palmer, plaintiff.

Alan N. Magenheim, Magenheim, Bateman, Robinson, Wrotenbery & Helfand, Houston, TX, for Wal-Mart Stores, Inc., Sam's Club, Inc, Jon Ainsworth, defendants.

### ORDER DENYING MOTION TO REMAND AND GRANTING MOTION TO DISMISS

KENT, District Judge.

**\*1** On June 10, 1999, Plaintiff filed this slip and fall premises liability negligence action in the 149th Judicial District Court of Brazoria County, Texas. Defendants timely removed the case to this Court on August 20, 1999. Now before the Court is Plaintiff's Motion to Remand, Defendants' Response to Plaintiff's Motion to Remand, and Defendants' Motion to Dismiss Jon Ainsworth. For the reasons set forth below, Plaintiff's Motion to Remand is DENIED, and Defendant's Motion to Dismiss Jon Ainsworth is GRANTED.

Plaintiff alleges that on March 13, 1998 she

sustained severe personal injuries when she slipped and fell in a puddle of water while walking in Defendants' Sam's Club Store in Texas City. She subsequently sued Sam's Club, Wal-Mart, and Jon Ainsworth, the store manager for the Texas City Sam's Club. Plaintiff alleges she suffered $750,000 in damages as a result of a fractured left hip and injuries to her left leg, back and chest.

Defendant removed the case based on diversity jurisdiction. See 28 U.S.C. § 1332; § 1441(a). One of the requirements for diversity jurisdiction is clearly met because the parties agree that the amount in controversy exceeds $75,000. The parties also agree that Defendants Wal-Mart Stores, Inc. and Sam's Club, Inc. are foreign corporations having Arkansas as their principal place of business. Moreover, it is undisputed that both the Plaintiff and the store manager, Jon Ainsworth, are residents of Texas.

Whether Jon Ainsworth has properly been joined as a defendant is the key to resolving the motions before the Court. Defendants contend that Mr. Ainsworth was fraudulently joined and should be dismissed. If Mr. Ainsworth is dismissed as a party to this suit, then removal is clearly warranted because there is complete diversity of citizenship between Plaintiff and the remaining Defendants. Plaintiff, on the other hand, contends that Mr. Ainsworth is a proper defendant in this action. If Plaintiff is correct, removal would be improper for two reasons: there would not be complete diversity between the Plaintiff and the Defendants as required by 28 U.S.C. § 1332, and one Defendant would be a resident of the state in which the removal court sits, contrary to the provisions of 28 U.S.C. § 1441(b).

**[1][2]** The Court begins by noting that "the burden of persuasion placed upon those who cry 'fraudulent joinder' is indeed a heavy one." B., Inc. v. Miller Brewing Co., 663 F.2d 545, 549 (5th Cir. Unit A Dec.1981). In order to prove that a non-diverse defendant was fraudulently joined in a case to defeat diversity jurisdiction, the removing party must show either that there has been outright

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works



fraud in the plaintiff's pleadings of jurisdictional facts or that there is no possibility that the plaintiff would be able to recover against the non-diverse defendant in state court. See Sid Richardson Carbon & Gasoline Co. v. Interenergy Resources, Ltd., 99 F.3d 746, 751 (5th Cir.1996); Cavallini v. State Farm Mut. Auto Ins. Co., 44 F.3d 256, 259 (5th Cir.1995). "If the plaintiff has any possibility of recovery under state law against the party whose joinder is questioned, then the joinder is not fraudulent in fact or law."; Burden v. General Dynamics Corp., 60 F.3d 213, 216 (5th Cir.1995).

*2 Since the parties agree that the Plaintiff and Jon Ainsworth are both residents of Texas, Defendants are not alleging any fraud in Plaintiff's pleading of jurisdictional facts. Hence for Defendants to defeat Plaintiff's Motion for Remand, Defendants must establish that Plaintiff has no possibility of recovering against Jon Ainsworth under Texas law.

[3][4] In assessing a "no possibility of recovery" fraudulent joinder claim, the Court must evaluate all of the contested factual allegations in the light most favorable to the plaintiff. In addition, the Court must resolve any uncertainties concerning the current status of controlling state substantive law in favor of the plaintiff. See Sid Richardson, 99 F.3d at 751; Burden, 60 F.3d at 216. "After all disputed questions of fact and all ambiguities in the controlling state law are resolved in favor of the nonremoving party, the court determines whether that party has any possibility of recovery against the party whose joinder is questioned." Carriere v. Sears, Roebuck & Co., 893 F.2d 98, 100 (5th Cir.1990); see also Burden, 60 F.3d at 216.

[5][6] Although Defendants' burden is a heavy one, the court finds that Defendants here have carried it. To prove that Plaintiff cannot possibly recover against Mr. Ainsworth, Defendants point to Leitch v. Hornsby, 935 S.W.2d 114 (Tex.1996). The Texas Supreme Court there held that corporate employees have no independent duty to furnish a safe workplace, and therefore corporate employees cannot be held personally liable for the corporation's failure to provide a safe place to work. See id. at 120. Of particular significance for present purposes, the Leitch court explained that "individual liability arises only when the officer or agent owes an independent duty of reasonable care to the injured party apart from the employer's duty." Id. at 117 (emphasis added). Except for alter ego situations, "corporate officers and agents are subject to personal liability for their action within the employment context only when they breach an independent duty of care." Id.

Oblivious to the unambiguous language of this recent Texas Supreme Court case, Plaintiff asserts claims against Mr. Ainsworth, a managerial employee of the corporate owner of the premises. There are no allegations that Mr. Ainsworth owed Plaintiff any independent duty of reasonable care, apart from that which his employer owed any store patron. There are no allegations that Mr. Ainsworth committed any intentional torts or the like against Plaintiff. On the contrary, Plaintiff merely claims that Mr. Ainsworth was "negligent in allowing the defect to exist on the premises in Defendants' store." Hence Plaintiff simply alleges that Mr. Ainsworth is liable for some action plainly committed within the course and scope of his employment as a Sam's Club manager. In light of the controlling Leitch precedent, the joinder of Mr. Ainsworth for purposes of defeating diversity jurisdiction borders on being sanctionable.

*3 Accordingly, Defendant Ainsworth is hereby DISMISSED as a party to this action, WITH PREJUDICE. Plaintiff's Motion to Remand is DENIED. This action, now consisting of Plaintiff Jacqueline Palmer and Defendants Wal-Mart Stores, Inc. and Sam's Club, Inc. will most emphatically remain in this Court. The parties are ORDERED to file no further pleadings on these issues in this Court, including motions to reconsider or the like, and in due course the Court will enter a final judgement on the dismissed claim.

IT IS SO ORDERED.

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works




--- F.Supp.2d ----
(Cite as: 1999 WL 759804, *3 (S.D.Tex.))

Page    4

END OF DOCUMENT

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works



# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ANA AGUIRRE, et al., | § | |
| | § | |
| **Plaintiffs** | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. C-00-61 |
| | § | |
| CITGO PETROLEUM CORPORATION, | § | |
| et al., | § | |
| | § | |
| **Defendants** | § | |

## ORDER DENYING PLAINTIFFS' MOTION TO REMAND

The Court, having fully considered the Plaintiffs' Motion to Remand and Defendants' Opposition thereto, finds that this case involves diverse parties and an amount in controversy in excess of $75,000.

Accordingly, IT IS HEREBY ORDERED that Plaintiffs' Motion to Remand is DENIED.

SIGNED on this ___ day of _____ 2000.


_____
HONORABLE HAYDEN W. HEAD, JR.
UNITED STATES DISTRICT JUDGE

43256:915754.1:032700