**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

United States District Court
Southern District of Texas
FILED

AUG - 3 2000

Michael N. Milby, Clerk

| | | |
|---|---|---|
| ANA AGUIRRE, ET AL. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. C-00-61 |
| | § | |
| | § | |
| CITGO PETROLEUM | § | |
| CORPORATION, ET AL. | § | |
| | § | |
| Defendants. | § | |

### CITGO DEFENDANTS' MOTION TO STRIKE PLAINTIFFS' EXPERT, MR. RONALD A. BRITTON FOR LACK OF QUALIFICATIONS

Defendants CITGO Refining and Chemicals Company, L.P., CITGO Petroleum Corporation, and Mr. Alvin Prebula (collectively, "CITGO"), request that this court enter an order striking the expert opinion of Plaintiffs' designated expert, Mr. Ronald A. Britton, P.E., in accordance with Fed. R. Evid. 702 and 703, because he is not qualified as an expert in the field in which he offers his expert opinion, and in support, respectfully show:

### I.
### Background

This is a complex environmental release lawsuit for personal injuries and property damage. Plaintiffs claim damages from a release of hydrofluoric acid and various hydrocarbons into the air allegedly resulting from a fire at the CITGO refinery on May 12, 1997.

In accordance with this court's Memorandum and Order of February 23, 2000, CITGO challenges the qualifications of Plaintiffs' designated standard of care expert, Mr. Ronald A. Britton, P.E.

## II.
## Legal Standard

Pursuant to Fed. R. Evid. 702, a person may testify as an expert if that person is "qualified as an expert by knowledge, skill, experience, training, or education[.]" Further, the facts or data used by an expert must be "of a type reasonably relied upon by experts *in the particular field*[.]" Fed. R. Evid. 703 (emphasis added). The trial court's authority to limit expert testimony to that of a qualified expert in his or her *specific discipline* is specified by the Fifth Circuit: "The court should ensure that the [expert] opinion comports with applicable professional standards outside the courtroom and that it 'will have a reliable basis in the knowledge and experience *of [the] discipline.*'" *Watkins v. Telsmith, Inc.,* 121 F.3d 984, 991 (5th Cir. 1997) (emphasis added) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592 (1993)).

As shown below, Mr. Britton's experience, knowledge, and training are limited to the disciplines of exploration and production operations in the field for petroleum and gas. Mr. Britton is not an expert in the wholly different discipline of refining crude oil and further processing it in an alkylate facility. Yet, he offers opinions on the standard of care applicable to a petroleum refinery operation. Given that Mr. Britton is not competent or qualified in the refinery engineering discipline, it follows that he is not qualified to make a determination of the applicable standard of care and whether or not the data or facts he used to form his opinions are "of a type reasonably relied upon by experts *in the particular field*[.]" Fed. R. Evid. 703 (emphasis added).

## III.
## Bases to Disqualify Ronald A. Britton, P.E.

CITGO moves to strike the testimony of Plaintiffs' designated standard of care expert, Mr. Britton, because he lacks the requisite qualifications by education, training, and experience to offer an expert opinion on the standard of care applicable to, and conditions relating to the standard of care opinion he may offer about refinery operations generally and the alkylation process unit at issue in this litigation specifically.

1.    **Mr. Britton's opinions are dependant upon, and limited by his experience.**

In his expert report of July 18, 2000, Mr. Britton writes "my opinions are based on ... my education, training, and experience, in this type of operation, as outlined in my CV in Exhibit 'B.'" *See* Written Expert Report, attached and incorporated as Exhibit A, at 1-2. Mr. Britton goes on to offer 28 specific opinions and conclusions concerning CITGO's refinery operations and its alkylation unit relative to the May 12, 1997 alkylation unit fire at issue in this lawsuit. *See* Exhibit A, Written Expert Report, at 2-6. It is clear, from the face of Mr. Britton's report as well as the Federal Rules of Evidence governing expert opinions in court, that each and every opinion and conclusion offered by Mr. Britton will be dependent upon his experience as specifically applicable to refinery operations and operation of an alkylation unit of the type at issue in this lawsuit.

2.    **Mr. Britton is not qualified to offer opinions about refinery operations or alkylation unit operations within a refinery, relative to a standard of care.**

Mr. Britton's curriculum vitae, attached to his expert report and referenced by him as exemplifying the experience, training, and education on which he relies for his opinions about CITGO's refinery operations and alkylation unit fire of May 12, 1997, is devoid of any education, training, or experience in engineering in a petroleum refinery, petrochemical plant, or specifically in the operations of an alkylation processing unit utilizing hydrofluoric acid as a catalyst. *See* Curriculum Vitae of Ronald A. Britton, P.E., attached and incorporated as Exhibit

B; Affidavit of Kenneth Baker, attached and incorporated as Exhibit C. Mr. Britton's one-page curriculum vitae only references his experience in the field, limited to exploration and production operations for petroleum and gas resources "in the ground" or "down hole". *See* Exhibit B, CV of Mr. Britton; Exhibit C, Affidavit of Kenneth Baker. This is completely different and separate from the qualifications involved in refinery engineering which deal with the refining of crude oil and the further processing of it in an alkylation process unit such as that operated by CITGO and at issue in this lawsuit. *See* Exhibit C, Affidavit of Kenneth Baker. Prior testimony given by Mr. Britton as an expert in other cases clarifies this fact. *See, e.g.*, No. 73,487-B; *James E. Burke and Betty Burke v. Phillips Petroleum Co.*; In the 181st Judicial District Court of Potter County, Texas, statement of facts with excerpted testimony of Mr. Ron Britton, September 20-21, 1994, attached and incorporated as Exhibit D. This testimony confirms that Mr. Britton's experience in the field has been limited to engineering problems relating to oil and gas drilling operations, including deep wells. *See* Exhibit D, Mr. Britton's Trial Testimony, at 75-78. In fact, Mr. Britton's first consulting firm was limited to doing business transactions involving production wells, not refinery operations. *See* Exhibit D, Mr. Britton's Trial Testimony, at 78. Mr. Britton's manufacturing experience is not in crude refining operations, but in the fabrication and manufacture of drilling rigs. *See* Exhibit D, Mr. Britton's Trial Testimony, at 78-79. Finally, it is clear from the context of Mr. Britton's testimony, his certifications and experience with the Occupational Safety and Health Administration is in the context of the oil and gas drilling production industry. His expertise is in drilling, not refinery operations. *See* Exhibit D, Mr. Britton's Trial Testimony, at 81-82.

**3.     In order to be admissible, an expert's testimony must relate to "specific" experience relevant to issues at hand.**

The Fifth Circuit Court of Appeals has stated, in order to be relevant and admissible in trial, an expert's opinions and conclusions must relate to experience and education specific to matters in controversy. *See Allen v. Pennsylvania Engineering Corp.,* 102 F.3d 194, 196 (5th Cir. 1996).  Mr. Britton's experience, while impressive from the standpoint of petroleum and gas production in the drilling fields, is utterly unrelated to refinery operations generally and the operation of an alkylation process within a refinery which utilizes hydrofluoric acid as a catalyst. Mr. Britton's experience, education, and training are demonstrably irrelevant to, and fail to encompass, a standard of care applicable to the matters in controversy in the case at hand. Accordingly, Mr. Britton should be stricken as an expert, his testimony should be deemed inadmissible for any purpose, and any reference to his testimony, reports, or other matters relating to his designation as an expert should be excluded.

## IV.
### Prayer

FOR THESE REASONS, Defendants CITGO Refining and Chemicals Company, L.P., CITGO Petroleum Corporation, and Mr. Alvin Prebula pray for relief as follows:

1.     Entry of an order by this court striking Mr. Ronald A. Britton as a witness in this cause and precluding the Plaintiffs from the offer and admission of any evidence, either by direct testimony or by other matters presented as those upon which other properly designated experts purportedly rely, the origin of which is material provided by or through Mr. Britton, at any hearing, on any motion, or at time of trial, or in any other proceeding in this cause before the jury or otherwise.

2.      An award of attorney's fees, costs, and expenses for CITGO's preparation and prosecution of this motion.

3.      Such other and further relief at law and at equity to which it may be entitled.

Respectfully submitted,

AKIN, GUMP, STRAUSS, HAUER & FELD, L.L.P.

Jeffrey K. Sherwood, SBN 24009354*
Attorney-in-Charge
So. Dist. Texas. No. 21427
Akin, Gump, Strauss, Hauer & Feld, L.L.P.
1333 New Hampshire Avenue, N.W., Suite 400
Washington, D.C.  20036
(202) 887-4000
(202) 887-4288 (FAX)

\* Signed with permission

OF COUNSEL

Richard M. Parr, SBN 15534250
James S.E. Cowan, SBN 04912250
Brad Taylor, SBN 24008125

Akin, Gump, Strauss, Hauer & Feld, L.L.P.
711 Louisiana Street, Suite 1900
Houston, Texas 77002
(713) 220-5800
(713) 236-0822 (FAX)

Ralph F. Meyer, SBN 13994300
1700 Wilson Plaza West
606 N. Carancahua
Corpus Christi, Texas 78476
(361) 884-8808
(361) 884-7261 (FAX)

**ATTORNEYS FOR DEFENDANTS CITGO
REFINING AND CHEMICALS COMPANY,
L.P., CITGO PETROLEUM CORPORATION
and MR. ALVIN PREBULA**

## <u>CERTIFICATE OF SERVICE</u>

This will certify that a true and correct copy of the foregoing has been duly served on all counsel of record via certified mail, return receipt requested, on this 3rd day of August, 2000.

Richard M. Parr

# ROHILL

OPERATING COMPANY, Ltd.

SACRE, INC., General Partner
RONALD A. BRITTON, President

July 18, 2000

Mr. Michael G. Terry
The Edward Law Firm, L.L.P.
1400 Frost Bank Plaza
Corpus Christi, TX 78403-0480

Re:  Cause No. C-99-379; Acosta vs
Citgo Petroleum Corp.; In the
United States District Court for
the Southern District of Texas
Corpus Christi Division

Dear Mr. Terry:

This letter will be in answer to your request that I provide a written report
as to my opinions and conclusions in the above referenced case. This
report is specifically meant to cover the events that occurred on or about
On May 12, 1997, when a 6-inch pipe ruptured in the Alkylation Unit at
the Corpus Christi Citgo Refinery.  A fire and several explosions were
reported.  Significant quantities of toxic fumes were released, requiring
the evacuation of residents near the plant.

My opinions are based on the review of materials I have received and

**EXHIBIT "A"**

CITGO       8089
EX000001

A TEXAS LIMITED PARTNERSHIP

Rohill Building / 3100 North A, Suite 200 / Midland, Texas 79705-5360 / 915/686-0022 / Fax 915/686-2034

Mr. Michael G. Terry
Acosta vs Citgo Petroleum Corp.
July 18, 2000
Page 3

4.  Citgo Petroleum Corp.'s inspection and testing procedures was negligent in that it did not follow recognized and accepted engineering practices for verification of maintenance activities.

5.  Citgo Petroleum Corp. was negligent in failing to correct deficiencies in the process equipment that were outside acceptable limits.

6.  Citgo Petroleum Corp. was negligent in that it did not prepare an incident report which covered essential elements that contributed to this accident.

7.  Citgo Petroleum Corp. was negligent in starting the alkylation unit back up without proper incident reporting documentation to insure the problems had been corrected and to prevent the same catastrophe from happening again.

8.  Citgo Petroleum Corp. was negligent in that it did not develop energy control (lockout/tagout) procedures that clearly and specifically outlined the scope, purpose, authorization, rules and techniques to be utilized for the control of hazardous energy, and the means to enforce compliance.

9.  Citgo Petroleum Corp. was negligent in that it did not provide specific procedural steps for shutting down, isolating, blocking and securing pumps or equipment to control hazardous energy.

CITGO
EX000003

8089

Mr. Michael G. Terry
Acosta vs Citgo Petroleum Corp.
July 18, 2000
Page 4

10. Citgo Petroleum Corp. was negligent in that its lockout devices were not identifiable for the sole use for controlling energy only and not other purposes.

11. Citgo Petroleum Corp. was negligent in that its lockout and tagout devices were not standardized within the facility.

12. Citgo Petroleum Corp. was negligent in not providing retraining for all employees whenever there was a change in their job assignments, machines, equipment or processes or when there was a change of energy control procedures.

13. Citgo Petroleum Corp. may have been negligent in allowing non-authorized employees to provide service and maintenance to its equipment.

14. Citgo Petroleum Corp.'s authorized employees did not have a failure mode and effect analysis covering the isolation and deenergization of the equipment at the time of the incident. Therefore, there was no training to respond to this event.

15. Citgo Petroleum Corp.'s inappropriately isolating equipment was intensified by hazards encountered in this incident.

16. Citgo Petroleum Corp. allowed unauthorized employees to remove lockout/tagout devices that were put into place by another employee.

CITGO   8089
EX000004

Mr. Michael G. Terry
Acosta vs Citgo Petroleum Corp.
July 18, 2000
Page 5

17. Citgo Petroleum Corp. did not communicate to other contractors on their property about its lockout/tagout procedures.

18. Citgo Petroleum Corp. did not train their employees to affix a personal lockout/tagout device to the group lockout device when they were to begin work and to remove those services when they stopped working on the machine or equipment.

19. Citgo Petroleum Corp. was negligent for not repairing the six-inch pipe that failed as per its own recommendations and drawings.

20. Citgo Petroleum Corp. was grossly negligent for using improper maintenance and repair procedures with the alkylation unit; i.e., using jiffy clamps in several process lines.

21. Citgo Petroleum Corp. was negligent in failing to update its P&ID's from the 1995 turnaround of current changes, as a requirement for process safety management.

22. Citgo Petroleum Corp. failed to include explosion and fire hazard assessments, including defects of the fire fighting system, as required by process safety management.

23. Citgo Petroleum Corp. failed to properly instruct its employees in the proper use of SCBA's and other safety equipment, as Mr. Key talked about in his deposition.

CITGO
EX000005

8089

24. Citgo Petroleum Corp. violated OSHA standard 29 CFR 1910.119(j)(5) concerning equipment deficiencies.

25. Citgo Petroleum Corp. violated OSHA standard 29 CFR 1910.147 (c)(5)(ii) regarding energy control procedures.

26. Citgo Petroleum Corp. violated OSHA standard 29 CFR 1910.147 (f)(2)(i) concerning outside contractors.

27. Citgo Petroleum Corp. violated the General Duty Clause, Section 5 A.1 of the OSHA Act of 1970.

28. Citgo Petroleum Corp. has previously been cited by OSHA Inspection No. 110416880 and entered into an Informal Settlement Agreement to implement many changes in its process safety management procedures and process hazards analysis. Citgo failed to implement these agreed changes and this accident is one of the results. Due to Citgo's prior knowledge of these problems and its lack of concern, it is my opinion that Citgo Petroleum Corp. is guilty of gross negligence.

Any opinions expressed in this report are subject to change and revision pending my receipt and review of additional, pertinent materials. It is clear that many documents are missing and have not been furnished at this date. I do retain the right to alter, modify, change or add to these opinions and conclusions as further evidence becomes available on this case. I will, of course, reserve the unilateral right to amend my report

CITGO
EX000006      8089

Mr. Michael G. Terry
Acosta vs Citgo Petroleum Corp.
July 18, 2000
Page 7

at such time as that happens and I deem it necessary.

Sincerely,

Ronald A. Britton, P.E.
TX PE #29472
OK PE #11750
DABFE # 911
DABFET # 1261
SIPES #2730





RAB/lvh
Attachments







CITGO
EX000007                    8089

## RONALD A. BRITTON, P.E.

### CURRICULUM VITAE

Ronald A. Britton was born in El Paso, Texas on September 16, 1937 and was raised in Texas and Oklahoma. He worked for El Paso Natural Gas during summer periods from 1956 to 1958. In 1959 he worked as an optical and electrical engineer at White Sands Missile Range covering top secret missile shots. He graduated from Oklahoma State University in 1960 with a BS degree in Mechanical Engineering. In 1962 he was awarded his wings as a naval aviator. From 1962 to 1965 he served as a naval jet fighter pilot aboard several aircraft carriers and later served as an instructor in jet power plants and aerodynamics.

In 1965 he joined Texaco, Inc. as a Petroleum Engineer and held positions as Field Engineer, Area Engineer, Operations Assistant, Drilling Engineer, Equipment Engineer, and Reservoir Engineer with responsibilities including planning, design, drilling, and completions of 20,000-feet-plus deep gas wells. In 1968 he was hired as Drilling Engineer for Roden Oil Company and was responsible for the drilling of their deep gas wells. Beginning in 1970 he acted as Vice President and General Manager of J. C. Barnes Oil Company for their operations throughout the United States. In 1973 he started his own independent oil company and consulting firm. He was also the president of three other oil and gas companies, as well as serving as president of T.A.P.S., a plugging and abandonment company. In 1978 he became President and C.E.O. of Rohill Energy, Inc. and is now managing Rohill Operating Company, Ltd.

Mr. Britton is a registered Professional Petroleum Engineer in the states of Texas and Oklahoma and is a member of the following organizations: Society of Petroleum Engineers of AIME, Board Certified Forensic Examiner, FACFE and Diplomate of the American Board of Forensic Examiners, Aircraft Owners and Pilots Association, National Association of Property Owners, United States Industrial Council, Independent Petroleum Association of America, National Society of Professional Engineers, and the Mid-Continent Oil & Gas Association. He is a past board member of the International Association of Drilling Contractors, the Rotary Club, and past director and member of the finance committee of the Texas Research League. He has served as a Director of the Permian Basin Petroleum Association, as a Colonel in the Confederate Air Force, and has previously served two terms as board member and past Vice President of the Midland Independent School District. Mr. Britton has also served as Director of the Permian Basin Civic Ballet, as the regional chairman and member of the National Board of Trustees of the Palmer Drug Abuse Program, as Vice President of the Natural Gas Men's Association, and as a board member of the Midland Council on Alcoholism. He also is a member of the National Association of Corrosion Engineers, the Texas Society of Professional Engineers, the Four Mile Deep Club, the American Association of Petroleum Geologists, the Association of Energy Servicing Companies, the Permian Basin Petroleum Safety Group, the Texas Excavation Safety System, the American Society of Safety Engineers, the Society of Independent Professional Earth Scientists and is an approved OSHA consultant.

January 19, 2000

**EXHIBIT "B"**

CITGO
EX000011

8089

# AFFIDAVIT OF KENNETH BAKER

STATE OF TEXAS         §
                             §
COUNTY OF DALLAS     §

BEFORE ME, the undersigned authority, on this day appeared Kenneth Baker, who upon his oath stated the following:

1.      My name is Kenneth Baker. I am over the age of twenty-one (21). I have never been convicted of a felony or crime involving moral turpitude. I am personally knowledgeable of the facts stated herein and am qualified to make this Affidavit.

2.      I am a principal in the firm of Baker & O'Brien, a professional engineering consulting firm which provides a significant amount of consultation to the petroleum refining industry. I have personally consulted with respect to operations of petroleum refineries for a number of clients, including CITGO Petroleum Corporation's Corpus Christi refinery operation. Engineers employed with my firm have substantial professional experience in the petroleum refining industry, and specifically with alkylation unit design and operations within that industry.

3.      Petroleum engineering is significantly different than refinery engineering. Petroleum engineering qualifications and experience such as that exhibited by Mr. Britton's curriculum vitae and the accompanying trial testimony expounding upon his experience and qualifications have to do with exploration and production for petroleum and gas resources "in the ground" or "down hole" operations. Refinery operations in which the crude oil delivered from the wellhead by pipelines or other means is a different process which involves different engineering considerations and factors with respect to operations.

4.      I find no suggestion, reference or indication that Mr. Britton has ever worked in or studied petroleum refining operations from the face of his curriculum vitae which his report states exhibits the experience upon which he bases his opinions and conclusions as an expert in these lawsuits. Mr. Britton does not exhibit any petroleum refining background in the materials he presented in support of his expert report and the additional materials I have reviewed which provide more detail. Opinions dealing with the standard of care applicable to the appropriate operations of a petroleum refinery such as the CITGO Corpus Christi refinery and the alkylation unit within that refinery require Mr. Britton to demonstrate expertise in addition to that apparent from the face of his report, supporting materials including

**EXHIBIT "C"**

his curriculum vitae, and the experience exhibited through the direct testimony taken at the *Burke* trial, in order for him to render informed and reasonable opinions on the appropriate standard of care.

6.  From the materials I have been provided, it does not appear Mr. Ron Britton exhibits the appropriate and necessary minimal qualifications to render informed, professional appropriate opinions about the standard of care applicable to refinery operations generally, or the operations of the CITGO Corpus Christi refinery in particular.

FURTHER AFFIANT SAYETH NOT.

Kenneth Baker

SUBSCRIBED AND SWORN TO BEFORE ME on this ___ day of August, 1998.

Notary Public in and for
The State of T E X A S

CONNIE MILLER
NOTARY PUBLIC
State of Texas
Comm. Exp. 10-25-2000

2

1                          NO.   73,487-B

2

3     JAMES E. BURK AND           *    IN THE 181ST DISTRICT COURT

4     BETTY BURK

5     VS.                          *    IN AND FOR

6     PHILLIPS PETROLEUM CO.,

7     PHILLIPS 66 NATURAL GAS CO.,

8     AND RICHARD EARLS            *    POTTER  COUNTY, TEXAS

9

10

11

12

13            EXCERPTED TESTIMONY OF MR. RON BRITTON

14                   September 20 and 21, 1994

15

16

17

18

19

20

21

22

23    BRENDA GOUGE

24    CERTIFIED SHORTHAND REPORTER

25    AMARILLO, TEXAS   79101

**EXHIBIT "D"**

1                          NO.  73,487-B

2     JAMES E. BURK AND           ( IN THE 181ST DISTRICT COURT

3     BETTY BURK

4     VS.                         ( IN AND FOR

5     PHILLIPS PETROLEUM CO.,

6     PHILLIPS 66 NATURAL GAS CO.,

7     AND RICHARD EARLS           ( POTTER COUNTY, TEXAS

8

9

10                              APPEARANCES:

11

12

13

14                         HON. SAMUEL C. KISER

15                         181st District Court
                           Potter County Courthouse
16                         Amarillo, Texas  79101

17     JUDGE PRESIDING.

18

19                         MR. JOHN LOVELL
                           Attorney at Law
20                         7th & Pierce
                           Amarillo, TX  79101

21     FOR THE PLAINTIFF

22

                           MR. TOM RINEY
23                         MS. SUSAN HEADY
                           Attorneys at Law
24                         Amarillo, TX 79101

25     FOR THE DEFENDANTS

```
 1                    (Jury returned to the courtroom.)

 2

 3

 4              MR. LOVELL:  Call Ron Britton.  (Witness

 5         sworn.)

 6

 7                       RON BRITTON

 8    having been duly sworn, testified upon the oath as follows:

 9

10                    DIRECT EXAMINATION

11

12    BY MR. LOVELL:

13

14    Q    Would you tell us your name, please, sir.

15    A    Ron Britton.

16    Q    Where do you live?

17    A    Midland, Texas.

18    Q    I would like to know a little about your background.

19         First, where did you go to high school?

20    A    Mr. Lovell, that is a little difficult.  My father

21         was in the military, I went to seventeen different

22         schools.  I ended up at the Santa Ana Air Base in

23         Santa Ana, California my senior year.

24    Q    Do you have any college training?

25    A    Yes, sir.
```

73

| 1 | Q | What is that? |
|---|---|---|
| 2 | A | I have a Bachelor of Science degree from what used |
| 3 | | to be Oklahoma A & M. |
| 4 | Q | What year? |
| 5 | A | In 1960. |
| 6 | Q | After getting your degree -- well, first, did you |
| 7 | | are enter the military? |
| 8 | A | Yes, sir, I went the into the United States Navy in |
| 9 | | -- I believe it was May of 1960. |
| 10 | Q | What did you do while you were in the Navy? |
| 11 | A | When I first went in, I had an engineering degree |
| 12 | | from Oklahoma State University, now, and I went in |
| 13 | | the United States Navy as what they called a line |
| 14 | | officer, aboard ship.  Went through shipboard |
| 15 | | training, and became an ensign in the Navy.  Then |
| 16 | | shortly after, I wanted to get into pilot training |
| 17 | | and I took the exam and was accepted to go to |
| 18 | | Pensacola, Florida and enter flight training, which |
| 19 | | I did. |
| 20 | Q | Did you complete the flight training? |
| 21 | A | Yes, sir, I did. |
| 22 | Q | What did you do with your flight training, once you |
| 23 | | got through there.  What did you fly? |
| 24 | A | Well, I went through, of course, all the different |
| 25 | | planes and ended up in advanced jet training, ended |

74

1           up going to Cecil Field in Jacksonville, Florida to

2           what they call a replacement air group, where you

3           get trained in a specific plane and get your

4           qualifications, and I was flying the F-8U crusader,

5           a high performance Navy fighter.

6     Q     Did that operate off aircraft carriers?

7     A     They didn't operate off it, but very shortly after

8           that, we had a small crisis and I was transferred to

9           a fighter squadron in Virginia Beach, Virginia and

10          was stationed aboard the brand new nuclear carrier,

11          enterprise.

12    Q     When did you leave the military?

13    A     September 16, 1965, my birthday.

14    Q     What did you do after you got out of the military?

15    A     I went to work -- I wanted to get into the oil

16          business, because in the summers in the fifties, I

17          had worked for some oil companies, and I had a job

18          offer to go to work for Texaco, in Midland, Texas as

19          an area engineer, and I took that job.

20    Q     What did you do as an area engineer for Texaco?

21    A     We had a geographical area of about, I don't know

22          how many square miles.  It went from Midland clear

23          over to the other side of -- to El Paso and down

24          south almost to Laredo, so we had about a thousand

25          oil and gas wells of all different kinds.  Water

1        floods, drilling wells, producing wells, and my job

2        was to be the area engineer in that area, and work

3        on the engineering technical problems.

4    Q   How long did you work as an engineer for Texaco?

5    A   Little over a year and a half, nearly two years.

6    Q   You are now a registered --  or, I'm sorry,

7        Certified Professional Engineer?

8    A   Yes, sir.  What happens after you work for five

9        years in the business, you can take an exam or be

10       granted a grandfather clause by experience, and get

11       what they call your registered P.E., you get to put

12       the initials P. E. behind your name, so you are a

13       registered professional engineer both in the state

14       and locally.

15              And I am now registered in Texas I was

16          registered in Texas, in, I believe, 1968, then I

17          was registered later in the state of Oklahoma, so

18          I'm currently registered in Oklahoma and Texas as

19          a registered professional engineer.

20   Q   What was your next job after leaving Texaco?

21   A   Went to work for a company called Roden Oil Company,

22       who had a large contract with Williams Pipeline out

23       of Tulsa to drill and explore for deep high pressure

24       gas wells, they were looking for one well to make

25       thirty million a day, and we drilled wells all over

76

Case 2:00-cv-00061 Document 17 Filed in TXSD on 08/03/2000 Page 23 of 30

```
 1            New Mexico, Texas, Oklahoma, and even down into the

 2            deep wells in Mississippi.

 3      Q     The well in Mississippi, did it have any hydrogen

 4            sulphide in it?

 5      A     Yes, sir, we had hydrogen sulphide in the wells I

 6            operated, but down there it was extremely bad,

 7            because the wells were fifty percent hydrogen

 8            sulphide, half of the gas, and that is the

 9            equivalent of 500 parts per million so it was very,

10            very bad.

11      Q     As a point of contrast, the Witherbee wells, the

12            casinghead gas, what is that part per million?

13      A     The H-9 file shows 10,714 which is about one

14            percent, so it is about one percent, these wells

15            were fifty percent.

16      Q     How long did you work in that drilling business?

17      A     Well, I really worked with it for the next fifteen

18            or twenty years for different companies, we drilled

19            down there for different companies after I left

20            Roden, and drilled other wells down there for other

21            companies in the same area.

22      Q     Did you later work with J. C. Barnes Oil Company?

23      A     Yes, sir, I went to work for J. C. Barnes Oil

24            Company and became their vice president and general

25            manager and head of their engineering department,
```

1       because they didn't have an engineer at that time,

2       they were a small company, and we drilled wells in

3       Canada, Nigeria, some in the North Sea.  Had some

4       interests with other companies in Australia, and

5       then mainly drilled our wells in New Mexico,

6       Oklahoma, some in Montana, New Mexico, Mississippi.

7   Q   What other businesses have you been involved in

8       since J. C. Barnes?

9   A   About the early 1970's I formed my own company to be

10      a consulting firm.  I wanted to get into the oil and

11      gas business myself, felt like I had the training,

12      so I started a company called Britton Management

13      Corporation, and I continued to do the consulting

14      work for Barnes Oil Company and for other people to

15      help pay to get me started in the business, and

16      started to try to put together deals, drill wells

17      myself anywhere I could or take an interest in them

18      to get in the oil and gas business.

19  Q   Have you been involved in any businesses that built

20      oil drilling rigs?

21  A   Yes, sir.  In the late seventies, we had a real

22      shortage, the oil crunch hit, and the oil embargo

23      started coming in, and we couldn't find drilling

24      rigs, so I formed Britton Industries Drilling, and I

25      started building and manufacturing my own drilling

1        rigs.

2                        In other words, I designed and built

3        them from scratch, we designed the rigs and built

4        them, and then would either sell the rigs and keep

5        them until we had between three and six rigs

6        operating under Britton Industries Drilling, both

7        for our own account and drilling for other major

8        oil companies.

9    Q   As a consultant in the last few years, what type of

10       work have you done that is H2-S related?

11   A   Of course it started out with the wells in

12       Mississippi, because those were -- and one thing I

13       don't want to mislead anybody.  Anything over a

14       thousand parts per million kills you.  Really over

15       about 700.  Anything from there up it is more

16       deadly, it is still bad, but those wells down there

17       were so high in percentages, that we had extremely

18       strong problems down there with it.  And I got my

19       first training in H2-S, although I had been

20       certified with Texaco, because they had rules you

21       had been certified in blow- out prevention and toxic

22       gases on a yearly basis.

23   Q   And you maintain that certification?

24   A   Not 100% of the time.  In the late eighties, I got

25       out of the drilling business, in '86, sold all the

79

1          drilling rigs, they weren't worth much anyway, but

2          got about out of that had business and started doing

3          more office type work, where I would go out on

4          wells.

5                    So I let it lapse a a few years, then I

6               renewed it in '88 or '89, but I am currently

7               certified today, which I did primarily to go visit

8               the Witherbee lease again.

9     Q    What did you make on your test?

10    A    I got a 100 on it.

11    Q    And can you describe generally the topics you intend

12         to testify to here today as far as the subject

13         matter?

14    A    Yes, sir, I think it is important both you and the

15         Court and the jury understands the problems that

16         happen down on a lease.

17                   The Railroad Commission Rule 36 is very

18              critical because that is the governing rule

19              specifically made to handle hydrogen sulphide gas.

20              The equipment on the lease, the meter charts,

21              about how the system works, I think is very

22              important for the jury to understand so they can

23              make that decision based on some facts, because

24              there is a lot of misinformation going around.

25              Training requirements are very critical, the

```
 1              warning signs.  Those all tie together.

 2     Q        Have you studied the maintenance of equipment at the

 3              Witherbee lease and Phillips?

 4     A        Yes, sir, that is what I was talking about.  The

 5              equipment.

 6     Q        Do you have any certification from OSHA?

 7     A        Yes, sir, I do.

 8     Q        What is your certification?

 9     A        About three or four years ago, OSHA called me and

10              asked me if I would represent them in their

11              hearings, and I went through some exams with their

12              district officer down in Corpus Christi, and it

13              really more was informal meetings.

14                   They looked at my credentials as a P.E.,

15                met with me on two occasions in Dallas. and they

16                certified me to represent them in the OSHA

17                requirements and rules of the federal government.

18                And I did represent them, then, later in some

19                citations and litigations matters concerning OSHA

20                violations.

21     Q        Can you explain briefly to the jury what OSHA has to

22              do with the oil and gas industry?

23     A        OSHA is the occupational safety and health

24              administration, and they were set up by law in the

25              early days, when they set up under the Department of
```

1       Labor the OSHA organization.  And then they wrote

2       rules they published in the Federal Register, made

3       rules that apply to most of the industries.

4               They started out with construction

5       industries, manufacturing, different industries,

6       and they wrote rules and regulations and published

7       them, they gave federal guidelines and standards

8       that are minimums that they think you should

9       follow, and safety rules about it.

10              They also have, in some states, they

11      have a state agency, that mirrors them.  In Texas

12      they do not.  In New Mexico, they do.  And they

13      also then issue, it used to be if five people were

14      hospitalized or one person killed, the employer

15      had to file a report within 48 hours.  They have

16      now brought that down, if there is one person

17      killed or three people injured, you have to notify

18      them in under twenty-four hours.  So they can come

19      out and make an investigation.  And they actually

20      issue citations or, like a ticket, if you would,

21      against whoever they feel is responsible at the

22      site.

23  Q   Let's direct our attention to Rule 36 and the

24      Railroad Commission.  First, if you would tell us,

25      what the --  what is the Texas Railroad Commission

82

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| ANA AGUIRRE, ET AL. | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. C-00-61 |
| | § | |
| | § | |
| CITGO PETROLEUM | § | |
| CORPORATION, ET AL. | § | |
| | § | |
| **Defendants.** | § | |

## ORDER

On this _____ day of _____, 2000, this court considered CITGO Defendants'

Motion to Strike Plaintiffs' Expert, Mr. Ronald A. Britton for Lack of Qualifications. This court,

having considered the pleadings, oral arguments, and evidence filed herein, is of the opinion that

Plaintiffs' designated expert, Mr. Ronald A. Britton, P.E., should be stricken as a witness in this

cause of action because he lacks the qualifications necessary to provide an expert opinion with

respect to the disciplines in which he purports to opine.

It is therefore ORDERED that Mr. Ronald A. Britton is stricken as a witness in this cause

of action.

It is further ORDERED that Plaintiffs are precluded from the offer and admission of any

evidence, either by direct testimony or by other matters presented as those upon which other

properly designated experts purportedly rely, the origin of which is material provided by or

through Mr. Britton, at any hearing, on any motion, or at time of trial, or in any other proceeding

in this cause before the jury or otherwise.

007506.0051 HOUSTON 158216 v1

It is further ORDERED that Plaintiffs shall award the CITGO Defendants the sum of _____ as an award of attorneys' fees, costs, and expenses for the CITGO Defendants' preparation and prosecution of this motion.

SIGNED on this _____ day of _____, 2000.

_____
JUDGE PRESIDING